**Nos. 26-4450, 26-4454**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

WASHINGTON DEPARTMENT OF HEALTH,
*Plaintiff–Appellee,*

v.

THE GEO GROUP, INC.,
*Defendant–Appellant.*

THE GEO GROUP, INC.,
*Plaintiff–Counter-Defendant–Appellant,*

v.

ROBERT W. FERGUSON, NICHOLAS W. BROWN,
*Defendants–Counter-Claimants–Appellees.*

On Appeal from the U.S. District Court, W. District of Washington
The Honorable Benjamin H. Settle
Case Nos. 3:24-cv-05639-BHS, 3:23-cv-05626-BHS

**APPELLANT'S OPENING BRIEF**

Harry J.F. Korrell
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA 98104
(206) 757-8030
harrykorrell@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Ste. 500-E
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Scott Schipma
THE GEO GROUP, INC.
4955 Technology Way
Boca Raton, FL 33431
(561) 999-7615
scott.schipma@geogroup.com

*Attorneys for The GEO Group, Inc.*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iv

GLOSSARY .......... xi

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

ISSUES PRESENTED .......... 4

PROVISIONS INVOLVED .......... 5

STATEMENT .......... 5

A. The federal government's controls over immigration policy and immigration facilities .......... 5

B. The Northwest ICE Processing Center .......... 6

C. Washington targets the ICE Facility for state inspections .......... 8

1. HB 1470 .......... 9

2. HB 1232 .......... 10

3. Attempted inspections under RCW 43.70.170 .......... 11

D. The district court's July 2026 preliminary injunctions .......... 14

E. These appeals .......... 17

STANDARD OF REVIEW .......... 18

SUMMARY OF THE ARGUMENT .......... 18

ARGUMENT .......... 24

**TABLE OF CONTENTS (continued)**

**Page**

I. The District Court Failed To Apply The Correct Standard For Mandatory Preliminary Injunctions. .................................... 24

II. The State Cannot Show Likelihood Of Success On The Merits. .................................................................................. 26

A. Rule 19 requires dismissal of all claims on which the district court entered the preliminary injunctions............... 27

1. ICE is a required party under Rule 19(a)(1)(A) because complete relief cannot be granted by enjoining GEO alone. ................................................. 28

2. ICE is a required party under Rule 19(a)(1)(B)(i) because of its interest in whether the State can access a secure ICE facility......................................... 33

3. ICE is a required party under Rule 19(a)(1)(B)(ii) because proceeding in its absence exposes GEO to inconsistent obligations. ............................................. 39

4. Joinder of ICE is infeasible because the United States has not waived sovereign immunity................. 40

5. Dismissal is required under Rule 19(b)........................ 41

6. Rule 19's public-rights exception to dismissal does not apply........................................................... 46

B. The State is unlikely to succeed on its claims because the inspection statutes violate the principle of intergovernmental immunity............................................... 47

1. Both disputed inspection statutes directly regulate the federal government, via GEO. ................ 49

**TABLE OF CONTENTS (continued)**

**Page**

2. RCW 70.395.050(2)(b) also discriminates against the federal government, via GEO. ....... 56

C. GEO is likely to prevail on its *Yearsley* defense. ....... 61

III. The Other *Winter* Factors Also Favor GEO ....... 67

IV. The Injunctions Violate Rule 65(d). ....... 70

CONCLUSION ....... 73

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ....... 75

CERTIFICATE OF SERVICE ....... 76

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alto v. Black*,
738 F.3d 1111 (9th Cir. 2013) .......... 20, 29, 30, 46

*Am. Greyhound Racing, Inc. v. Hull*,
305 F.3d 1015 (9th Cir. 2002) .......... 35

*Amir v. Five Unnamed U.S. Immigr. Enf't & Custom Offs. in Vancouver Int'l Airport*,
2010 WL 2402910 (W.D. Wash. Mar. 30, 2010) .......... 40

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 5, 6, 34

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .......... 47, 49, 53, 56

*California v. Azar*,
950 F.3d 1067 (9th Cir. 2020) (en banc) .......... 18

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) .......... 22, 62, 65

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 30

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*,
928 F.2d 1496 (9th Cir. 1991) .......... 36

*CP Nat'l Corp. v. Bonneville Power Admin.*,
928 F.2d 905 (9th Cir. 1991) .......... 29, 30

*Dawavendewa v. Salt River Project Agr. Improvement & Power Dist.*,
276 F.3d 1150 (9th Cir. 2002) .......... *passim*

## TABLE OF AUTHORITIES (continued)

**Page**

*De Canas v. Bica*,
424 U.S. 351 (1976) .......... 5

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 20, 40, 41

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*,
932 F.3d 843 (9th Cir. 2019) .......... 28

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) .......... 31

*DISH Network Corp. v. F.C.C.*,
653 F.3d 771 (9th Cir. 2011) .......... 67

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......... 41

*Fiallo v. Bell*,
430 U.S. 787 (1977) .......... 33

*Garcia v. Google*,
786 F.3d 733 (9th Cir. 2015) (en banc) .......... *passim*

*GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025), *reh'g denied*,
166 F.4th 1188 (2026), *and pet. for cert. filed*,
No. 26-71 (U.S. July 16, 2026) .......... *passim*

*GEO Grp., Inc. v. Inslee*,
720 F. Supp. 3d 1029 (W.D. Wash. 2024), *vacated and remanded*, 151 F.4th 1107 (9th Cir. 2025) .......... 9

*GEO Grp., Inc. v. Menocal*,
607 U.S. 438 (2026) .......... 22, 62, 65, 66

**TABLE OF AUTHORITIES (continued)**

**Page**

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 53

*Goldie's Bookstore, Inc. v. Sup. Ct. of State of Cal.*,
739 F.2d 466 (9th Cir. 1984) .......... 69

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .......... 47

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) .......... 22, 62, 64, 67

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 33, 34

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 5, 49, 53, 55

*Kescoli v. Babbitt*,
101 F.3d 1304 (9th Cir. 1996) .......... 46

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) .......... 47, 49

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) .......... 24, 25

*Maverick Gaming LLC v. United States*,
123 F.4th 960 (9th Cir. 2024) .......... 28, 42

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 21, 49, 53, 54

*Minnesota v. United States*,
305 U.S. 382 (1939) .......... 40

## TABLE OF AUTHORITIES (continued)

**Page**

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 30

*NGV Gaming, Ltd. v. Upstream Point Molate, LLC*,
355 F. Supp. 2d 1061 (N.D. Cal. 2005) .......... 31

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 21, 47

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) .......... 51, 52

*Ohio v. Thomas*,
173 U. S. 276 (1899) .......... 5

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) .......... 68

*Pub. Utils. Comm'n of Cal. v. United States*,
355 U.S. 534 (1958) .......... 49

*Quileute Indian Tribe v. Babbitt*,
18 F.3d 1456 (9th Cir. 1994) .......... 39, 40

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) .......... 68

*Rep. of Philippines v. Pimentel*,
553 U.S. 851 (2008) .......... *passim*

*RMS NA, Inc. v. RMS (Aus) Pty Ltd.*,
2024 WL 4495515 (S.D. Cal. Oct. 15, 2024) .......... 68

*RunItOneTime LLC v. United States*,
146 S. Ct. 98 (2025) .......... 42

## TABLE OF AUTHORITIES (continued)

**Page**

*Ry. Mail Ass'n v. Corsi*,
326 U.S. 88 (1945) .......... 21, 49, 51

*Truax v. Raich*,
239 U.S. 33 (1915) .......... 34

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 33

*U.S. Postal Serv. v. City of Berkeley*,
228 F. Supp. 3d 963 (N.D. Cal. 2017) .......... 60, 61

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 51

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 48, 56, 58

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .......... 49, 53

*United States v. O'Brien*,
391 U.S. 367 (1968) .......... 61

*United States v. Washington*,
596 U.S. 832 (2022) .......... 56

*Wash. Dep't of Health v. GEO Grp., Inc.*,
2025 WL 2986482 (9th Cir. Oct. 23, 2025) .......... 13, 26, 48,

*White v. Univ. of Cal.*,
765 F.3d 1010 (9th Cir. 2014) .......... 2, 20, 28, 42

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... *passim*

## TABLE OF AUTHORITIES (continued)

**Page**

*Yearsley v. W.A. Ross Constr. Co.*,
309 U.S. 18 (1940) ........ *passim*

### Constitutional Provisions

U.S. Const. Art. I, § 8, Cl. 4 ........ 5

### Federal Statutes

6 U.S.C.
§ 112 ........ 6, 41, 52, 63
§ 205 ........ 36, 63
§ 251 ........ 6, 63
§ 252 ........ 34, 63

8 U.S.C.
§ 1225 ........ 34, 41
§ 1226 ........ 34, 41
§ 1231 ........ 6, 22, 34, 52, 63

28 U.S.C.
§ 530C ........ 6, 22, 41
§ 1292 ........ 4
§ 1331 ........ 4
§ 1442 ........ 12

### State Statutes

HB 1232, 69th Leg., Reg. Sess. (Wash. 2025) § 1(6) ........ 10

RCW
43.70.170 ........ *passim*
70.395.010 ........ 9
70.395.040 ........ 57
70.395.050 ........ *passim*
71.12.455 ........ 60

**TABLE OF AUTHORITIES (continued)**

**Page**

## Regulations

WAC 246-215 .......... 32
WAC 246-322-025 .......... 59
WAC 246-322-030 .......... 59, 60
WAC 246-337-005 .......... 59
WAC 246-337-021 .......... 59

## Rules

Fed. R. Civ. P.
12 .......... 20, 27, 47
19 .......... *passim*
65 .......... *passim*

# GLOSSARY

| **Item** | **Definition** |
|---|---|
| **Department of Health *or* Department *or* DOH** | Washington State Department of Health |
| **DHS** | United States Department of Homeland Security |
| **Field Office *or* ICE Field Office *or* ERO Field Office** | The ICE Enforcement and Removal Operations Field Office in Seattle, Washington |
| **GEO** | The GEO Group, Inc. |
| **ICE** | U.S. Immigration and Customs Enforcement |
| **ICE Facility *or* NWIPC** | The Northwest ICE Processing Center in Tacoma, Washington |
| **NDS 2025** | ICE National Detention Standards 2025. |
| **OIDO** | The Office of the Immigration Detention Ombudsman, part of DHS |

## INTRODUCTION

This is a dispute between the State of Washington and the United States. The State disagrees with the federal government's immigration policy and has weaponized state law and state agencies to hinder it. But the State has no power to impose its preferences on the United States in an area—immigration—committed to the federal government's exclusive authority. The State seeks access to a federal facility operated under contract by The GEO Group, Inc. (GEO) but fundamentally controlled by U.S. Immigration and Customs Enforcement (ICE). ICE has repeatedly denied that access. The State cannot sue ICE because it has sovereign immunity—so the State brought claims against GEO, asking the federal courts to force GEO to give it the access that ICE would not. Those claims must fail, and the injunctions effecting them must be vacated.

The district court swept aside the sworn testimony of the ICE officer who oversees the facility that it is ICE—not GEO—that controls access to the facility, and that it was ICE—not GEO—that denied the State access. Every ruling based on that error collapses.

To start, the district court applied the wrong standard in granting the appealed preliminary injunctions. The injunctions are "mandatory."

Rather than preserving the status quo, they compel GEO to take action—admit state inspectors to the facility over ICE's objections. The district court wrongly applied the less-onerous standard applicable to "prohibitory" injunctions. This Court can vacate on that basis alone.

In any event, the injunctions fail no matter the standard applied. Most importantly, the State cannot show the likelihood of success on the merits required by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). ***First***, ICE is a necessary party under Federal Rule of Civil Procedure 19(a), but joinder is infeasible under principles of sovereign immunity. In these circumstances, a "wall of circuit authority" compels dismissal. *White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014). ***Second***, the State inspection laws violate the intergovernmental immunity doctrine by directly regulating and discriminating against a federal detention operation. Those laws require GEO to admit State inspectors to secure areas of the ICE Facility over the denial of its federal custodian, substituting the State's judgment for ICE's on a core federal operational question: who may enter a federal detention facility. ***Third***, GEO cannot be held liable, and thus the injunctions must be vacated under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). A

federal contractor is not liable for conduct directed by the federal government subject to a program validly authorized by Congress. *Id.* at 20–21. The district court misapplied *Yearsley* to require GEO to identify a *specific* law expressly authorizing ICE to deny access to the ICE Facility. That is not the law.

The other *Winter* factors—irreparable harm, balance of equities, and the public interest—also mandate vacating the preliminary injunctions. Those injunctions inflict irreparable harm on GEO by forcing GEO to risk breaching its contract with ICE, which has ultimate control over facility access, and placing GEO in the midst of a fight between the federal government and the State of Washington. The State cannot show any imminent harm that the injunctions would relieve, nor that the public interest is benefited by ignoring the federal government's commands.

Finally, even if *a* preliminary injunction might be warranted here, the injunctions as ordered violate Federal Rule of Civil Procedure 65(d), which requires that every injunction "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). Here, the district court's injunctions lack the

detail necessary for GEO to determine what conduct is required to comply lawfully with those orders.

## JURISDICTIONAL STATEMENT

The district court has original jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over interlocutory appeals of preliminary injunction orders under 28 U.S.C. § 1292(a)(1). The district court entered the appealed preliminary injunction orders on July 9, 2026. 1-ER-2–33. GEO filed its notices of appeal on July 13, 2026. 4-ER-789–94.

## ISSUES PRESENTED

1. Whether the district court failed to apply the heightened standard for entering a mandatory injunction and failed to state with sufficient specificity the actions mandated by the preliminary injunctions?

2. Whether the case against GEO must be dismissed under Federal Rule of Civil Procedure 19 and *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), because ICE is the necessary, indispensable party that controls access to the ICE Facility?

3. Whether the preliminary injunctions must be vacated because they force GEO to comply with state laws that violate intergovernmental immunity by directly regulating or discriminating against a federal detention operation?

4. Whether GEO, as a federal contractor, can be held liable for conduct expressly authorized and directed by the U.S. Government notwithstanding the contrary rule announced in *Yearsley*?

## PROVISIONS INVOLVED

Pertinent constitutional provisions, statutes, regulations, and rules are reproduced in the separately bound addendum.

## STATEMENT

### A. The federal government's controls over immigration policy and immigration facilities

Under our constitutional system, the "Power to regulate immigration is unquestionably exclusively a federal power." *De Canas v. Bica*, 424 U.S. 351, 354 (1976). In the words of the Constitution, Congress is empowered "[t]o establish an uniform Rule of Naturalization." U.S. Const. Art. I, § 8, Cl. 4; *Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (citing Art. I, § 8, Cl. 4 and the federal government's "inherent power as sovereign to control and conduct relations with foreign nations" as basis of "broad, undoubted power over" immigration). Federal officers, including those executing federal immigration policy, are "not 'subject to the jurisdiction of the State in regard to those very matters of administration which are … approved by Federal authority.'" *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (quoting *Ohio v. Thomas*, 173 U. S. 276, 283 (1899)).

One aspect of that federal control over immigration is that the federal government controls federal immigration detention facilities. *See Arizona*, 567 U.S. at 394–97, 409 ("the removal process is entrusted to the discretion of the Federal Government"). Congress has assigned to the Secretary of Homeland Security—and through him the U.S. Immigration and Customs Enforcement (ICE), a part of the Department of Homeland Security—the authority to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g)(1); *see also* 6 USC § 251; 28 U.S.C. § 530C(a)(4).

ICE is specifically authorized to enter contracts with private entities for places to detain immigrants pending removal. 6 U.S.C. § 112; *see also* 28 U.S.C. § 530C(a)(4). As of January 6, 2025, approximately 86% of people detained by ICE were held in facilities operated by private entities under contract with ICE. *See* https://perma.cc/U3HE-FAU9.

### B. The Northwest ICE Processing Center

The Northwest ICE Processing Center in Tacoma, Washington (the ICE Facility), is a secure federal immigration detention facility housing detainees in ICE custody. The GEO Group, Inc., operates the ICE Facility under contract on behalf of ICE. 3-ER-468–69.

ICE personnel are "on-site to monitor contract performance and manage other government interests associated with the operation of the federal facility." 3-ER-473. Among the on-site personnel is ICE's Assistant Field Office Director, who supervises GEO and the facility and is responsible for facility access. 4-ER-645–46 ¶¶ 4–10. There are approximately 60 ICE staff at the facility. 3-ER-474 (§ 5.5.)

The contract between ICE and GEO requires GEO to comply with ICE's National Detention Standards (NDS 2025), 3-ER-472, and myriad other federal standards, 3-ER-472–73 (§§ 5.1–5.3). ICE monitors GEO's compliance with these standards via both daily inspections and other inspections. *See* 3-ER-471 (§ 4) ("DHS, ICE, federal entities, and ICE-approved third-party inspectors (e.g., contracted support for conducting inspections) will conduct scheduled and unscheduled audits and inspections of performance"); *see also* 3-ER-472 (§ 5.1) ("For safety, security, and sanitation purposes, an inspection of housing areas shall be conducted by a supervisor at a minimum of once per shift," and "shall be logged into the security logbook and available for review" by an "ICE official").

Under the ICE-GEO contract, GEO generally has "control [of] all designated points of ingress and egress on the site," including to the "medical facilities." 3-ER-484(§ 12.1). But the contract reserves to ICE ultimate authority over any access to the facility. "[F]inal authority and control over access to the secure portions of" the facility is exercised by the responsible federal officer. 4-ER-646 ¶ 10; *see also* 3-ER-473 (§ 5.3). (requiring GEO itself to obtain access permission from ICE for areas of the facility); 3-ER-537 (§ 40.0) (section titled "ICE … Control Over Facility Access"; requires ICE "[p]re-clearance approvals … for access to ICE field staff, facilities and information.").[1]

### C. Washington targets the ICE Facility for state inspections

The State of Washington has repeatedly targeted the ICE Facility for inspections, despite the federal government's control of that facility—including by enacting two new laws targeting that facility.

[1] *See also id.* (providing that "[p]ublic contact is prohibited unless authorized in advance by [ICE]," and defining "Public contact" as "any visits with outsiders[] not sanctioned by ICE," including visits by "state and local governmental agencies."). Before visits, written requests "must be submitted in writing to the local ICE/ERO Field Office *supervising the facility* or the ICE Office of State, Local and Tribal Coordination." *Id.* (emphasis added).

### 1. HB 1470

In May 2023, Washington enacted Engrossed Substitute House Bill 1470 (HB 1470), codified in relevant part at RCW 70.395. HB 1470 purported to impose inspection and operational requirements on "private detention facilities." RCW 70.395.010(1). But as initially adopted, the statute applied to just one facility in the state—the ICE Facility in Tacoma. HB 1470 also included a provision—codified at RCW 70.395.050(2)(b)—authorizing the Department of Health to inspect the ICE Facility in response to complaints it may receive that relate in *any* way to the ICE Facility.

In July 2023, GEO filed an action challenging the constitutionality of HB 1470. *GEO Grp., Inc. v. Inslee*, 3-23-cv-05626 (W.D. Wash. July 13, 2023), ECF No. 1. The district court concluded that because the law imposed burdens only on the ICE Facility and not other similarly situated facilities, the law was discriminatory, violated intergovernmental immunity, and violated the Supremacy Clause. Accordingly, the court preliminarily enjoined portions of the law. *GEO Grp., Inc. v. Inslee*, 720 F. Supp. 3d 1029 (W.D. Wash. 2024), *vacated and remanded*, 151 F.4th 1107 (9th Cir. 2025).

On appeal, this Court vacated that injunction in part and remanded for further proceedings. *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025) (No. 24-2815), *reh'g denied*, 166 F.4th 1188 (2026), *and pet. for cert. filed*, No. 26-71 (U.S. July 16, 2026).[2] This Court directed the district court to reassess GEO's intergovernmental immunity claim using a different standard. On remand, the State counterclaimed for an injunction compelling GEO to admit Washington Department of Health inspectors under the law.

**2. HB 1232**

While the appeal in the HB 1470 case was pending, the State passed HB 1232, amending certain provisions of HB 1470. This new legislation deleted "for-profit" from the definition of "[p]rivate detention facility" in HB 1470, to give the new law the appearance of applying beyond just the ICE Facility. In fact, that amendment authorized inspection of only one additional facility—a non-profit juvenile detention facility housing 13 people. HB 1232, 69th Leg., Reg. Sess. (Wash. 2025) § 1(6). *See also* 3-ER-450, 462–63; MapJustice.org, Martin Hall Juvenile

[2] The United States participated as amicus curiae in that appeal (without waiving its sovereign immunity), addressing the intergovernmental-immunity questions. Br. for the United States as Amicus, *GEO Grp. v. Inslee*, 2024 WL 6959788 (9th Cir. July 1, 2024).

Detention Facility, Washington Inmate Search, https://perma.cc/PLS7-6TJV (last visited Aug. 11, 2026) ("[F]acility has a maximum capacity of 68 inmates, with 13 inmates currently incarcerated.").

There can be no doubt that the sole purpose of this amendment was to improve the State's litigation position in this proceeding: Less than a month after this Court's decision in the *Inslee* appeal, the Department of Health proposed creating *separate* rules for that juvenile detention facility. 3-ER-465. And the State worked hand in glove with advocacy organizations, including those whose mission is to end federal immigration detention and deportations, to build out a process for documenting generating complaints about the ICE Facility. *See* 3-ER-432. Rather than focus on accuracy, the State created an online form allowing *anyone* to submit a complaint about the ICE Facility—without any need for identification or attestations of truthfulness. 3-ER-434–36.

**3. Attempted inspections under RCW 43.70.170**

While the *Inslee* appeal was pending, in July 2024 the State also attempted to inspect the ICE Facility under the putative authority of a different statute, RCW 43.70.170, which allows the Department of

Health to investigate threats to public health. ICE personnel denied the inspectors entry.

The Department of Health sued GEO in state court, seeking an injunction compelling access to the facility. GEO removed the *DOH* case under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). The district court remanded *sua sponte*, and GEO appealed to this Court (No. 24-5880, and collectively, the *DOH* case).

While that appeal was pending, the Department again repeatedly attempted to enter the ICE Facility under RCW 43.70.170—in September 2025, March 2026, and April 2026. Each time, an ICE official—not a GEO employee—denied access. As to the 2024 attempt, the district court found that "[t]he parties do not dispute that ICE employees played a significant role in denying [the Department of Health] entry." 4-ER-684. As to the 2025 and 2026 attempts, the evidence is undisputed: The ICE Assistant Field Office Director personally came to the facility lobby and denied entry on ICE's behalf and "within the scope of [his] responsibilities"; he executed Inspection Access Forms memorializing the denials; and the events were captured on video. 4-ER-646–48 ¶¶ 8–10, 14–32. The ICE Assistant Field Office Director further attested that ICE "has final

authority and control over access to the secure portions" of the ICE Facility and that admitting the Department's inspectors over ICE's denial would violate GEO's federal contract. 4-ER-646, 648 ¶¶ 8–10, 30–32.

This Court reversed the district court's order remanding the *DOH* case to state court, holding that GEO's derivative-immunity and direct-regulation defenses should not have been rejected on the existing record. *See Wash. Dep't of Health v. GEO Grp., Inc.*, 2025 WL 2986482, at *1 (9th Cir. Oct. 23, 2025), 4-ER-725–30. The Court identified four unresolved factual questions to be determined by the district court: (1) Who denied the Department entry; (2) "the scope of the authority of the relevant [ICE] employee over access to the facility"; (3) the scope of GEO's authority over access; and (4) "what authority ICE contracted away, what authority it retained, and for whom." Those "uncertainties implicate both the derivative immunity and direct-regulation defenses." *Id.* at *1–2.

The parties submitted additional evidence to the district court, which held that GEO's federal defenses are "colorable"—that is, supported by a preponderance of evidence—and denied remand to state court. 4-ER-684–85.

### D. The district court's July 2026 preliminary injunctions

On April 28, 2026, the State moved in the HB 1470 case (formerly known as *Inslee* but now re-captioned *Ferguson*) to add a counterclaim asserting that GEO violated RCW § 70.395.050 when it denied access to the ICE Facility. 4-ER-714–24. It simultaneously moved for a preliminary injunction to enjoin GEO from "blocking" Department of Health inspectors from the facility to inspect it under RCW 70.395.050(2)(b). 4-ER-692. GEO opposed the State's motion for a preliminary injunction and moved to dismiss the counterclaim. 4-ER-649–80, 2-ER-161–96.

On June 11, 2026, the State moved in *DOH* for a preliminary injunction requiring GEO to admit Department of Health inspectors to enforce RCW 43.70.170. 2-ER-136–62. GEO moved the same day to dismiss the State's complaint under Federal Rule of Civil Procedure 19 because ICE is a necessary party that the State did not, and cannot, join. 2-ER-103–28.

The district court decided all these motions on July 9, 2026. The court denied GEO's motions to dismiss the State's complaint in *DOH* and counterclaim in *Ferguson*, and it granted the State's motions for preliminary injunctions in both cases. 1-ER-2–33.

In *DOH*, the court issued a preliminary injunction requiring GEO to admit State "inspectors to the Tacoma facility to enforce RCW 43.70.170." 1-ER-32. The court exempted "ICE-controlled administrative and medical areas" on the ground that the State "has not demonstrated it is likely to succeed in enforcing its statutory authority in those ICE-operated areas." *Id.* The court also ordered GEO to "provide written notice of this Order within 48 hours to all employees employed at the Tacoma facility." *Id.* It issued an identical injunction in *Ferguson*, except for changing the statutory reference to RCW 70.395.050(2). 1-ER-29.

In both cases, the court did "not authorize review and copying of any ICE records"; noted that "if GEO disregards the Order, the Court will consider appropriate sanctions upon the State's request"; and stayed the injunctions for fourteen days "to allow the parties the opportunity to appeal." 1-ER-29, 32. The district court set out its reasoning for both orders in the *Ferguson* order. *See* 1-ER-32. It rejected GEO's defenses in toto. *First*, the court rejected GEO's Rule 19 defense, holding that "ICE is not a necessary party, and it is not an indispensable party." 1-ER-12. It further held that even if ICE were an indispensable party, an "exception to traditional joinder rules" applies because the State "seeks

to vindicate a public right" and the present litigation does not "destroy the rights" of ICE, in part because it is "not clear whether the ICE employee was acting within the scope of ICE's authority when he instructed GEO Group to deny access to Department [of Health] employees, or whether he was acting *ultra vires*." 1-ER-11–13 (quoting CA9's October 2025 Memo, 24-cv-05639, Dkt. 22 at 5).]

*Second*, the district court rejected GEO's defense under *Yearsley*. GEO argued that, even if GEO had played a role in denying Department of Health inspectors access to the ICE Facility, GEO had followed ICE's lawful order—which is a complete defense under *Yearsley*. 4-ER-670–73, 2-ER-180–82. The district court rejected GEO's *Yearsley* defense on the ground that, "even if ICE did require GEO to deny access to state inspectors, either by contract or through a verbal directive by one of its employees, such a directive is not authorized by federal law." 1-ER-18.

*Third*, the district court rejected GEO's argument that applying RCW 70.395 to require GEO to admit State inspectors to secure areas of the ICE Facility over ICE's denial constitutes direct regulation of ICE, effectively substituting the State's judgment for ICE's on a core federal operational question: who may enter a federal detention facility. The

court found that the statute does not directly regulate ICE; rather, it "mandates that GEO, not ICE, maintain certain health and safety standards in its facility and allow inspections." 1-ER-23. The court held that RCW 70.395 does not discriminate against GEO because the "requirements imposed on GEO are substantially similar to those imposed on other civil detention facilities in Washington," including "unannounced inspections to check for compliance with [mandated] standards and to investigate complaints." 1-ER-23.

**E. These appeals**

GEO filed its notice of appeal in both cases on July 13, 2026. *See* 4-ER-789–94 On July 15, GEO moved the district court to stay the preliminary injunctions pending appeal. The district court denied the motions, expressly deferring to this Court whether a stay pending appeal is appropriate. *See* 2-ER-35–38. GEO then filed parallel emergency motions in this Court to stay the preliminary injunctions pending appeal. No. 26-4450, Dkt. 9.1 & 10.1; No. 26-4454, Dkt. 11.1 & 12.1. Those motions are pending as of the filing of this brief.

On July 21, 2026, the Court granted GEO's unopposed motion to consolidate the cases. No. 26-4450, Dkt. 5; No. 26-4454, Dkt. 7.

## STANDARD OF REVIEW

This Court reviews an order granting a preliminary injunction for abuse of discretion. *California v. Azar*, 950 F.3d 1067, 1082 (9th Cir. 2020) (en banc). "But legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *Id*. (cleaned up).

To obtain the disputed preliminary injunctions, the State had to establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunctions are in the public interest. *Winter,* 555 U.S. at 20. Because the State sought preliminary injunctions that mandate GEO take action, it also had the burden to show that "the facts and law clearly favor[ed]" injunctive relief. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (cleaned up).

## SUMMARY OF THE ARGUMENT

The preliminary injunctions must be vacated because the State has not made the required showing for any of the four *Winter* factors, let alone demonstrated that the facts and law "clearly favor" issuing the mandatory preliminary injunctions. *Garcia*, 786 F.3d at 740.

As an initial matter, the injunctions cannot stand because the district court issued them under the wrong standard. The injunctions are mandatory—compelling GEO to admit inspectors and notify every facility employee about the injunctions within 48 hours. 1-ER-2–33. But the district court applied the lower standard for issuing prohibitory injunctions. The heightened standard for "particularly disfavored" mandatory injunctions requires showing that "the facts and law clearly favor the moving party." *Garcia*, 786 F.3d at 740. Numerous contested legal and factual questions foreclose the "clear" showing that mandatory relief demands—especially where the district court has already found GEO's federal defenses "colorable." 4-ER-684–85. *See* Part I, *infra*.

But even under the lower standard, the State cannot make the "most important" showing required by *Winter*: "likely success on the merits." *Garcia*, 786 F.3d at 740. Indeed, one of GEO's defenses, under Rule 19, requires not only vacating the injunctions but also dismissing the State's claims outright for lack of jurisdiction. GEO's intergovernmental-immunity and *Yearsley* defenses cast further serious doubt on the viability of the State's claims.

***Rule 19:*** Most fundamentally, reversal is necessary because the district court should have dismissed the case before even considering the preliminary injunctions. The claims against GEO should have been dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join a required party under Rule 19. ICE is not a party to the litigation, and it cannot be joined due to its sovereign immunity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999). No court can provide the State complete relief in ICE's absence because ICE alone is denying the State's inspectors access to the ICE Facility—ICE is therefore a necessary party who cannot be joined as a defendant. Fed. R. Civ. P. 19(a)(1)(A); *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013). In these circumstances, a "wall of circuit authority" compels dismissal. *White*, 765 F.3d at 1028. The district court thus never should have entered an injunction against GEO. Consequently, the State cannot come close to showing it is likely to succeed on the merits. *See* Part II.A, *infra*.

***Intergovernmental Immunity:*** The State also cannot show it is likely to succeed on the merits because the state inspection provisions it seeks to enforce via the preliminary injunctions violate the principle of intergovernmental immunity. A State's laws may not directly regulate or

discriminate against the federal government or those with whom it deals. *North Dakota v. United States*, 495 U.S. 423, 435 (1990). Compelling a federal contractor to admit state inspectors into secure areas of a federal detention facility, over the federal custodian's denial, upends that principle. The State's inspection statutes, if enforced against GEO, would be a "direct, physical interference" with a federal function, substituting the State's judgment for ICE's on the quintessentially federal question of who can access a facility housing federal detainees. *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945); *Mayo v. United States*, 319 U.S. 441, 447–48 (1943). The State's complaint-investigation regime also discriminates: It authorizes investigation of complaints on any subject matter so long as the complaint relates to the ICE Facility. That sweeps far more broadly than state inspection regimes applicable to comparable civil detention facilities—and HB 1232's cosmetic addition of a single juvenile facility does not cure the discrimination. Because the injunctions the State seeks would enforce laws that are not enforceable as to GEO on the facts of this case, the State is unlikely to succeed on the merits. *See* Part II.B, *infra*.

***Yearsley:*** The State is also unlikely to succeed on the merits because GEO cannot be held liable for adhering to ICE's directives.

*Yearsley* provides a complete defense when a contractor is merely executing federal directives. *GEO Grp., Inc. v. Menocal*, 607 U.S. 438, 449–52 (2026); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–69 (2016). And that is precisely the situation here: ICE denied State inspectors access to the ICE Facility so GEO did not admit them. Under *Yearsley*, a district court cannot punish GEO "precisely for accomplishing what the Federal Government requested." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1099 (2026). ICE's denial of access was a lawful directive, issued pursuant to an immigration-detention program authorized by Congress and delegated to ICE. *See* 8 U.S.C. § 1231(g)(1); *see also* 28 U.S.C. § 530C(a)(4). GEO did precisely what ICE directed, consistent with its federal contract—GEO routed each inspector's access request to ICE. And ICE, not GEO, denied the inspectors entry. 4-ER-647–48 ¶¶ 17–18, 25–26. Contrary to the district court's flawed reasoning, *Yearsley* does not require a congressional enactment expressly authorizing ICE to deny the inspectors access. That would gut the *Yearsley* defense—it would in fact have doomed the contractor in *Yearsley* itself. Thus, the preliminary injunctions cannot provide the State the relief it seeks—because GEO

would have a complete defense for non-compliance—and they should not have been issued. *See* Part II.C, *infra.*

The other *Winter* factors also favor GEO. The State's alleged harms are speculative and unsupported by evidence of an imminent emergency, while an injunction would force GEO into conflict with ICE authority, risk breach of its federal contract, and disrupt secure detention operations and federal interests. *See* Part III, *infra.*

Finally, even if the Court concludes that the State made the required showing for *an* injunction to issue, these injunctions must nonetheless be vacated because they violate Rule 65(d). The injunctions' operative limitation—that the State cannot enter "ICE-controlled administrative and medical areas"—is undefined and leaves GEO to guess, on pain of contempt, which spaces are excluded and what it must do if a nonparty federal officer again refuses State inspectors access to any area. If not vacated outright, the injunctions should at least be vacated and remanded with instructions to specify GEO's obligations with the precision Rule 65(d) requires. *See* Part IV, *infra.*

# ARGUMENT

## I. The District Court Failed To Apply The Correct Standard For Mandatory Preliminary Injunctions.

The preliminary injunctions must be vacated because the district court applied the wrong standard. The injunctions are "mandatory," and thus required the State to meet a heightened standard. But the court applied the less-onerous standard applicable to "prohibitory" injunctions.

A "mandatory" preliminary injunction orders the enjoined party "to take affirmative action"—not merely to refrain from taking action, as with a prohibitory injunction. *Garcia*, 786 F.3d at 740. Any injunction is an "extraordinary remedy," *Winter*, 555 U.S. at 24, and mandatory preliminary injunctions are "particularly disfavored" and "should not issue in doubtful cases." *Garcia*, 786 F.3d at 740 & n.4 (cleaned up). *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 875–79 (9th Cir. 2009) (affirming preliminary injunction in pharmaceutical trademark suit as to prohibition of sales of allegedly infringing dietary supplement, but vacating it with respect to recall mandate, which "did not operate simply to preserve the status quo"). Courts should issue mandatory preliminary injunctions only if "the facts and law clearly favor the moving party." *Garcia*, 786 F.3d at 740. This

rule reflects the risk that preliminary relief materially changes real-world conditions before a final ruling on the merits determines that disturbing the status quo is warranted.

The preliminary injunctions here do not preserve the status quo. They compel GEO to take action—to admit state inspectors to the ICE Facility. 1-ER-29. That relief alters the "last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citation omitted). The State has *never* inspected the ICE Facility under either disputed inspection statute, nor over ICE's objection. And the injunctions do not merely require GEO to do nothing when inspectors again try to inspect the ICE Facility. Rather, they enjoin GEO affirmatively to "admit" them, over ICE's refusal. 1-ER-29. The injunctions thus do not preserve a neutral baseline while the parties litigate. And the injunctions order this radical change before final resolution of GEO's substantial legal arguments.

The district court considered no factors beyond the traditional standard for prohibitory preliminary injunctions; it did not even acknowledge a higher standard exists for disfavored mandatory relief. *See* 1-ER-4 (noting only the standard for preliminary injunctions that

"prohibit[] a party from taking action"). As a result, the district court issued the mandatory preliminary injunctions without determining whether the facts and law clearly favored the State. That was legal error and warrants vacating the preliminary injunctions and remanding for the district court to analyze the case under the correct legal standard. But at minimum, that legal error puts a significant thumb on the scale in favor of vacating the injunctions, as the State's burden to obtain preliminary injunctive relief in these cases was substantially higher than had they sought prohibitory injunctions.

## II. The State Cannot Show Likelihood Of Success On The Merits.

The State cannot show that its claims are likely to succeed on the merits—much less clearly likely, which it must show to obtain mandatory preliminary relief. *Garcia*, 786 F.3d at 740.[3]

[3] GEO previously argued to this Court that the Washington laws at issue here are preempted under both field preemption and conflict preemption doctrines. The Court rejected those arguments in *Inslee*, *see* 151 F.4th at 1123–24, 4-ER-731–63, and *DOH*, 2025 WL 2986482, at *2–3, 4-ER-725–30. GEO has raised preemption in its pending cert petition from the *Inslee* decision, and specifically preserves the argument for the eventual merits stage of this litigation.

### A. Rule 19 requires dismissal of all claims on which the district court entered the preliminary injunctions.

The district court erred in granting the preliminary injunction because both the *DOH* case and the *Ferguson* counterclaim should have been dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join a required party under Rule 19—and thus the State cannot show a likelihood of success on the merits.

The Rule 19 analysis asks whether an absent party is required under Rule 19(a); whether joinder is feasible; and, if joinder is not feasible, whether the case should proceed under Rule 19(b). Under Rule 19(a), ICE is a required party, and joinder is not feasible here because ICE is protected by sovereign immunity. The case similarly cannot proceed under Rule 19(b), which requires dismissal where an absent sovereign has a nonfrivolous interest in the subject of the litigation and sovereign immunity bars its joinder.

While the resulting absence of a forum may seem like harsh medicine, the Supreme Court has stressed that this "is contemplated under the doctrine" of sovereign immunity. *Pimentel*, 553 U.S. at 865–73. Indeed, it is the appropriate consequence of that immunity, not a reason to proceed without the sovereign. *Id*. Thus, this Court has repeatedly

recognized "a wall of circuit authority in favor of dismissing actions in which a necessary party cannot be joined." *Maverick Gaming LLC v. United States*, 123 F.4th 960, 981–82 (9th Cir. 2024) (affirming Rule 19 dismissal after sovereign could not be joined); *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 857–61 (9th Cir. 2019) (same); *White*, 765 F.3d at 1028(same).

ICE is a necessary party to this litigation that must be joined if feasible under each of Rules 19(a)(1)(A), (B)(i), and (B)(ii). Joinder is infeasible because the United States has not waived ICE's sovereign immunity. Ordinarily, under Rule 19(b), when joinder is infeasible the court weighs several factors to determine whether the action should continue without the necessary party. Here, those factors weigh in favor of dismissing the State's claims. But because ICE's joinder is infeasible due to sovereign immunity, the State's claims must be dismissed regardless.

#### 1. ICE is a required party under Rule 19(a)(1)(A) because complete relief cannot be granted by enjoining GEO alone.

Under Rule 19(a)(1)(A), a person is a required party to litigation if "in that person's absence, the court cannot accord complete relief among

existing parties." Complete relief "is concerned with consummate rather than partial or hollow relief as to those already parties.... To be 'complete,' relief must be "meaningful."" *Alto*, 738 F.3d at 1126 (cleaned up). Importantly, Rule 19 does not just further the interests of the parties, but also those "of the public in avoiding repeated lawsuits on the same essential subject matter." *CP Nat'l Corp. v. Bonneville Power Admin.*, 928 F.2d 905, 912 (9th Cir. 1991) (quoting Fed. R. Civ. P. 19 advisory comm.'s note to the 1966 amendment).

The Court here cannot grant the State "complete relief" in ICE's absence. The State seeks access to the secure areas of the ICE Facility. But ***only ICE can grant this relief***. ICE has sole authority to grant or deny access to the secure portions of the ICE Facility, and GEO is without authority to grant access absent ICE's approval. 4-ER-646, 648 ¶¶ 8–10, 30–32; pages 6–8, *supra*. And the facts show that it was ICE—not GEO—that refused entry to the Department of Health every time it tried to inspect the ICE Facility. *See, e.g.*, *Dawavendewa v. Salt River Project Agr. Improvement & Power Dist.*, 276 F.3d 1150, 1155–56, 1161–62 (9th Cir. 2002) (affirming dismissal where "complete relief" "cannot be accorded" "in the absence of the [Navajo] Nation").

A judgment against GEO alone would also be "hollow" relief, *Alto*, 738 F.3d at 1126: It would not bind the agency that controls secure-area access and can withhold, deny, or countermand entry. Relief compelling GEO to allow entry and cooperate with the Department's inspections cannot be effective where ICE initially denied and continues to deny access. An injunction against GEO will not bind ICE. Fed. R. Civ. P. 65(d)(2). GEO cannot compel ICE to approve access, cannot authorize disclosure of federal records or detainee information, and cannot decide whether a particular inspection request implicates federal security, detainee custody, medical operations, or law-enforcement information. And there is no evidence that an injunction against GEO will change how ICE, an independent decisionmaker, "will exercise [its] judgment." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (dismissing claims against government for lack of standing because social media companies could exercise independent judgment) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)).

Finally, proceeding in the absence of ICE will lead to "repeated lawsuits on the same essential subject matter." *CP Nat'l*, 928 F.2d at 912 (citation omitted). Indeed, the district court, this Court, and other courts

around the nation have seen repeated, ineffectual suits against GEO for several years.

The State previously justified the injunctions it sought by citing *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061 (N.D. Cal. 2005), and *Disabled Rights Action Committee v. Las Vegas Events*, *Inc.*, 375 F.3d 861 (9th Cir. 2004). *See* 2-ER-51–102. But these cases merely illustrate the problem here. Both involved an existing defendant that could successfully be ordered by the court to provide complete relief. In *NGV*, for instance, the plaintiff sought "only monetary damages" and did "not seek to enforce the provisions or terms of [a] contract" or seek other equitable relief. 355 F. Supp. 2d at 1068–69. Similarly, the plaintiffs' alleged harms in *Disabled Rights*—inaccessibility of an event venue leased from the Nevada University System—could be remedied by an injunction requiring the event promotor to install temporary accessibility features to comply with the Americans With Disabilities Act. 375 F.3d at 879–80. This Court in *Disabled Rights* explained that such measures could be taken "with or without" the participation of the University System, which was not a proper defendant under the ADA, because an order making the venue

"accessible to the degree possible within the scope of [the promoter's] lease" would provide complete relief. *Id.* at 880. The situation here is far different. The state is seeking something—access to the ICE Facility—that no injunction against GEO can afford it.

The district court also latched onto the State's argument that prior food-safety inspections of the ICE Facility by the Tacoma-Pierce County Health Department under WAC chapter 246-215 demonstrate that access here too could be ordered. *See* 2-ER-90, 97–98. But those inspections are irrelevant to the Rule 19 question. There is nothing in the record that suggests that those inspections—which were directed to kitchen, food-preparation, and food-storage areas, 2-ER-40 ¶¶ 2–4, 2-ER-43 ¶¶ 4–9, 2-ER-46–74 ¶¶ 4–10, 2-ER-50 ¶¶ 4–6—proceeded over ICE's objection. No prior case has adjudicated whether GEO may admit state inspectors into secure areas of the facility after ICE has denied or withheld approval. Past access in other contexts neither waives ICE's retained authority nor vests GEO with power to override it. The Rule 19(a)(1)(A) question is remedy-specific: Whether a decree against GEO

alone can possibly yield an inspection over ICE's objection. The evidence in the record, *see* pages 6–8, 12–13, *supra*, shows that it will not.

ICE is thus a necessary party under Rule 19(a)(1)(A).

#### 2. ICE is a required party under Rule 19(a)(1)(B)(i) because of its interest in whether the State can access a secure ICE facility.

Rule 19(a)(1)(B)(i) requires joinder of an absent entity that has an "interest relating to the subject of the action," and whose "absence may … impair" that entity's interest. ICE is a required party under this provision of the rule, too.

The federal government's authority over immigration is a "fundamental sovereign attribute." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). This stems from the intertwined nature of immigration and foreign policy. *See Hines v. Davidowitz*, 312 U.S. 52, 64 (1941) ("One of the most important and delicate of all international relationships ... has to do with the protection of the just rights of a country's own nationals when those nationals are in another country."). ICE's interests here are multiple, and proceeding in its absence would clearly impair those interests.

***First***, ICE has a sovereign and operational interest in federal immigration detention. *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration … is vested solely in the Federal Government"). Congress assigned DHS and ICE responsibility for detention and removal operations. *See* 6 U.S.C. § 252; 8 U.S.C. §§ 1225, 1226, 1231. Federal immigration detention implicates national sovereign interests. *Arizona*, 567 U.S. at 415–16 (invalidating state immigration provisions that intruded on federal immigration authority); *Hines*, 312 U.S. at 73–74 (invalidating state alien-registration law in light of federal immigration authority). And ICE has a keen interest in preventing another sovereign from interfering with federal immigration detention policy through sham inspections. The district court itself recognized ICE's interest by carving out "ICE-controlled administrative and medical areas" from its injunction, 1-ER-29—a tailoring decision that credits the very possessory interests the court's Rule 19 analysis declared nonexistent. The district court failed to recognize that this possessory interest extends to the entire ICE Facility.

***Second***, ICE has an interest in ensuring that its facility remains secure. The ICE-GEO contract expressly reserves to ICE pre-clearance

authority over access to ICE facilities and information, routes state-governmental access requests through ICE, and requires GEO to comply with ICE security plans. 3-ER-537; pages 6–8, *supra*. The contract further expressly requires GEO to "attempt to detect anyone attempting to gain unauthorized access" to the ICE Facility "and notify both ICE and local law enforcement." 3-ER-484. The district court's injunction upends that contract and usurps ICE's methods for securing the facility.

***Third***, ICE has legally protected interests in the access-control regime it negotiated and has exercised under its contract with GEO. ICE negotiated access-control, security, records, inspection, and operational provisions in the contract. A court order requiring GEO to provide access over ICE's denial would alter that regime and impair ICE's contractual rights. *See Dawavendewa*, 276 F.3d at 1156–57 (holding tribe was a required party because plaintiff's lawsuit against his employer requested relief that would invalidate or substantially impair the tribe's rights under contract to which it was a party); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022–25 (9th Cir. 2002) (affirming Rule 19 dismissal because the challenged relief threatened absent tribes' contractual and sovereign interests in gaming contracts negotiated with the state);

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1498–1500 (9th Cir. 1991) (absent tribe could not be excluded where the suit sought relief that would directly undermine governmental and contractual interests belonging to the tribe).

***Finally***, Congress has created a federal inspection and complaint process for immigration detention. The Office of the Immigration Detention Ombudsman is responsible for receiving and investigating complaints concerning individuals in immigration detention and may conduct unannounced inspections of detention facilities. 6 U.S.C. § 205(b)(1), (3). The Department of Health's requested access to federal detention areas would require the Court to adjudicate how the state statute interacts with ICE's access controls. ICE has a direct interest in that adjudication.

Importantly, ICE's interests here are more than abstract. The record clearly establishes that ICE has consistently exercised its access-control interests throughout this dispute. ICE Assistant Field Office Director Cantrell confirmed under oath to the district court that "ICE has final authority and control over access to the secure portions" of the ICE Facility, that all "potential visitors … require authorization,

coordination, and/or approval by the ERO Field Office[,] as well as pre-clearance approvals and background checks as necessary." 4-ER-622 ¶¶ 8–9. This authority is expressly codified in the contract between ICE and GEO. 4-ER-646–48 ¶¶ 9–10, 14–32; 3-ER-537 (§ 40.0). At every attempt by the State to inspect the ICE Facility, ICE—not GEO—denied access to the inspectors, consistent with ICE's authority and security protocols. 4-ER-646–48 ¶¶ 8–10, 23–32. Indeed, the district court itself recognized that ICE employees "played a significant role in denying [the Department of Health] entry." 4-ER-684.

The State cannot avoid Rule 19(a)(1)(B)(i) by dismissing ICE's interests as merely being over a contractual provision that can be disregarded. *Cf.* 2-ER-98. This addresses issues at the heart of ICE's authority to control access to a federal immigration detention facility. Contract-based and operational interests of this kind are precisely what Rule 19(a)(1)(B) protects. In *Dawavendewa*, this Court held that an absent tribe was a required party under Rule 19(a)(1)(B)(i)[4] because the plaintiff sought relief that would invalidate a contractual provision the

[4] The relevant rule has been re-codified from Rule 19(a)(2)(i) since *Dawavendewa*, but is materially identical. *Compare* Fed. R. Civ. P. 19(a)(1)(B) (2026), *with* Fed. R. Civ. P. 19(a)(2) (2006).

tribe had negotiated, even though the tribe itself had not been sued. *See* 276 F.3d 1156–57 ("a judgment rendered in the [Navajo] Nation's absence will impair its sovereign capacity to negotiate contracts and … to govern the Navajo reservation"). Likewise, the State seeks relief that would override access-control and security provisions ICE negotiated and administers under its contract with GEO.

Nor can the state avoid Rule 19(a)(1)(B)(i) by arguing that ICE has not "claimed" an interest in this litigation. That argument ignores that one purpose of immunity is the "protection from the inconvenience of suit." *Pimentel*, 553 U.S. at 865. A requirement of formal intervention would countermand that purpose. ICE submitted a declaration to the district court identifying ICE's "statutory responsibilities," which "include detention of noncitizens" awaiting immigration proceedings. 4-ER-645. That declaration further identified ICE's contractual rights vis-à-vis GEO's operation of the facility. 4-ER-646 ¶¶ 9–10. This more than suffices to claim an interest in the litigation.

Here, an injunction requiring GEO to disregard ICE's access decisions would practically impair ICE's ability to control facility access

and implement the security regime it established. ICE is thus a required party under Rule 19(a)(1)(B)(i).

#### 3. ICE is a required party under Rule 19(a)(1)(B)(ii) because proceeding in its absence exposes GEO to inconsistent obligations.

Under Rule 19(a)(1)(B)(ii), an absent entity is a required party if in that entity's absence an existing party will be subject to "double, multiple, or otherwise inconsistent obligations." Here, proceeding without ICE will force GEO into an untenable position of having to mediate directly conflicting orders from ICE and the courts.

ICE's position—reflected in the contract and in the undisputed facts—is that access to secure areas of the ICE Facility requires ICE approval. But the State seeks—and the district court's injunctions command—GEO to provide access without ICE approval (and even over ICE's objection). If GEO complies, it risks violating its contract with ICE, ICE security plans, and ICE's express access decisions. If GEO follows direction from ICE, it risks contempt. Rule 19 (a)(1)(B))(ii) exists to prevent precisely this "rock and a hard place." *See Dawavendewa*, 276 F.3d at 1156; *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460–

61 (9th Cir. 1994) (affirming Rule 19 dismissal where proceeding would impair absent tribes' treaty rights and risk inconsistent obligations).

#### 4. Joinder of ICE is infeasible because the United States has not waived sovereign immunity.

Assuming an absent entity is "required" under Rule 19(a), the next question in the Rule 19 analysis is whether joinder is feasible. Here, it is indisputably not.

Federal agencies are immune from suit unless Congress unequivocally waives immunity. *Blue Fox*, 525 U.S. at 260–61 (affirming dismissal because sovereign immunity barred requested equitable lien against federal funds); *Minnesota v. United States*, 305 U.S. 382, 386–91 (1939) (holding United States was indispensable and could not be sued absent consent). Waivers of sovereign immunity are "strictly construed … in favor of the sovereign." *Blue Fox*, 525 U.S. at 261.

The United States has not waived ICE's sovereign immunity. *Amir v. Five Unnamed U.S.A. Immigr. Enf't & Custom Offs. in Vancouver Int'l Airport*, 2010 WL 2402910, at *3 (W.D. Wash. Mar. 30, 2010), *report & recommendation adopted*, 2010 WL 2402915 (W.D. Wash. June 10, 2010) (dismissing claim against ICE including because ICE had not waived sovereign immunity). To the contrary, Congress specifically assigned

responsibility to address the conditions of immigration detention to the discretion of DHS and ICE. *See* 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 8 U.S.C. §§ 1225(d)(2); 1226. And "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Blue Fox*, 525 U.S. at 260 (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

The State has never asserted that ICE has waived its sovereign immunity, or identified a waiver allowing it to sue ICE under RCW 43.70.170 or 70.395.050(2)(b). GEO is unaware of any such waiver. Indeed, the State's apparent belief that ICE's actions here are unlawful[5] confirms the problem. The State's dispute is really with ICE's access decision and access-control regime, not with GEO—let alone with GEO alone. The State cannot obtain the functional equivalent of relief against ICE by suing GEO and asking the Court to declare irrelevant ICE's denial in ICE's absence.

#### 5. Dismissal is required under Rule 19(b).

Because ICE is a required party that cannot be joined, dismissal is required under Rule 19(b).

[5] *See* 2-ER-154 ("Even if this Court finds an order [by ICE to deny access], either by contract or verbal, this order would be unlawful").

The multifactor test under Rule 19(b) to determine whether to proceed in the absence of the required party or dismiss the case entirely is short-circuited when the absent party is an immune sovereign. In such cases, a "wall of circuit authority" compels dismissal regardless of the result of any balancing analysis. *White*, 765 F.3d at 1028–29.

But even if this Court examined each of the Rule 19(b) factors, *see* Fed. R. Civ. P. 19(b)(1)–(4), dismissal would still be required. "To determine whether a suit should proceed among the existing parties where a required party cannot be joined, courts consider (i) potential prejudice, (ii) possibility to reduce prejudice, (iii) adequacy of a judgment without the required party, and (iv) adequacy of a remedy with dismissal." *Maverick Gaming LLC v. United States*, 123 F.4th 960, 980 (9th Cir. 2024) (citation omitted), cert. denied sub nom. *RunItOneTime LLC v. United States*, 146 S. Ct. 98 (2025). Each of these factors supports dismissal here.

***Rule 19(b)(1): Prejudice is not potential but assured***. The Supreme Court has cautioned courts not to give "insufficient weight" to the "sovereign status" of absent parties. *Pimentel*, 553 U.S. at 865. As detailed above, a judgment in ICE's absence would prejudice both ICE

and GEO. It would adjudicate ICE's access-control regime, security interests, contract rights, federal records, detainee information, and medical operations without ICE. And it would prejudice GEO by placing it between ICE's access requirements and a district-court injunction. The first 19(b) factor favors dismissal.

***Rule 19(b)(2): That prejudice cannot be reduced***. The broad order issued by the district court requiring GEO to provide access without ICE approval impairs ICE's security and contractual interests and forces GEO into an operational conflict with the federal agency that manages its contract. ICE remains unbound and may continue to deny or withhold approval. Even a narrower order requiring GEO merely to cooperate, route requests, or refrain from independent obstruction would not justify allowing claims against GEO to continue. Such an order would provide only hollow relief for the State. In the absence of an "alternative remed[y]," Rule 19 does not permit the State to avoid ICE's absence by forcing on the Court a choice between ineffective relief and prejudicial relief. *Pimentel*, 553 U.S. at 870. The second 19(b) factor favors dismissal.

***Rule 19(b)(3): There can be no adequate judgment for the State without ICE.*** "[A]dequacy refers to the 'public stake in settling

disputes by wholes, whenever possible.'" *Pimentel*, 553 U.S. at 870 (citation omitted). The district court's injunction against GEO perpetuates an interminable cycle of litigation and fails to advance the "social interest in the efficient administration of justice and the avoidance of multiple litigation." *Id.* (citation omitted). This interest is undercut in a case, as here, where an absent sovereign "would not be bound by the judgment in an action where" it was not a party. The third 19(b) factor thus favors dismissal. *Id.* at 871.

***Rule 19(b)(4): The lack of an alternative remedy does not override sovereign immunity***. *Pimentel* recognizes that dismissal may leave a plaintiff without a forum for definitive resolution, but that result is a necessary implication of the very concept of sovereign immunity. 553 U.S. at 872. The State may seek access through ICE or pursue whatever federal process Congress has authorized. It may not obtain indirect relief against ICE by suing GEO alone.

The district court ignored Supreme Court and Ninth Circuit precedent, justifying its ruling against GEO in ICE's absence on three grounds. All fail.

First, the district court asserted that ICE's interest was undercut by the agency's decision not to intervene or file a statement of interest in this case. 1-ER-12. But *Pimentel* squarely rejects that reasoning. The sovereigns in *Pimentel* did not participate in the litigation, yet the Court held that their interests nonetheless had to be accorded "full effect" and that the action could not proceed in their absence. 553 U.S. at 865–72. A contrary rule would force a sovereign to appear and litigate merely to protect interests that Rule 19 and sovereign immunity are intended to safeguard. *Id*.

Second, the district court relied on GEO's stipulated resolution of a separate state Labor & Industries matter. 1-ER-9. But nothing in the record suggests that *those* inspections proceeded over an ICE denial or without ICE's approval, and GEO has no power to stipulate away the United States' interests.

Third, the district court weighed the absence of an alternative forum against dismissal. *See id*. But *Pimentel* instructs that such an absence runs against claiming jurisdiction, not in favor of it. *See* 553 U.S. at 872.

Where litigation impairs the interests of an absent sovereign, the Rule 19 case law is clear. The case—or in this instance, the State's case against GEO in *DOH* and the State's counterclaims against GEO in Ferguson—must be dismissed. And what that means here is that the district court lacked any jurisdiction to grant the State injunctive relief, preliminary or otherwise. *See Alto*, 738 F.3d at 1125 (noting that if an intervening party's Rule 19 arguments were successful, it would "result in dissolving the injunction").

#### 6. Rule 19's public-rights exception to dismissal does not apply.

The public-rights exception is narrow and applies only where the litigation seeks to vindicate a public right *and* the requested relief does not "destroy the legal entitlements of the absent part[y]." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (cleaned up). At the very least, the second condition is not met. The State seeks an order compelling access to secure areas of a federal facility over the federal custodian's objection. Because the injunctions purport to eliminate ICE's asserted authority over access to those secure areas, this case falls well outside this exception.

### B. The State is unlikely to succeed on its claims because the inspection statutes violate the principle of intergovernmental immunity.

The district court erred in concluding that the State was likely to succeed on its claims in both cases because, on the facts alleged, the inspection statutes violate intergovernmental immunity. The district court should instead have concluded that intergovernmental immunity sinks the State's claims in both cases, denied its motions for preliminary injunctions, and dismissed its claims in both cases under Rule 12(b)(6).

The principle of intergovernmental immunity prohibits state laws if they either "regulate[] the United States directly" or "discriminate[] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). These prohibitions apply whether the state regulation applies to the federal government itself or to a contractor performing a federal function. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 189–90 (1956); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–43 (9th Cir. 2014). A state law that burdens "only a federal contractor" is permissible only if it "duplicate[s] requirements otherwise mandated under" state law and is imposed on similarly

situated non-federal facilities. *Inslee*, 151 F.4th at 1118 (quoting *United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019)).

The two panels of this Court that previously addressed aspects of these cases each ordered the district court to determine whether the disputed inspection provisions violate the principle of intergovernmental immunity.[6] *Inslee*, 151 F.4th at 1122, 4-ER-759–60; *DOH*, 2025 WL 2986482, at *2–3, 4-ER-727–29. On remand, the district court concluded that RCW 43.70.170 and 70.395.050(2)(b) do not violate the intergovernmental immunity doctrine because they are "not discriminatory" and, so "long as [each] law does not interfere with ICE's operations in the facility's administrative and medical areas, [they do] not directly regulate the federal government." 1-ER-23, 26, 31–32. These conclusions are erroneous. Both inspection statutes directly regulate ICE, via GEO, by substituting the State's judgment for ICE's on the core operational question—who may enter the ICE facility. And RCW

[6] Each panel ordered the district court to address one form of intergovernmental immunity and rejected the other. The *DOH* panel remanded the question of direct regulation but deemed GEO's "discrimination defense" forfeited. 4-ER-729. The *Ferguson* panel remanded the question of discriminatory regulation but held RCW 70.395.050(2) "does not directly regulate the federal government." *Inslee*, 151 F.4th at 1118.

70.395.050(2)(b) discriminates against GEO by burdening it alone with a complaint-investigation regime untethered from any limiting principles.

**1. Both disputed inspection statutes directly regulate the federal government, via GEO.**

A state law directly regulates the federal government if it "involve[s] a direct, physical interference with federal activities … or some direct, immediate burden on the performance of the [federal] functions." *Corsi*, 326 U.S. at 96); *see also Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 543–44 (1958) (state regulator could not dictate when federal government sought lower haulage rates); *Leslie Miller*, 352 U.S. at 189—90 (per curiam) (state contractor licensing standards could not limit federal-contractor selection); *Mayo*, 319 U.S. at 445–48 (state inspection regime could not apply to federal program activity); *Johnson*, 254 U.S. at 56–57; *United States v. King County*, 122 F.4th 740, 756–58 (9th Cir. 2024) (county could not direct ICE air operations); *Boeing*, 768 F.3d at 839–42 (state law could not override federal contractor's decisions "as to necessary … measures").

The district court concluded that the State inspection statutes do not directly regulate ICE because, "as a matter of law … GEO, not ICE, retains possessory control over and is ultimately responsible for access"

to the ICE Facility, "aside from the ICE-controlled administrative areas and perhaps medical areas." 1-ER-15 n.8, 22–23. On these bases, the district court issued the preliminary injunctions compelling GEO to disregard ICE's denial of access to state inspectors. 1-ER-16 n.9, 22–23, 29, 32. The district court's reasoning is flawed. GEO is left trapped between the contrary directives of two governments at loggerheads.

***First***, ICE controls the entire operation at the ICE Facility, not only certain administrative and medical areas. The facility operates under Congress's mandate to ICE. *See* pages 5–6, *supra*. In GEO's contract, ICE reserved final say over facility access by requiring "[p]re-clearance approvals" from ICE "for access to ICE field staff, facilities and information" and advance authorization from ICE for "visits" of, among others, "state and local governmental agencies." 3-ER-537 (§ 40.0). The senior ICE officer at the facility confirmed that ICE retained "authority and control" over access under both the contract and ICE's National Detention Standards. 4-ER-646 ¶¶ 9–10. The district court itself, via the

injunctions' carve-outs for administrative and medical areas, conceded that GEO does not control access to the whole facility.[7]

***Second***, the injunctions, by ordering GEO to admit state inspectors to the ICE Facility without ICE pre-approval, permit the state inspection provisions to regulate "the manner and conditions under which federal agents can enforce federal law." *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026). ICE sets its security requirements, *see* 3-ER-537, and bars GEO from allowing access over ICE's denial, 4-ER-648 ¶ 32. The injunctions—which grant the State unlimited, unannounced, immediate access to the ICE Facility—are, therefore, a "direct, physical interference" with ICE's security activities. *Corsi*, 326 U.S. at 96; *see also Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 762 (9th Cir. 2025) (regimes

[7] The medical-area carve-out, in particular, highlights the court's error. The district court reasoned that ICE retains control over medical areas because the ICE Health Services Corps is "responsible for the provision of health care services for ICE detainees at the facility." 1-ER-16 n.9 (citing Contract § 27.0). But the court also noted that ICE "subcontract[ed] another medical contractor" to provide some of those medical services. *Id.* This is precisely GEO's situation. Just as ICE "retain[s] control over" areas where contracted medical services are provided, ICE retains control over areas where GEO provides detention services.

that "dictat[e] the terms of a federal contract" directly regulate federal government).

***Third***, RCW 70.395.050(2)(b) and 43.70.170 directly regulate the federal government by regulating GEO's performance of federal functions through largely unfettered state investigations of any and all complaints relating to the ICE Facility. As explained in pages 5–6, *supra*, Congress authorized ICE to identify "appropriate" facilities for detention and to contract for related services. 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2). Pursuant to its congressional mandate, ICE issued National Detention Standards with the intention of "establish[ing] consistent conditions of confinement, program operations, and management expectations within the agency's detention system." 2-ER-199. These standards spell out the specific areas where ICE expects compliance with state or local laws. *See, e.g.*, 2-ER-207 (fire safety codes), 2-ER-208 (drinking and wastewater only "[i]f the facility is not on a certified community water source"), 2-ER-210 (infectious and hazardous waste generated at a medical facility), 2-ER-234 (accessibility standards).

In GEO's contract, ICE preserved its interest in uniform national standards. 3-ER-470 ("more stringent state or local laws" do not apply to

GEO's performance). ICE, therefore, established standards for operations over which the federal government is primarily responsible. 3-ER-468 ("[ICE] is responsible for the detention, health, [and] welfare … of aliens."). To the extent the State requests unfettered access to investigate any and all complaints relating to the ICE Facility, it in effect seeks to override ICE's contracting decisions and to "prohibit[] ICE from exercising its discretion to arrange for immigration detention" in the manner ICE has deemed appropriate—that is, immigration detention subject to uniform federal standards. *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750, 760–61 (9th Cir. 2022). This is precisely the replacement of federal standards with state standards that *Boeing* prohibits. 768 F.3d at 839–42.

The injunctions override ICE's lawful federal authority by ordering a federal contractor to open a federal facility to state inspection, despite ICE's reservation of its authority to deny state access. That is state control of a federal function. *King County*, *Mayo*, and *Johnson* forbid it.

In *King County*, this Court reiterated that state regulations may not "override the federal government's decisions about who will carry out federal functions." 122 F.4th at 756 (quoting *Newsom*, 50 F.4th at 750).

There, a state executive order impermissibly barred contractors from refueling ICE flights because that overrode ICE's "decision, pursuant to discretion conferred by Congress, to use private contractors to run its flights." *Id.* at 756–57 (cleaned up). Here, likewise, the inspection statutes' effect, if enforced, is to let the State dictate control over inspector access to the federal facility—a federal function—overriding ICE's onsite officer.[8]

In *Mayo*, the state stopped "county committees" from distributing fertilizer to farmers in a federal soil-preservation program because state inspectors had not inspected the fertilizer as state law required. 319 U.S. at 442–43. The Court recognized the state's inspection regime was aimed "to protect consumers" but held it unenforceable as to the federal fertilizer because the federal government had not "affirmatively declare[d] its instrumentalities or property subject to [state] regulation." *Id.* at 447–48. The same is true here. ICE has repeatedly asserted the

[8] The Court previously distinguished *King County* from this case. *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025), *pet. for cert. filed*, No. 26-71 (July 10, 2026). But whether ICE or GEO controlled inspector access to the facility was not squarely before the *King County* or *Inslee* panels. *King County* did not involve inspections. In *Inslee*, GEO made no "argument directed to the inspection … provision[]" at issue here. *Id.*

federal government's control over access to the ICE facility; the State's inspection statutes cannot override that.

Finally, in *Johnson*, the state cited a federal postal employee for driving a mail truck without a driver's license issued by that state. 254 U.S. at 55. The Court held the federal driver did not need the state's license due to "the immunity of the instruments of the United States from state control in the performance of their duties." *Id.* at 57. While the Court noted state law "might affect incidentally the mode of carrying out" those duties, it may not "lay[] hold of them in their specific attempt to obey orders." *Id.* at 56–57. States must "presume" that the federal government has "employ[ed] person[s] competent for their work," such as driving a mail truck, regardless of state licensing requirements. *Id.* Likewise here, the State's inspection statutes cannot prevent GEO obeying ICE's access directives, particularly as ICE has its own competent inspection regime.

Thus, the State is unlikely to succeed on the merits of its claims in either case because the permanent injunctions it seeks would compel GEO to comply with state inspection statutes that directly regulate ICE, via GEO, violating the principle of intergovernmental immunity—and

trapping GEO in an impossible position between two governments' contrary directives. The preliminary injunctions should be vacated on this basis. Dismissal of the State's claims in both cases follows on the same basis.

#### 2. RCW 70.395.050(2)(b) also discriminates against the federal government, via GEO.

RCW 70.395.050(2)(b) also discriminates against the federal government. A state law discriminates against the federal government "or its contractors if it singles them out for less favorable treatment" or "regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 839 (2022) (cleaned up). A state law cannot "treat[] a state entity more favorably than it treats a comparable federal entity." *Inslee*, 151 F.4th at 1118; *see also Boeing*, 768 F.3d at 842. Even if a state law only "incidentally target[s]" a federal contractor, being "incidentally burdened" by the law "might implicate intergovernmental immunity." *California*, 921 F.3d at 880.

This Court previously remanded the issue of discriminatory regulation to the district court to determine "whether Washington regulates the conditions of confinement at the [ICE Facility] differently from the way it regulates the conditions of confinement in the two [other

types of] civil detention facilities" in Washington, "residential treatment facilities" and "involuntary civil commitment facilities." *Inslee*, 151 F.4th at 1121–22. On remand, the district court found that the "requirements imposed on GEO" were "substantially similar." 1-ER-25. It reasoned that all "these facilities are required by law to implement an infection control program; provide detainees with nutritious meals, potable water; include laundry facilities; and maintain clean and hygienic premises with adequate heating and ventilation," while also being subject to "unannounced inspections" by the state "to check for compliance with these standards and to investigate complaints." 1-ER-25.

The district court's reasoning misses the point. The question is whether RCW 70.395.050***(2)(b)*** constitutes discriminatory regulation. That law authorizes the State to "[c]onduct investigations of complaints received relating to any private detention facility located within the state." RCW 70.395.050(2)(b). Other subsections of RCW 70.395 are irrelevant because the State sought a preliminary injunction in *Ferguson* only to enforce a specific subsection, RCW 70.395.050(2)(b), 4-ER-700, notwithstanding that RCW 70.395 includes several other inspection provisions, *e.g.*, RCW 70.395.040, .050(1), .050(2)(a). Despite the narrow

question it faced, the district court focused almost everywhere but RCW 70.395.050(2)(b), and primarily on RCW 70.395's broader scheme of "health and safety requirements." 1-ER-23–25.

To the extent the district court analyzed inspection authorizations, it conflated RCW 70.395.050(2)(b) with others. The court found that "RCW 70.395.050 permits the Department to conduct 'routine, unannounced inspections,' investigate complaints, regularly review food items, and test drinking water." [1-ER-24. But only RCW 70.395.050(2)(a) and .050(5) refer to "routine, unannounced inspections"; food-related inspections are mentioned only in RCW 70.395.050(2)(a), (2)(c), and (3); and only RCW 70.395.050(2)(d) refers to testing drinking water. These are not the inspection authorizations the State sought to enforce. Thus, the district court erred in concluding that the inspection scheme of RCW 70.395.050(2)(b) is not a discriminatory regulation after focusing almost entirely on irrelevant portions of RCW 70.395.

In fact, RCW 70.395.050(2)(b)'s complaint-investigation regime imposes a greater burden on GEO than comparable non-federal actors endure. *See California*, 921 F.3d at 873. Its intrusive breadth is evident in the State's complaint-intake form. It does not require complainants to

identify themselves, have first-hand knowledge, provide an attestation, or link their complaints to RCW 70.395. 3-ER-434–36. Any complaint relating to the ICE Facility is a cause for inspection under RCW 70.395.050(2)(b), no matter how far it strays from public health—for example, a complaint about due process in immigration courts. This is far more burdensome than inspection regimes covering comparable non-federal actors.

The district court identified provisions of the Washington Administrative Code concerning inspection and investigation of the two comparable civil detention facilities this Court previously identified: WAC 246-337-005(32) and -021(1)(a)–(b) concerning residential treatment centers, and WAC 246-322-025(3)(c) and -030(7)(b) concerning private involuntary-commitment centers.[9] 1-ER-23–25. ; *Inslee*, 151 F.4th at 1121; WAC 246-337-005(32), 246-337-021(1)(a)–(b), and 246-322-025(3)(c) narrowly authorize inspection or investigation of facilities' noncompliance with RCW 71.12, which concerns conditions in facilities

[9] In relation to private involuntary commitment centers, the district court cited "WAC 246-332-025(2)(c), 246-332-025(7)(b)." 1-ER-25. However, the statutory language quoted in the district court's order appears in WAC 246-322-025(3)(c) and -030(7)(b).

"caring for any person with a behavioral health or substance use disorder." RCW 71.12.455(3)(a). Likewise, WAC 246-322-030(7)(b) authorizes the State to investigate a facility's noncompliance with state law governing background checks. These provisions authorize inspections in response to complaints, but only complaints about facilities' noncompliance with particular statutes. Conversely, RCW 70.395.050(2)(b)'s sweeping authority allows the State to investigate complaints of any nature that touch on the ICE Facility. This significantly broader inspection regime of RCW 70.395.050(2)(b) is, thus, discriminatory regulation.

The State cannot hide behind the flimsy façade of HB 1232. It added one small juvenile facility to the list of detention facilities purportedly covered by RCW 70.395—theoretically making it a list of two. The State has argued that RCW 70.395.050(2)(b)'s complaint-investigation regime therefore does not target GEO alone. *See* 3-ER-450, 462–63. But such minimal expansion—if it even is an expansion—does not cure discrimination where the statute effectively still targets a single federal contractor. *U.S. Postal Serv. v. City of Berkeley*, 228 F. Supp. 3d 963, 969 (N.D. Cal. 2017) (finding "inevitable effect of a statute" can violate

intergovernmental immunity (quoting *United States v. O'Brien*, 391 U.S. 367, 384–85 (1968)). That is the reality here: The State has indicated it will likely promulgate different rules for the juvenile facility. 3-ER-465. HB 1232 is a ruse to hide function behind form. The Court should not credit it.

Thus, the State is unlikely to succeed on the merits of its *Ferguson* counterclaim because the permanent injunction it seeks would compel GEO to comply with a discriminatory complaint-investigation regime, violating the principle of intergovernmental immunity—again wedging GEO between two governments' contrary directives. This Court should therefore vacate the *Ferguson* preliminary injunction. Dismissal of the *Ferguson* counterclaim is warranted on the same basis.

### C. GEO is likely to prevail on its *Yearsley* defense.

Even if the district court had jurisdiction to address the State's claims against GEO in the absence of ICE in this litigation, the preliminary injunctions cannot stand because the district court did not credit GEO's complete defense to those claims under *Yearsley*. The governing test is straightforward: A federal contractor can "be held liable for injurious conduct in only two circumstances: when 'he exceeded his

authority' or when that authority 'was not validly conferred.'" *Menocal*, 607 U.S. at 441, 449 (citing *Yearsley*, 309 U.S. at 20–21); *Campbell-Ewald*, 577 U.S. at 166–68; *Hencely*, 146 S. Ct. at 1095, 1099. Neither circumstance exists here. The sworn record shows that ICE directed the precise conduct for which the State seeks to hold GEO liable, and ICE did so when administering the federal immigration-detention program Congress validly authorized.

The district court rejected GEO's *Yearsley* defense after *reciting* the correct project-level test but *applying* a different one. The court noted correctly that, when a contractor follows a federal officer's directive within a federal project, the *Yearsley* defense turns on whether "the authority to carry out the project was validly conferred." 1-ER-14. But the court concluded GEO is unlikely to prevail on this defense because it had not identified "any law, regulation, or constitutional provision giving ICE the lawful authority to immunize GEO from state law." 1-ER-8, 19. The court's analysis thus required a congressional enactment expressly authorizing ICE's specific directive to deny state inspectors access. *See id*. That is not the test. The *Yearsley* test asks not whether Congress expressly authorized a state-law exemption or the ICE officer's denial of

access but whether Congress validly authorized the federal project within which the federal officer directed GEO not to admit the inspectors.

Congress did so. Congress validly authorized ICE to detain noncitizens pending removal or a decision on removal; to arrange for "appropriate places of detention"; and to perform that detention function through contracts with private entities. 8 U.S.C. § 1231(g)(1); 6 U.S.C. §§ 112, 251, 252. Congress also vested the federal government with detention-oversight and complaint-investigation responsibilities through the Office of the Immigration Detention Ombudsman. 6 U.S.C. § 205(b)(1), (3). In this setting, control over who may enter secure portions of an ICE detention facility and under what conditions is not peripheral to the federal project; it is a pivotal operational security function within the project Congress authorized. ICE's direction to GEO that state agencies' access requests must be approved by the ICE Field Office came within that congressionally authorized program. *See* 3-ER-537 (§ 40.0). And so did ICE's denial of such requests.

The district court therefore erred by asking whether Congress expressly authorized ICE to immunize GEO from state law, rather than concluding that ICE denied state inspectors within the scope of its

congressionally conferred authority over federal immigration detention—and that GEO simply adhered to that decision. 1-ER-19.

*Yearsley* itself refutes the district court's conclusion. The contractor there built river dikes at the federal government's direction, and the dikes eroded the plaintiffs' land. 309 U.S. at 19–20. Congress had authorized the river-improvement project but had not specifically authorized erosion of private property or expressly immunized the contractor from liability. *Id.* at 20–22. The Supreme Court nonetheless held the contractor had a complete defense to liability because the dike project was validly authorized and the contractor performed the work as directed by federal officers. *Id.* Yet, under the district court's test, the contractor in *Yearsley* would have lost because no statute specifically authorized the injury-producing consequence of the authorized federal work.

Nor do *Menocal or Hencely*, which the district court cited (1-ER-14), support the district court's express-authorization requirement. In *Hencely*, the Supreme Court found that *Yearsley* was not a defense when the government contractor violated the government's instructions. *Hencely,* 146 S. Ct. at 1099. In contrast here, GEO followed ICE's

directive.[10] And although *Menocal* held that *Yearsley* protection is a merits defense rather than an immediately appealable source of immunity, *Menocal*, 607 U.S. 438, 449–52, the Court did not narrow the substantive rule that a contractor is not liable for conduct the government lawfully authorized and directed.

Furthermore, the district court's definition of "lawful" was circular. 1-ER-8, 12–13. The relevant *Yearsley* inquiry is not whether the contractor's conduct complied with state law, but whether the contractor acted within the scope of authority validly conferred by the federal government. Yet the district court reasoned that because Washington's inspection statute was not preempted, ICE could not lawfully direct GEO to deny state inspectors access. 1-ER-8. That approach improperly defines the scope of federal authorization by reference to the very state-law obligation GEO contends cannot be enforced against it. The question under *Yearsley* is not whether the plaintiff has identified a state-law duty that, absent federal direction, might apply to the government contractor

---

[10] The Supreme Court's decision in *Campbell-Ewald* similarly supports GEO's argument here: In that case, the Court denied *Yearsley* protection because the contractor invoking it violated both federal law and directives of government entity it was working for. C*ampbell-Ewald*, 577 U.S. at 166.

and form the basis of liability. It is whether the contractor acted pursuant to lawful federal authorization and according to the government's terms in undertaking the actions that the plaintiff argues violate that state-law duty. *Menocal*, 607 U.S. at 449. If the existence of a contested state-law duty were enough to make the federal direction "unlawful," *Yearsley* would cease to protect contractors from liability for carrying out federal instructions. *Id.*

In sum, the injunctions seek to punish GEO for doing exactly what ICE required—routing state inspection requests to ICE, following ICE's access determination, and not attempting to override ICE's denial of access to the federal detention facility. GEO did not independently decide to exclude state inspectors. ICE Assistant Field Office Director Matthew Cantrell personally denied them access in his role as the senior ICE official at the facility; documented ICE's denial on the inspection forms; and testified that he acted within the scope of his ICE responsibilities. 4-ER-647–48 ¶¶ 14–30. ICE also confirmed that GEO did not deny access and that allowing the inspectors into the facility over ICE's denial would violate GEO's federal contract. 4-ER-648 ¶¶ 31–32.

This is the paradigm case for *Yearsley* protection: GEO is a contractor sued "precisely for accomplishing what the Federal Government requested." *Hencely*, 146 S. Ct. at 1099. Accordingly, because the State is unlikely to overcome GEO's complete *Yearsley* defense, it cannot establish a likelihood of success on the merits. The district court therefore abused its discretion in concluding otherwise and in issuing preliminary injunctive relief against GEO.

## III. The Other *Winter* Factors Also Favor GEO.

Because the State "has failed to show the likelihood of success on the merits"—much less a clear likelihood of success—the Court "need not consider the remaining three *Winter* elements." *Garcia*, 786 F.3d at 740 (cleaned up). But should the Court consider the remaining *Winter* factors, they weigh against issuing the preliminary injunctions—and certainly do not *clearly* favor their issuance. *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011) ("[E]ven if [a party] … is likely to succeed on the merits, we would still need to consider whether it satisfied the remaining [*Winter* factors].").

The second factor, likely irreparable harm to GEO, favors GEO. The preliminary injunctions upend the status quo during the present

litigation by enjoining GEO to ignore federal directives at the State's whim, thereby breaching its federal contract and inviting that contract's termination. 4-ER-648 ¶ 32. The inevitable loss of goodwill is an irreparable injury. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *RMS NA, Inc. v. RMS (Aus) Pty Ltd.*, 2024 WL 4495515, at *11–12 (S.D. Cal. Oct. 15, 2024). Conversely, if GEO follows ICE's directives, it will suffer the consequences of contempt proceedings in the district court. Moreover, the preliminary injunctions, by facilitating the State's intrusion into a secure federal facility, also expose sensitive information governed by federal statutes and regulations. That harm, too, cannot be undone.

The third and fourth factors—the balance of equities and public interest—merge because the litigation involves the government. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Whether separately or together, neither factor favors issuing the injunctions.

The balance of equities weighs against the State. It has not made a clear showing of an imminent public-health emergency that the preliminary injunctions would relieve. *Winter*, 555 U.S. at 21–22. The State demands inspections based on complaints of unclear provenance.

2-ER-129–31 ¶¶ 4–10; 2-ER-133–35; 3-ER-434–36. The extraordinary remedy of a preliminary injunction requires more. "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). And the State has not shown existing processes to be inadequate: Washington's Pierce County has already investigated food-related issues without objection from ICE. And even if the State could show likely imminent harm, the requested injunction would not remedy it if ICE withholds approval, because ICE—not GEO—controls access to the ICE Facility.

Nor does the public interest favor the injunctions. While public health interests are significant (though in this case, speculative), equally substantial countervailing federal interests exist—secure detention operations, protection of sensitive federal records, and ICE's authority to control access to its facility. The injunctions disregard those interests by compelling GEO to admit inspectors over ICE's objections, wedging GEO into an impossible position between conflicting state and federal directives. Maintaining the status quo while important legal questions are resolved is far from inequitable.

Thus, the State has failed to make the required showing under any of *Winter*'s four factors.

## IV. The Injunctions Violate Rule 65(d).

Even were preliminary injunctive relief warranted here, the district court's injunctions must be vacated because they do not comply with Federal Rule of Civil Procedure 65(d).

Under Rule 65(d), every injunction must "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). That requirement is not technical. It protects the enjoined party from contempt based on uncertain commands and ensures that the injunction can be enforced without requiring the parties to guess at its meaning. An injunction must therefore be clear enough that the defendant can know what conduct is required before sanctions attach.

These injunctions do not meet that standard. The district court ordered GEO to provide access, but excluded "ICE-controlled administrative and medical areas" without defining that phrase. 1-ER-29. The phrase is not self-executing. It does not identify which rooms, corridors, records areas, medical spaces, staff offices, control points, or

mixed-use areas are excluded. Nor does it specify who decides whether a particular area is "ICE-controlled"; what happens if ICE and GEO disagree; whether ICE's access determination defines what is "ICE-controlled"; or how GEO is supposed to separate state-inspectable areas from ICE-controlled areas in real time during an inspection. The undefined carveout is the operative line between compliance and contempt.

The problem is compounded because a nonparty, ICE, controls whether GEO can comply with the injunctions. If ICE denies entry to particular areas, objects to the inspectors' route, withholds pre-clearance, or directs GEO not to admit inspectors beyond a certain point, the injunctions do not say what GEO must do. The district court threatens sanctions if GEO "disregards" the injunctions, 1-ER-29, but those injunctions do not resolve the central practical question: What happens when ICE refuses access? GEO is left to choose between obeying the injunctions as the State understands them, obeying ICE as GEO understands its contract and federal obligations, or risking contempt based on a later judicial determination of what "ICE-controlled" meant. Rule 65(d) does not permit that uncertainty.

The State may say these issues can be worked out during implementation. But Rule 65(d) requires specificity *before* enforcement, not after contempt becomes a possibility. An injunction must tell GEO what conduct is required, not leave the parties to litigate the meaning of "ICE-controlled" during an inspection at a secure federal facility. That vagueness is particularly problematic because the injunctions bind GEO, but the operative access decisions will be made by a nonparty federal officer who is neither subject to the injunctions nor before the court.

Thus, if the preliminary injunctions are not vacated as wholly outside the authority of the district court, the litigation should be remanded with instructions to the district court to apply the mandatory-injunction standard and, assuming that heightened standard is met, to define with specificity any access obligations, including the meaning of "ICE-controlled administrative and medical areas," the effect of ICE's refusal or limitation of access, and the precise conduct GEO must undertake in the face of ICE denial of access to comply without risking sanctions.

## CONCLUSION

This Court should vacate the preliminary injunctions, dismiss the State's complaint in *DOH*, dismiss the State's counterclaim in *Ferguson*, and remand for further proceedings. Alternatively, the Court should vacate the injunctions and instruct the district court to apply the heightened standard for mandatory injunctions and to specify GEO's obligations under any such injunction it issues.

Respectfully submitted,

/s/ David M. Gossett
David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Ste. 500-East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Harry J.F. Korrell
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA 98104
(206) 757-8030
harrykorrell@dwt.com

Scott Schipma
THE GEO GROUP, INC.
4955 Technology Way
Boca Raton, FL 33431
(561) 999-7615
scott.schipma@geogroup.com

*Attorneys for The Geo Group, Inc.*

Dated: August 11, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: https://www.ca9.uscourts.gov/filing/forms/form-8-certificate-of-compliance-briefs/*

**9th Cir. Case Number(s): 26-4450, 26-4454**

I am the attorney or self-represented party.

**This brief contains 13,900 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[●] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** /s/ *David M. Gossett* **Date:** August 11, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's Appellate Case Management System (ACMS) on August 11, 2026.

I further certify that all participants in this case are registered ACMS users and that service will be accomplished via ACMS.

Dated: August 11, 2026

*/s/ David M. Gossett*