No. 26-4450, No. 26-4454

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

WASHINGTON STATE DEPARTMENT OF HEALTH,

*Plaintiff-Appellee,*

v.

THE GEO GROUP, INC.,

*Defendant-Appellant.*

---

THE GEO GROUP, INC.,

*Plaintiff-Ctr-Defendant-Appellant*,

v.

ROBERT W. FERGUSON, in his official capacity as Governor of the State of Washington; NICHOLAS W. BROWN, in his official capacity as Attorney General of the State of Washington,

*Defendants-Ctr-Claimants-Appellees*.

On Appeal from the U.S. District Court for the Western District of Washington
No. 3:23-cv-05626-BHS, No. 3:23-cv-05639-BHS
The Honorable Benjamin H. Settle, U.S. District Court Judge

# STATE APPELLEES' CONSOLIDATED ANSWERING BRIEF

NICHOLAS W. BROWN
*Attorney General*

ELLEN RANGE, WSBA No. 51334
ANDREW HUGHES, WSBA No. 49515
MINA SHAHIN, WSBA No. 46661
*Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

206-464-7744
Ellen.Range@atg.wa.gov
Mina.Shahin@atg.wa.gov
Andrew.Hughes@atg.wa.gov

MARSHA CHIEN, WSBA No. 47020
*Worker Rights Unit Chief*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Marsha.Chien@atg.wa.gov

CRISTINA SEPE, WSBA No. 53609
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for State Appellees*

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ISSUE PRESENTED .......... 3

III. STATEMENT OF THE CASE .......... 3

A. GEO Owns and Operates a Private Detention Facility .......... 3

B. Washington Laws Authorize the Department to Inspect "Any . . . Place" for Public Health Threats, Specifically Including Private Detention Facilities .......... 5

C. GEO—Not ICE—Sues to Enjoin the Private Detention Inspection Law, and the State Sues to Inspect the Tacoma Facility Under Its General Inspection Law Authority .......... 8

D. In Both Cases, this Court Rejected GEO's Preemption Argument and Remanded to the District Court for Further Proceedings .......... 13

E. Following this Court's Vacatur of the *Inslee* Preliminary Injunction, GEO Continued to Block Access to Its Tacoma Facility .......... 16

F. The State Sues to Seek Access to GEO's Tacoma Facility under the Private Detention Inspection Law and Renews Its Efforts to Inspect under the General Inspection Law .......... 17

IV. SUMMARY OF ARGUMENT .......... 19

V. STANDARD OF REVIEW .......... 20

VI. ARGUMENT .......... 20

A. Washington Is Likely to Succeed on Its Argument That GEO's Denial of Entry to Department Inspectors Violates Washington Law .......... 20

1. The District Court's injunction is prohibitory, not mandatory ....................20

2. The Department has statutory rights to enter GEO's facility ....................22

3. Rule 19 does not require dismissal because ICE is neither required nor indispensable ....................24

a. ICE is not a required part under Rule 19(a) because complete relief is possible in its absence ....................25

b. ICE is not a required party because it has not claimed an interest ....................28

c. Even if GEO could speak for ICE, GEO failed to demonstrate a legally protected interest on ICE's behalf that would be impaired ....................30

d. GEO cannot demonstrate inconsistent obligations ....................34

e. Equity and good conscience cut sharply against dismissal under Rule 19(b) ....................35

f. Even were ICE indispensable, the public rights exception would apply ....................37

4. GEO has no *Yearsley* defense ....................38

5. Intergovernmental immunity does not permit GEO to disregard Washington law ....................47

a. Washington law regulates GEO—not ICE ....................47

b. The Private Detention Inspection Law does not discriminate against GEO as a federal contractor ....................51

B. The District Court Did Not Err in Concluding That the State Will Suffer Irreparable Harm Without Preliminary Relief ....................56

C. The Balance of Equities and Public Interest Clearly Favor Oversight of GEO's Tacoma Facility ....................................58

D. The District Court's Injunction Complies with Federal Rule 65 .............60

VII. CONCLUSION...........................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Accura Eng'g and Consulting Servs., Inc. v. United States*,
167 Fed. Cl. 258 (Fed. Cl. 2023) ....................................................................42

*Am. Beverage Ass'n v. City and Cnty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ..........................................................................20

*Barnes v. Glen Theatre, Inc.*,
501 U.S. 560 (1991) ......................................................................................59

*Boeing v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .................................................................. 48, 50

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) .............................................................................. 45, 46

*Bradley, Gmelich & Wellerstein LLP v. Kay*,
No. 2:25-cv-10471-AB-DFM,
2026 WL 712564 (C.D. Cal. Feb. 3, 2026) ....................................................29

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
797 F.3d 720 (9th Cir. 2015) .................................................................. 38, 44

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) ......................................................................................38

*Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*,
17 F.3d 1292 (10th Cir. 1994) ........................................................................31

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
981 F.3d 742 (9th Cir. 2020) ..........................................................................59

*Clinton v. Babbit*,
180 F.3d 1081 (9th Cir. 1999) ........................................................................33

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ........................................................................37

*County of King v. Turner*,
No. 25-3664,
2026 WL 2489361 (9th Cir. Aug. 25, 2026)........................................39

*Dart Advantage Warehousing, Inc. v. United States*,
52 Fed. Cl. 694 (Fed. Cl. 2002)...............................................................34

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
276 F.3d 1150 (9th Cir. 2002)................................................. 33, 35, 36

*Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004)............................................................ 25, 35

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023)....................................................................21

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) ..................................... 27, 39, 44, 45, 46, 48, 49

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017)....................................................................21

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934) .................................................................................40

*Johnson v. Maryland*,
254 U.S. 51 (1920) ...................................................................................50

*Kescoli v. Babbitt*,
101 F.3d 1304 (9th Cir. 1996) ..................................................................38

*L.T. v. ICE*,
No. 5:26-cv-00322 (C.D. Cal. Mar. 30, 2026) ............................... 29, 30

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .................................................................................16

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) .................................................................................49

*Makah Indian Tribe v. Verity*,
910 F.2d 555 (9th Cir. 1990) ....................................................................36

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ....................................................................21

*Maryland v. King*,
567 U.S. 1301 (2012) ....................................................................56

*Mayo v. United States*,
319 U.S. 441 (1943) ....................................................................49

*Menocal v. The GEO Grp., Inc.*,
635 F. Supp. 3d 1151 (D. Colo. 2022) ....................................................................35

*Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*,
425 F.3d 1308 (11th Cir. 2005) ....................................................................31

*Norfolk & W. Ry. v. Am. Train Dispatchers Ass'n*,
499 U.S. 117 (1991) ....................................................................40

*Northrop Corp. v. McDonnell Douglas Corp.*,
705 F.2d 1030 (9th Cir. 1983) .................................................... 25, 28, 31

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) .................................................... 44, 49

*Ocean View Towers Assocs., Ltd. P'ship v. United States*,
88 Fed. Cl. 169 (Fed. Cl. 2009) ....................................................................40

*Pub. Utils. Comm'n of State of Cal. v. United States*,
355 U.S. 534 (1958) ....................................................................49

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
499 F.3d 1108 (9th Cir. 2007) ....................................................................47

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008) ....................................................................36

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) .................................................... 58, 59

*Spokane Cnty. Health Dist. v. Brockett*,
839 P.2d 324 (Wash. 1992) .......................................................................... 6, 23

*The GEO Grp. Inc. v. Ferguson*,
No. 24-2815 (9th Cir. July 25, 2024)...............................................................29

*The GEO Grp. Inc.*,
No. 3:17-cv-05806-RJB,
2018 WL 1963792 (W.D. Wash. Apr. 26, 2018) ................................................37

*The GEO Grp., Inc. v. Ferguson*,
No. 3:23-cv-05626-BHS,
2026 WL 1983207 (W.D. Wash. Jul. 9, 2026)
............................................. 17, 18, 26, 27, 28, 34, 36, 37, 40, 41, 49, 56, 58, 60

*The GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025)...... 3, 13, 14, 15, 28, 31, 39, 44, 47, 48, 50, 52, 54

*The GEO Grp., Inc. v. Inslee*,
720 F. Supp. 3d 102 (W.D. Wash. 2024) ............................................................8

*The GEO Grp., Inc. v. Menocal*,
146 S. Ct. 774 (2026) .........................................................................................27

*The Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022)..................................................................27, 32, 47

*Trump v. California*,
609 U.S. ----, No. 26A124,
2026 WL 2473573 (U.S. Aug. 24, 2026) ............................................................53

*United States v. Amdahl Corp.*,
786 F.2d 387 (Fed. Cir. 1986) ...........................................................................34

*United States v. Bowen*,
172 F.3d 682 (9th Cir.1999) ............................................................ 25, 28, 29, 30

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ............................................................ 14, 31, 52, 59

*United States v. King County, Washington*,
122 F.4th 740 (9th Cir. 2024)....................................................................50

*United States v. Washington*,
596 U.S. 832 (2022) ........................................................................ 47, 52

*Valentine v. Collier*,
978 F.3d 154 (5th Cir. 2020)........................................................................59

*Walsh v. Centeio*,
692 F.2d 1239 (9th Cir. 1982)......................................................................20

*Ward v. Apple Inc.*,
791 F.3d 1041 (9th Cir. 2015)............................................................... 30, 33

*Wash. Dep't of Health v. The GEO Grp., Inc.*,
No. 24-5880,
2025 WL 2986482 (9th Cir. Oct. 23, 2025) ...............................................15

*Wash. Dep't of Lab. & Indus. v. GEO Secure Servs., LLC*,
No. 3:24-cv-05095-BHS (W.D. Wash. Sept. 25, 2024) .......................... 13, 27, 44

*Wash. Dep't of Labor & Indus. v. GEO Secure Servs., LLC*,
No. 3:24-05095-BHS, 2024 WL 3250426 (W.D. Wash. July 1, 2024).. 12, 13, 59

*Wash., Dep't of Health v. The GEO Grp., Inc.*,
No. 3:24-cv-05639-BHS,
2026 WL 1990779 (W.D. Wash. July 9, 2026)..................................... 19, 39, 40

*Washington v. United States*,
460 U.S.536 (1983) .......................................................................................56

*Xochihua-Jaimes v. Barr*,
962 F.3d 1065 (9th Cir. 2020)......................................................................23

*Yearsley v. W.A. Ross Const. Co.*,
309 U.S. 18 (1940) ........................................................................ 38, 43, 45, 47

*Yeend v. Akima Global Servs., LLC*,
347 F.R.D. 405 (N.D.N.Y. 2024)............................................................ 29, 33

## Statutes

Engrossed Second Substitute H.B. 1232, 69th Leg. Reg. Sess. (Wash. 2025) .........9

Second Substitute H.B. 1470, 68th Leg. Reg., Sess. (Wash. 2023) ..........................6

Wash. Rev. Code § 43.20.050(2)(d) ..................................................................6

Wash. Rev. Code § 43.70.005.......................................................................... 5, 58

Wash. Rev. Code § 43.70.130(3)..................................................................... 5, 58

Wash. Rev. Code § 43.70.130(8)..........................................................................6

Wash. Rev. Code § 43.70.170.................................................... 5, 11, 23, 24, 42, 55

Wash. Rev. Code § 43.70.190............................................................................11

Wash. Rev. Code § 49.17.070............................................................................12

Wash. Rev. Code ch. 70.395 .......................................................................... 23, 38

Wash. Rev. Code § 70.395.020.........................................................................25

Wash. Rev. Code § 70.395.020(6)......................................................................9

Wash. Rev. Code § 70.395.050...........................................................................7

Wash. Rev. Code § 70.395.050(2)(b) ............................................................ 23, 55

Wash. Rev. Code § 70.395.50(2)(b) .............................................................. 25, 37

Wash. Rev. Code ch. 71.05 ...............................................................................14

Wash. Rev. Code § 71.12.510............................................................................54

Wash. Rev. Code § 71.12.520............................................................................54

## Regulations

Wash. Admin. Code § 246-322..............................................................................7

Wash. Admin. Code § 246-322-025(3) ....................................................55

Wash. Admin. Code § 246-322-025(3)(c) ....................................................7

Wash. Admin. Code § 246-322-100 ....................................................15

Wash. Admin. Code § 246-322-120 .................................................... 9, 15

Wash. Admin. Code § 246-322-140 ....................................................15

Wash. Admin. Code § 246-322-160 ....................................................15

Wash. Admin. Code § 246-322-230 ....................................................15

Wash. Admin. Code § 246-322-240 ....................................................15

Wash. Admin. Code § 246-324....................................................7

Wash. Admin. Code § 246-324-025(3)(c) ....................................................7

Wash. Admin. Code § 246-337-001 ....................................................14

Wash. Admin. Code § 246-337-021(1)(a) ....................................................8

Wash. Admin. Code § 246-337-060 ....................................................14

Wash. Admin. Code § 246-337-111 ....................................................14

Wash. Admin. Code § 246-337-112 ....................................................14

Wash. Admin. Code § 246-337-124 ....................................................14

Wash. Admin. Code § 246-337-128 ....................................................14

Wash. Admin. Code § 246-337-135 ....................................................14

Wash. Admin. Code § 246-337-146 ....................................................14

**Rules**

Fed. R. Civ. P. 19(a)(1)(A) .................................................... 25, 27

Fed. R. Civ. P. 19(a)(1)(B) ....................................................................25

Fed. R. Civ. P. 19(b) ....................................................................... 25, 36

**Other Authorities**

Freddy Monares,
*ICE releases identity of latest death at Tacoma detention center*, KNKX Public Radio (Oct. 30, 2024),
https://www.knkx.org/social-justice/2024-10-30/immigration-customs-enforcement-releases-identity-second-death-tacoma-nw-processing-detention-center ....................................................................10

Univ. of Wash. Center for Human Rights,
*911 Call Logs Reveal Increase in Reports of Suicide Attempts at Northwest Detention Center in Tacoma, WA* (Apr. 9, 2024),
https://jsis.washington.edu/humanrights/2024/04/09/press-release-911-calls-reveal-suicide-attempts-at-nwdc/ ........................................................11

Public Hr'g on HB 1470 Before the H. Comm. on Community Safety, Justice & Reentry (Wash. Feb. 7, 2023), *video recording by* TVW, Washington State's Public Affairs Network,
https://tvw.org/video/house-community-safety-justice-reentry-2023021199/?eventID=2023021199 ........................................................6

Seattle Univ. School of Law Int'l Human Rights Clinic & OneAmerica,
*Voices from Detention: A Report on Human Rights Violations at the Northwest Detention Center in Tacoma, Washington* (July 2008),
https://www.yumpu.com/en/document/read/48836345/voices-from-detention-a-report-on-human-rights-oneamerica ..................................................7

U.S. Dep't of Homeland Sec., Off. of Inspector Gen.,
*Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma*, *Washington* (May 22, 2023),
https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf.......................................................................................7

Univ. of Wash. Ctr. for Human Rts.,
*Human Rights Conditions in the Northwest Detention Center* (Mar.-Dec. 2020), https://jsis.washington.edu/humanrights/projects/human-rights-at-home/conditions-at-the-northwest-detention-center/ ..............................7

Ximena Bustillo,
*DHS blames funding lapse for shutdown of internal detention oversight*, NPR (May 7, 2026), https://www.npr.org/2026/05/07/g-s1-120834/trump-immigration-detention-ombudsman-shutdown ........................................................................34

# I. INTRODUCTION

Like any private, for-profit business in Washington, The GEO Group must comply with state health and safety laws. The Washington State Department of Health (the Department) has long-held statutory authority to investigate public health threats, and for decades state and local agencies have inspected GEO's private detention facility in Tacoma. But after Washington's Legislature passed a statute specifically requiring the Department to investigate complaints at private detention facilities—just as it does at other civil detention facilities—GEO began refusing the Department access. GEO has continued to refuse access even as the Department has received thousands of complaints about GEO's facility that paint a stunning portrait of squalor and neglect—medical emergencies ignored, contaminated food, unsanitary conditions, and more. GEO's brazen disregard for Washington law is not only unlawful, it irreparably harms the State and the public interest. As a result, the district court entered two separate preliminary injunctions ordering GEO to step aside and let the Department do its job of protecting the health and safety of people within Washington's borders.

GEO's efforts to deflect blame onto ICE fail at every turn. First, GEO is wrong that ICE is the proper defendant. GEO, not ICE, owns and controls GEO's Tacoma facility and must comply with Washington laws. Indeed, GEO's contract with ICE makes clear that GEO controls access to the facility and specifically contemplates

GEO's compliance with state health and safety laws. As such, ICE has not attempted to claim any interest in this litigation, nor can GEO credibly ventriloquize any legally cognizable ICE interest that may be impaired by health inspections of GEO's facility. The district court thus acted well within its discretion in denying GEO's Rule 19 motion to dismiss.

GEO's Supremacy Clause defenses likewise lack merit. GEO's *Yearsley* defense fails because, as the district court correctly found, no law and no term in GEO's contract permits—let alone requires—GEO to deny access to Department inspectors. And contrary to GEO's claims, the purported verbal directive of a single ICE officer to defy Washington's health and safety inspection regime cannot provide GEO authority that federal statutes and GEO's contract do not.

GEO's intergovernmental immunity defenses fail as well. This Court already held that Washington's inspections of GEO's facility regulate GEO, not ICE, so GEO's direct regulation defense is dead on arrival. And GEO's discrimination defense founders twice over: a law that authorizes the Department to inspect "any . . . place" could not discriminate against GEO, and GEO cannot show it is being singled out because Washington's private detention inspection law applies to state and local contractors as well as GEO.

Nor, finally, can GEO show that the district court abused its discretion in finding a likelihood of irreparable harm or weighing the equities and public interest.

A preliminary injunction to end GEO's blatant obstruction of public health inspections is necessary to address serious, ongoing threats to public health at GEO's facility and to promote the public's interest in transparency and humane treatment of civil detainees.

This Court should affirm the district court's rulings.

## II. ISSUE PRESENTED

Was the district court's grant of preliminary injunctive relief within its discretion where GEO flouted state law by refusing to allow Department of Health inspectors access to its private facility to investigate public health threats?

## III. STATEMENT OF THE CASE

### A. GEO Owns and Operates a Private Detention Facility

GEO owns and operates a private detention facility in Tacoma, called the Northwest ICE Processing Center (NWIPC). *The GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1111 (9th Cir. 2025) (*GEO II*).[1] There, GEO detains immigrants under a contract with ICE. *Id.* at 1111-12. The immigrants are detained while awaiting administrative review of their immigration status, not because they have been charged with or convicted of any crime. *Id.* at 1112.

[1] Now-Governor Robert Ferguson and now-Attorney General Nick Brown have substituted in as parties for former Governor Jay Inslee and former Attorney General Ferguson.

The services GEO provides ICE are established by contract. GEO's contract explicitly states that GEO, "will operate and control all designated points of ingress and egress on the site." 3-ER-484. Although ICE controls portions of GEO's Tacoma facility that house ICE staff and information, i.e., the "ICE Administrative Space," 3-ER-474-75, the contract does not indicate any ICE approval or preclearance is necessary to access the remainder of the facility. When members of the public, including "state and local governmental agencies," seek "tours" or "visits" with detainees, they must make a written request, 3-ER-537, 562, but the contract imposes no such requirement for "inspections," despite referring to "inspections" or "inspectors" well over a dozen times, *see, e.g.*, 3-ER-471, 472, 486, 494, 495, 502, 516, 520, 525, 536, 576, 591, 592, 595. And state and local agencies have conducted unannounced inspections of GEO's facility for decades. *See, e.g.*, 1-SER-117-18, 121-22.

The contract additionally requires GEO to comply with the 2025 National Detention Standards (NDS), 3-ER-469, which likewise presume the applicability of state law to GEO. The NDS, for example, require GEO to comply with state and local fire codes, state water standards, state garbage and hazardous and infectious waste disposal regulations, state and local food service authorities, and state public health reporting laws. *See* 2-ER-207-08, 210, 234, 284; 3-ER-304, 307, 309, 318, 323, 328, 343, 344. The NDS, in fact, contemplates potential "adverse findings" in

state citations or licensure actions pertaining to "state and local health, life, safety, and fire codes." 2-ER-206. Only the "Contracting Officer" is permitted to modify the contract terms. *See* 3-ER-471, 582.

### B. Washington Laws Authorize the Department to Inspect "Any . . . Place" for Public Health Threats, Specifically Including Private Detention Facilities

Two state laws are at issue in these appeals: Wash. Rev. Code § 43.70.170 (the General Inspection Law) and Wash. Rev. Code § 70.395.050 (the Private Detention Inspection Law).

**The General Inspection Law:** For decades, Washington's Legislature has authorized the Department to access *any* facility to investigate public health threats. The Legislature mandates the Department "preserve the public health" by "[s]trictly enforc[ing] all laws for the protection of the public health and the improvement of sanitary conditions in the state[.]" Wash. Rev. Code §§ 43.70.005, .130(3). From its creation, the Department has held general authority to inspect "any . . . place" in Washington. Wash. Rev. Code § 43.70.170. The Legislature authorized the Department to "investigate, examine, sample, or inspect" any condition "constituting a threat to the public health" and specified the Department "shall *at all times* have free and unimpeded access to all buildings, yards, warehouses, storage and transportation facilities *or any other place*." *Id.* (emphasis added).

The General Inspection Law authorizes the Department to inspect "all . . . matters injurious to the public health." *Id.* All means all. *See Spokane Cnty. Health Dist. v. Brockett*, 839 P.2d 324, 329 (Wash. 1992) ("[P]ublic health statutes and the actions of local health boards implementing those statutes are liberally construed."). After all, "threats to public safety come in all shapes and sizes[.]" *Headworks Hand Crafted Ales, Inc. v. Wash. State Liquor & Cannabis Bd.*, 540 P.3d 863, 872 (Wash. App. 2024).

**The Private Detention Inspection Law:** Apart from the General Inspection Law, the Legislature also authorized state health authorities to set health and safety rules for a myriad of facilities implicating public health, from schools to transient accommodations. *See* Wash. Rev. Code §§ 43.20.050(2)(d); 43.70.130(8) (contracted facilities). In 2023, Washington passed House Bill 1470, setting health and safety standards for private, for-profit detention facilities. Second Substitute H.B. 1470, 68th Leg. Reg., Sess. (Wash. 2023), *enacted as* 2023 Wash. Sess. Laws, ch. 419. This law ensured parity between private detention facilities and other congregate facilities.[2] Prior to the law's passage, private detention facilities were essentially the only facilities in Washington that detain or institutionalize people that

[2] *See* Public Hr'g on HB 1470 Before the H. Comm. on Community Safety, Justice & Reentry (Wash. Feb. 7, 2023), at 4:04, *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/house-community-safety-justice-reentry-2023021199/?eventID=2023021199.

were *not* subject to specific state regulation and oversight. This was despite the fact that private detention facilities—including GEO's Tacoma facility—have well-documented histories of providing substandard care and living conditions.[3]

To close this loophole, the law, among other things, directs the Department and Washington's Department of Labor and Industries (L&I) to conduct inspections of private detention facilities, both routinely and in response to complaints. Wash. Rev. Code § 70.395.050.

This is no different from regulations for other congregate care facilities. The Department, for example, has set standards for private psychiatric hospitals, residential treatment facilities, and private alcohol and chemical dependency hospitals. *See* Wash. Admin. Code §§ 246-322, -324, -337. The Department likewise has the authority to inspect each of these facilities at any time. *See id.* § 246-322-025(3)(c) (requiring "on-site inspection" of private psychiatric hospitals "at any time"); *id.* § 246-324-025(3)(c) (same for private alcohol and

[3] *See, e.g.*, U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma, Washington*, at 9-12 (May 22, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf; Univ. of Wash. Ctr. for Human Rts., *Human Rights Conditions in the Northwest Detention Center* (Mar.-Dec. 2020), https://jsis.washington.edu/humanrights/projects/human-rights-at-home/conditions-at-the-northwest-detention-center/; Seattle Univ. School of Law Int'l Human Rights Clinic & OneAmerica, *Voices from Detention: A Report on Human Rights Violations at the Northwest Detention Center in Tacoma, Washington* (July 2008), https://www.yumpu.com/en/document/read/48836345/voices-from-detention-a-report-on-human-rights-oneamerica.

chemical dependency hospitals); *id.* § 246-337-021(1)(a) (authorizing "unannounced on-site surveys" of residential treatment facilities).

### C. GEO—Not ICE—Sues to Enjoin the Private Detention Inspection Law, and the State Sues to Inspect the Tacoma Facility Under Its General Inspection Law Authority

Two months after HB 1470's effective date, GEO—not ICE—filed the *Ferguson* suit against Washington's Governor and Attorney General, seeking to enjoin enforcement of the Private Detention Inspection Law. 3-SER-808. The district court ruled that HB 1470 did not directly regulate the federal government and was not preempted. *See The GEO Grp., Inc. v. Inslee*, 720 F. Supp. 3d 1029, 1057-61 (W.D. Wash. 2024) (*GEO I*). The district court nevertheless enjoined several sections of HB 1470, concluding that those provisions violated the discrimination prong of intergovernmental immunity. The court concluded that the requirements differed from those applicable to state prisons and jails and that, because GEO's Tacoma facility was the only private, for-profit detention facility in Washington, it was the only facility subject to the statute's requirements. *Id.* at 1054, 1064-65. The State parties appealed, arguing that HB 1470 did not discriminate against GEO because its requirements mirrored those that already apply to residential treatment facilities and similar facilities.

While that appeal was pending, Washington's Legislature enacted House Bill 1232 (HB 1232), which amended Wash. Rev. Code ch. 70.395. Relevant here,

HB 1232 expanded the definition of "private detention facilities" to include both for-profit and non-profit organizations. *See* Engrossed Second Substitute H.B. 1232, 69th Leg. Reg. Sess. (Wash. 2025). As a result, GEO's Tacoma facility is no longer the only "private detention facility" covered by the law. *See* Wash. Rev. Code § 70.395.020(6). Martin Hall Juvenile Detention Facility is now also subject to Wash. Rev. Code ch. 70.395's requirements. 3-ER-462-63. Further, HB 1232 added substantive provisions to Wash. Rev. Code § 70.395.040 and Wash. Rev. Code § 70.395.050, drawn directly from standards governing private psychiatric detention facilities. *See* Wash. Admin. Code § 246-322-120.

Meanwhile, complaints related to GEO's Tacoma facility piled up. After the passage of HB 1470, the Department received over *3,500* detainee complaints about abhorrent conditions at GEO's Tacoma facility. 2-ER-129-30; 1-SER-111. Immigrants have complained they are served food containing foreign objects, such as burned plastic, metal string, rope, splinters, hair, and worms. 2-ER-130. Detained immigrants state that food often tastes bad, smells bad, and they do not receive enough. *Id.* For example, one complaint reported that meat was served raw, resulting in "around 15 people" getting sick. 2-ER-134. The Department has also received complaints about drinking water, for example, that the water is brown and "tastes disgusting[.]" *Id.* There are also complaints about the air quality and that there is a "bad smell [] coming from the vents" and that it "smells like sewer." *Id.*

Immigrants have also complained GEO's Tacoma facility is unsanitary: bathrooms are rarely cleaned, floors go unswept, and the facility smells like a dirty bathroom. 2-ER-131. Immigrants report black mold in the showers. *Id.* A recent complaint stated that at one point there were only two working bathrooms for around 100 people. *Id.* Many complaints focus on laundry. Detainees' clothes are returned wet and dirtier than before. 2-ER-130-31. For example, one person reported that a "few days ago, I asked them to change my boxers, and they brought me ones that were dirty and belonged to someone else. The socks are also used and smell bad." 2-ER-135. There are reports that sheets are not washed after people are sick with infectious diseases like chicken pox or COVID. *Id.* One detainee with mental health issues allegedly soiled their clothing but was refused clean clothing by a GEO employee. *Id.*

Immigrants also report being denied access to medical care. 2-ER-135. Immigrants have reported suffering from strokes, paralysis, heart conditions, internal bleeding, and asthma, and that these complaints go unaddressed by GEO. 2-ER-130. Detainees have likewise complained that GEO has been denying access to necessary medication. *Id.* Two people have died while detained inside GEO's Tacoma facility,[4]

[4] *See* Freddy Monares, *ICE releases identity of latest death at Tacoma detention center*, KNKX Public Radio (Oct. 30, 2024), https://www.knkx.org/social-justice/2024-10-30/immigration-customs-enforcement-releases-identity-second-death-tacoma-nw-processing-detention-center.

and six more have attempted suicide.[5]

Based on these many allegations of health and safety violations from people detained in GEO's Tacoma facility, the Department concluded the conditions at the Tacoma facility pose public health threats warranting investigation. 2-ER-131; 1-SER-112-13; *see also* Wash. Rev. Code §§ 43.70.170, .190.

In July 2024, the Department attempted to inspect GEO's Tacoma facility, relying on its authority under the General Inspection Law, not the recently enacted HB 1470. 1-SER-113. When the Department investigator arrived, a GEO front desk employee did not allow her to enter but instead called GEO's Facility Administrator, Bruce Scott. *Id.* When Mr. Scott came to the lobby, the inspector stated that they were there pursuant to the General Inspection Law to inspect the facility's water quality, air quality, COVID and disease infection protocols, mental health care, and living conditions and hygiene. *Id.*; 1-SER-115. Mr. Scott then fetched GEO's Assistant Facility Administrator and an ICE employee. Together, the three men only allowed the Department to test the water in the bathroom next to the public lobby and otherwise denied the Department entry. 1-SER-113-14. This limited access did not allow adequate testing of the facility's water quality. 1-SER-109-10. GEO's

---

[5] S*ee* Univ. of Wash. Center for Human Rights, *911 Call Logs Reveal Increase in Reports of Suicide Attempts at Northwest Detention Center in Tacoma, WA* (Apr. 9, 2024), https://jsis.washington.edu/humanrights/2024/04/09/press-release-911-calls-reveal-suicide-attempts-at-nwdc/.

refusal of entry beyond the lobby bathroom blocked the Department from investigating the many other public health complaints from detainees. 1-SER-110; *see also* 1-SER-113-14.

The Department then filed the *DOH* suit in state court, seeking an order preventing GEO from continuing to block Department inspectors under the General Inspection Law. 1-SER-123. GEO removed to federal court under the federal officer removal statute, 28 U.S.C. § 1442, based on asserted federal defenses of derivative sovereign immunity, intergovernmental immunity, and preemption. 1-SER-127. The district court *sua sponte* remanded the case back to Washington state court, reasoning that (1) derivative sovereign immunity did not apply because nothing authorized either ICE or GEO to deny the Department access to GEO's Tacoma facility, (2) no federal law preempted Washington law, and (3) GEO is not so closely connected to the federal government that the direct regulation prong of intergovernmental immunity could ever apply. 1-SER-96. GEO appealed.

At around the same time, Washington's Department of Labor and Industries sought to inspect GEO's Tacoma facility under its own general authority to inspect "any . . . workplace," Wash. Rev. Code § 49.17.070—and was also denied access by GEO. *See Wash. Dep't of Labor & Indus. v. GEO Secure Servs., LLC*, No. 3:24-5095-BHS, 2024 WL 3250426, at *2-3 (W.D. Wash. July 1, 2024). L&I also sued, and the district court granted its request for an order preliminarily enjoining GEO

from denying L&I access to GEO's facility. *Id.* at *12. Thereafter, GEO stipulated to an injunction "permanently enjoining GEO from denying L&I access to" GEO's Tacoma facility. Stip. Mot. & Order at 1, *Wash. Dep't of Lab. & Indus. v. GEO Secure Servs., LLC*, No. 3:24-cv-05095-BHS (W.D. Wash. Sept. 25, 2024), ECF No. 54. Since then, GEO has complied with an unannounced L&l inspection. *See* 1-SER-105-06.

### D. In Both Cases, this Court Rejected GEO's Preemption Argument and Remanded to the District Court for Further Proceedings

Two different panels of this Court considered the *Ferguson* and *DOH* appeals.

In *Ferguson*, this Court vacated the preliminary injunction against Wash. Rev. Code ch. 70.395 and remanded in part. *GEO II*, 151 F.4th 1107. The Court affirmed the district court's order dismissing GEO's direct regulation and preemption defenses, reasoning that Wash. Rev. Code ch. 70.395 did *not* give Washington virtual power of review over ICE detention facilities nor prevent ICE from detaining individuals at GEO's facility. *Id.* at 1118. Regarding preemption, this Court "s[aw] no indication that Congress ha[d] demonstrated any intent, let alone a clear and manifest intent, to preempt" Washington's law. *Id.* at 1123. In other words, nothing in those sections of Washington law prevents GEO from accomplishing any task that has been required by the federal government—"especially when its own contract with ICE contemplates more stringent state requirements in the first place." *Id.* at 1124.

As for the discrimination prong, this Court concluded that the proper comparator was not state prisons or jails. *Id.* at 1119-20. While this Court in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), had compared immigration detention facilities to state prisons and jails, the Court concluded the comparison did not control here. Instead, the Court recognized there is a "fundamental difference between civil detainees and those charged [with] or convicted [of] crimes." *GEO II*, 151 F.4th. at 1119. Because the conditions of confinement are not "part of a penal regime," this Court concluded civil immigration facilities are more similar to civil detention facilities like residential treatment facilities or civil commitment centers, i.e., facilities where individuals are held in involuntary confinement, but not for punitive purposes. *Id.* at 1120. As such, this Court remanded for the district court to determine whether Washington regulates the conditions of confinement at GEO's Tacoma facility under Wash. Rev. Code § 70.395.040 differently from the way it regulates the conditions in other civil detention facilities. *Id.* at 1122. Although this Court required the district court to make the comparison "in the first instance," it observed that the vast majority of Wash. Rev. Code § 70.395.040's requirements appear to mirror those applicable to residential treatment facilities, i.e., Wash. Admin. Code §§ 246-337-001, -060, -111, -112, -124, -128, -135, -146, or involuntary civil commitment centers, i.e., Wash. Rev. Code ch. 71.05, Wash.

Admin. Code §§ 246-322-100, -120, -140, -160, -230, -240. *GEO II*, 151 F.4th. at 1121.

GEO sought en banc review and a stay of this Court's mandate pending a petition for certiorari. *See The GEO Grp. v. Inslee*, No. 24-2815 (9th Cir. 2025) DktEntry 75.1, 79.1. This Court denied both. *Id.*, DktEntry 78.1, 83.1. GEO's petition for certiorari is pending.

Separately, in *DOH*, this Court affirmed the district court's remand to state court in part. *Wash. Dep't of Health v. The GEO Grp., Inc.*, No. 24-5880, 2025 WL 2986482, at *1 (9th Cir. Oct. 23, 2025) (*DOH I*). The Court concluded that GEO's discrimination, field preemption, and conflict preemption defenses "fail to clear the low bar of frivolity." *Id.* at *2. But this Court remanded for the district court to determine whether any facts support GEO's derivative sovereign immunity or direct regulation defenses. This Court concluded GEO's contract with ICE and the Performance Based National Detention Standards could not support that the denial of entry was mandated by the federal government. *Id.* Nevertheless, this Court instructed the district court to hold an evidentiary hearing regarding "[t]he ICE employee's verbal directive" because "[i]t is not clear from the record which GEO Group actions, if any, the ICE employee's denial 'specifically authorized,'" *id.*—namely, "whether the ICE employee was acting within the scope of ICE's authority when he instructed GEO Group to deny access to Department employees or whether

he was acting *ultra vires*, that is, beyond 'the powers delegated to him by the sovereign.'" *Id*. (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 693 (1949)).

### E. Following this Court's Vacatur of the *Inslee* Preliminary Injunction, GEO Continued to Block Access to Its Tacoma Facility

After this Court issued its mandate vacating the injunction against Wash. Rev. Code ch. 70.395, the Department sent employees to GEO's Tacoma facility under both the General Inspection Law and the Private Detention Inspection Law. 1-SER-5-6.

In March 2026, two Department inspectors went to GEO's Tacoma facility to investigate complaints. *Id.* They were greeted by a GEO employee, who then called GEO's facility administrator, Mr. Scott. *Id*. The inspectors explained they were there to investigate complaints. *Id.* Instead of allowing the inspectors entry, Mr. Scott directed them to fill out a form and then left to get an ICE agent. *Id.* The ICE agent told inspectors to contact DHS's Seattle office to receive permission to access secure areas. 1-SER-6. The Department's employees were denied access to GEO's facility.

In April 2026, the Department again attempted to enter GEO's facility to investigate complaints. *Id.* They were again greeted by a GEO employee, and Mr. Scott was again summoned. *Id.* Again, Mr. Scott denied entry and got an ICE agent to speak with the Department inspectors. *Id.* Again, the agent told the Department inspectors that they are not allowed to enter secure areas without

permission from DHS's Seattle office. *Id.* Although the Department emailed DHS's Seattle Office, the Department has never received any response. *Id.*

### F. The State Sues to Seek Access to GEO's Tacoma Facility under the Private Detention Inspection Law and Renews Its Efforts to Inspect under the General Inspection Law

Following GEO's continued refusal to comply with Washington law, the State sought relief from the district court. In *Ferguson*, the State Defendants brought a counterclaim, alleging GEO violated the Private Detention Inspection Law, and sought a preliminary injunction to prohibit GEO from continuing to block access. GEO moved to dismiss the State's counterclaim, arguing that the State failed to join ICE as a necessary and indispensable party. In *DOH*, the Department renewed its prior motion for a preliminary injunction.

Applying this Court's guidance, the district court granted the State's preliminary injunction motions and denied GEO's motion to dismiss. *The GEO Grp., Inc. v. Ferguson*, No. 3:23-cv-05626-BHS, 2026 WL 1983207 (W.D. Wash. Jul. 9, 2026) (*GEO III*).

First, the district court rejected GEO's argument that ICE is a necessary and indispensable party to either matter. *Id.* at *3. Regardless of whether ICE also refused to permit the state inspection, the district court concluded that GEO's immunity is not coextensive with ICE's and thar no law, regulation, or constitutional provision authorizes an ICE agent to immunize GEO from state law. Second, the

district court dismissed GEO's *Yearsley* defense because GEO failed to identify any legal source of ICE's purported authorization for GEO to override state public health law. *Id.* at *5-9. Applying this Court's *GEO II* opinion, the district court disposed of GEO's intergovernmental immunity and preemption defenses, observing that Congress has not demonstrated any intent to preempt state law, and that the Private Detention Inspection Law imposes burdens comparable to those applicable to residential treatment centers and private commitment centers. *Id.* at *11-12.

Finally, the district court found that the remaining *Winter* factors heavily favor the State. Observing that the State raises "compelling concerns" for the health and safety of the detainees held at GEO's facility, and that detainees' welfare "remains within the State's purview," the district court ordered GEO to admit Department inspectors to the portions of the Tacoma facility that GEO undoubtedly controls. *Id.* at *13. In doing so, the district court carefully carved out Department access to ICE's Administrative Space and the medical areas, the latter being the only type of area for which the record was unclear about GEO or ICE control. *Id.* at *7 n.9.

In *DOH*, the district court concluded that GEO met the "low standard" of showing "[i]ts *Yearsley* and direct-regulation defenses are 'colorable'" for purposes of the federal officer removal statute, but nonetheless granted the Department's motion for a preliminary injunction, incorporating its reasoning from the *Ferguson* preliminary injunction order. *Wash. Dep't of Health v. The GEO Grp., Inc.*,

No. 3:24-cv-05639-BHS, 2026 WL 1990779, at *1 (W.D. Wash. July 9, 2026) (*DOH II*).

GEO appeals both preliminary injunctions, which have been consolidated before this Court.

## IV. SUMMARY OF ARGUMENT

The Washington Legislature has authorized the Department to investigate public health threats generally and inspect private detention facilities specifically. The district court entered two tailored preliminary injunctions prohibiting GEO from blocking inspections at a facility it owns and operates. In so doing, the district court correctly rejected GEO's argument that ICE—which neither owns nor operates GEO's facility and which has declined to intervene—was a necessary and indispensable party. The district court also correctly rejected GEO's *Yearsley* defense as lacking legal authorization and evidentiary support. A single ICE employee's purported directive does not preempt state law, nor does it override the plain terms of GEO's contract, which clearly places control over the entry and exit points of GEO's Tacoma facility with GEO—not ICE.

The district court likewise followed binding precedent and rejected GEO's arguments that GEO is immune from state health and safety regulation by virtue of its status as a federal contractor. Both Washington laws at issue operate against GEO—not the federal government. Nor are those laws discriminatory. The General

Inspection Law applies to "any ... place" in Washington, while the Private Detention Inspection Law extends standards that have long-applied to other civil detention contexts to private detention facilities, whether they contract with the federal, state, or local governments. This Court should affirm both injunctions. Nothing in federal law overrides the State's longstanding authority to address die public health threats arising out of the appalling living conditions at GEO's Tacoma facility.

## V. STANDARD OF REVIEW

This Court reviews a district court's grant of a preliminary injunction for abuse of discretion. *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc). It reviews conclusions of law de novo and findings of fact for clear error. *Id.*

This Court reviews a district court's Rule 19 determinations for abuse of discretion. *Walsh v. Centeio*, 692 F.2d 1239, 1241 (9th Cir. 1982).

## VI. ARGUMENT

### A. Washington Is Likely to Succeed on Its Argument That GEO's Denial of Entry to Department Inspectors Violates Washington Law

#### 1. The District Court's injunction is prohibitory, not mandatory

GEO first argues that the district court applied the wrong standard in granting injunctive relief here, but GEO is incorrect. In the face of GEO's intransigence, the district court issued a simple order: GEO must stop blocking the Department from inspecting GEO's Tacoma facility. Because this injunction merely prohibits GEO

from blocking Department inspectors from accessing its private facility, no heightened burden for mandatory injunctions applies. *Contra* Opening Br. 24-26.

"A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits," while "[a] mandatory injunction orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (citation modified). Generally speaking, an injunction prohibiting future legal violations is "a classic form of prohibitory injunction." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017). This is so even if following the law requires a defendant to change their conduct going forward. *Id.* (holding that an injunction requiring the government to "conduct future initial bond hearings in accordance with constitutional processes . . . is prohibitory").

Nonetheless, GEO argues that the injunction here is mandatory because "[t]he State has never inspected" GEO's Tacoma facility. Opening Br. 25 (emphasis omitted). This is both factually wrong and legally irrelevant.

It is factually wrong because GEO submitted to state and local health and safety inspections for decades before this suit. 1-SER-117-18, 121-22. GEO *changed* this status quo by refusing inspectors entry. The injunction does not alter the status quo but preserves it. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684-85 (9th Cir. 2023) (en banc).

Moreover, it is legally irrelevant because a defendant cannot possibly make it harder to get an injunction by refusing to follow the law. Under GEO's theory, because GEO has never allowed the Department to conduct inspections since the Private Detention Inspection Law passed, the court must apply a higher standard before requiring it to do so now (even though GEO allowed them previously). In other words, if the status quo is that a defendant is following state law, the prohibitory injunction standard would apply, but if the status quo is that a defendant is flouting state law, the more stringent mandatory injunction standard would apply. That cannot possibly be the law. A defendant like GEO should not get the benefit of a higher standard because it has been violating the law all along.

In short, because this injunction merely requires GEO to stop violating the law, it is prohibitory.

**2. The Department has statutory rights to enter GEO's facility**

GEO does not dispute that they have violated both the General Inspection Law and the Private Detention Inspection Law. Rightly so.

The Department has clear and long-standing authority to access GEO's facility to investigate public health threats. Under the General Inspection Law, the Department "may investigate . . . any article or condition constituting a threat to the public health including, but not limited to, outbreaks of communicable diseases, food poisoning, contaminated water supplies, and all other matters injurious to the public

health." Wash. Rev. Code § 43.70.170. The statute, including its reference to "all . . . matters injurious to the public health," is construed broadly. *See Spokane Cnty. Health Dist.*, 839 P.2d at 329. "Public health" undoubtedly includes matters affecting detainees' health. 1-SER-113 (finding deleterious conditions described by detainees presented a potential public health threat); *Xochihua-Jaimes v. Barr*, 962 F.3d 1065, 1066 (9th Cir. 2020) (ordering immediate release of detainee petitioner in light of public health crisis at immigration detention center).

For its part, the Private Detention Inspection Law specifically requires the Department to inspect private detention facilities in Washington. As relevant here, Wash. Rev. Code § 70.395.050(2)(b) provides that the Department "shall . . . [c]onduct investigations of complaints received relating to any private detention facility located within the state[.]" Yet after this Court vacated GEO's preliminary injunction against Wash. Rev. Code ch. 70.395, GEO continued to deny entry as the Department attempted to investigate some of the more than 3,500 complaints it had received.

These complaints unquestionably involve a private detention facility and describe conditions that constitute a threat to public health, including conditions specifically enumerated in statute. For example, the water serving as detainees' only source for drinking, bathing, laundry, and food preparation, is described as brown and foul-tasting, which means it is possibly contaminated. 1-SER-108, 113; 2-SER-

134. Similarly, a "lack of attention to medical needs" coupled with the unsanitary and unhygienic conditions at the facility certainly raises the risk of an "outbreak[] of communicable diseases" among the detainees, employees, and invariably the community at large. Wash. Rev. Code § 43.70.170; 1-SER-112-13; 2-ER-130-31.

And the public health threat posed by deleterious conditions would not remain contained within the facility. GEO's employees live in the surrounding community and can thus spread communicable diseases from the Tacoma facility to their communities. 2-ER-131. Detainees have also been released into, or received treatment in health care facilities in, the surrounding communities. Therefore, taken together, these 3,500-plus complaints indicate a public health crisis warranting investigation.

Because GEO's refusal violates both statutes, the State is likely to succeed unless GEO can show it was excused from complying with the law. But as the district court correctly found, GEO cannot make this showing.

### 3. Rule 19 does not require dismissal because ICE is neither required nor indispensable

GEO first argues that Rule 12(b)(7) required dismissal of the State's claims. Opening Br. 27. But GEO cannot show that the district court abused its discretion in concluding that ICE is neither required nor indispensable, and that even if it were, the public rights exception would apply.

A Rule 19 analysis asks whether an absent party is required under Rule 19(a); whether joinder is feasible; and, if joinder is not feasible, whether the case should proceed under Rule 19(b). *United States v. Bowen*, 172 F.3d 682, 688 (9th Cir.1999). A party is required if the court cannot provide complete relief in their absence *or* that person claims an interest relating to the action and proceeding without that person may impair the interest or expose an existing party to inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(A), (B). Even if a party is required and joinder is not feasible, a party is not indispensable if "in equity and good conscience, the action should proceed among the existing parties" rather than being dismissed. Fed. R. Civ. P. 19(b). The district court did not err in finding that ICE was neither required nor indispensable.

**a. ICE is not a required party under Rule 19(a) because complete relief is possible in its absence**

In conducting a Rule 19(a)(1)(A) analysis, courts ask whether the absence of the nonparty would preclude the court from fashioning meaningful relief as between the parties. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir. 1983). This prong only concerns current parties to the action. *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004).

As an operator of a private detention facility, GEO has the duty under Wash. Rev. Code §§ 70.395.020, .50(2)(b), to permit the Department entry. Doing so would provide the State with complete relief. Should GEO comply with this duty,

the Department would enter GEO's facility and fulfill its statutory duties, inspecting portions of the facility that threaten the health of detainees, GEO's employees, and the surrounding community. Based on the complaints the Department has received, the portions of the facility that would be inspected include, at a minimum, those relating to water, air, food, and laundry. GEO insists that "ICE has sole authority to grant or deny access" to these portions of the facility, Opening Br. 29, but that assertion entirely ignores the actual terms of its contract. As the district court found, "the contract makes clear that GEO, not ICE, is responsible for 'operat[ing] and control[ling] all designated points of ingress and egress on the site, such as housing units, courtrooms, . . . and hold rooms.'" *GEO III*, 2026 WL 1983207, at *7 (quoting 3-ER-484). And the contract similarly "incorporates ICE's Quality Assurance Plan, which 'is based on the premise that [GEO], and not the Government, is responsible for the day-to-day operation of the Federal facility and all the management and quality control actions required to meet the terms of the' contract." *Id.* (quoting 3-ER-590). Because ICE only reserves rights over a small portion of the facility that is of no interest to the Department (and that is outside the scope of the preliminary injunction that GEO appeals), i.e., the ICE Administrative Space, GEO can (and must) allow access to other portions of the facility notwithstanding any objections from ICE.

In other words, the Court can afford complete relief without ICE. Fed. R. Civ. P. 19(a)(1)(A). In fact, the district court already did so once when it granted L&I's request to investigate complaints at GEO's Tacoma facility without any suggestion that ICE was a necessary party. *See Wash. Dep't of Lab. & Indus.*, 2024 WL 3250426, at *12. There, GEO acquiesced to permanent and unannounced L&I inspections—again without any participation from ICE. *See* Stip. Mot. & Order, *Wash. Dep't of Lab. & Indus.*, No. 3:24-cv-05095-BHS, ECF No. 54; 1-SER-105.

Moreover, as detailed below, an ICE officer cannot require GEO to defy state law. *Infra* at 40-44; *see also The GEO Grp., Inc. v. Menocal*, 146 S. Ct. 774, 785 (2026) ("A private contractor cannot obtain '[i]mmunity from suit' by 'reason of a contract' it made with the [federal] Government."). Thus, even if GEO's contract and its own practices did not confirm that GEO can allow Department inspectors to enter its facility without ICE's permission, GEO would still be wrong that ICE exercises plenary power to deny State inspections of GEO's private property.

As the district court noted, GEO's argument that ICE is a required party runs roughshod over hornbook law that GEO does not enjoy the same immunity as the federal government. *GEO III*, 2026 WL 1983207, at *3; *see Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1098 (2026); *see also The Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc) ("Private contractors do not stand on the same

footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself."); *GEO II*, 151 F.4th at 1116 ("[S]tates may impose some regulations on federal contractors that they would not be able to impose on the federal government itself."). "This distinction would be meaningless if the State could not enforce its non-preempted regulation in the absence of the sovereign." *GEO III,* 2026 WL 1983207, at *3.

**b. ICE is not a required party because it has not claimed an interest**

Nor is ICE required by virtue of claiming an interest in this matter. Under this Court's precedent, parties who are aware of an action and choose not to intervene need not be considered required parties because they have not *claimed* an interest in the litigation. *See Bowen*, 172 F.3d at 689 (collecting Ninth Circuit cases); *Northrop Corp.*, 705 F.2d at 1043 (explaining that the subparts of Rule 19(a)(2) "are contingent, however, upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action"). This Court interprets this aspect of Rule 19 to require that an absent party personally assert a legally protected interest, rather than permitting a third party to do so on their behalf. *Bowen,* 172 F.3d at 689 ("[I]t is inappropriate for one defendant to attempt to champion the absent party's interests . . . . "). "In other words, it is not enough for a current party to the case to claim that an absent party has an interest; the absent party themselves must actively and affirmatively assert an interest in the subject matter of the

litigation." *Bradley, Gmelich & Wellerstein LLP v. Kay*, No. 2:25-cv-10471-AB-DFM, 2026 WL 712564, at *5 (C.D. Cal. Feb. 3, 2026); *see also Yeend v. Akima Global Servs., LLC*, 347 F.R.D. 405, 413 (N.D.N.Y. 2024) (denying Rule 12(b)(7) motion where the federal government had declined to intervene in action against private detention facility). When an absent party is "aware of [an] action and [chooses] not to claim an interest," "the district court d[oes] not err by holding that joinder [i]s unnecessary." *Bowen*, 172 F.3d at 689 (quotation omitted).

Here, ICE has not claimed any legal interest in keeping Department inspectors out of GEO's private facility. Thus far, ICE has declined to intervene or even file a statement of interest. And indeed, when the federal government did file an amicus brief in the earlier HB 1470 appeal, it *conceded* that binding case law from this Court allows for state inspections of private detention facilities. *See* U.S. Amicus Br. at 20, *The GEO Grp. Inc. v. Ferguson*, No. 24-2815, (9th Cir. July 25, 2024), DktEntry 34.1. On top of that, in other litigation challenging detention conditions, ICE has adamantly argued that GEO—not ICE—is the proper defendant. *See* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 13, *L.T. v. ICE*, No. 5:26-cv-00322 (C.D. Cal. Mar. 30, 2026), ECF No. 54 ("Plaintiffs' dispute is centered around GEO, not [ICE.]"); *id.* at 8-9, 13-16.

GEO argues ICE should not have to appear to claim an interest. Opening Br. 38. And they point to a declaration from an ICE employee as sufficient to

establish ICE's interest. *Id.* But GEO does not cite any caselaw holding that a witness declaration from a government employee is sufficient to claim a legal interest in the underlying lawsuit. And even were a declaration hypothetically sufficient, the declarant does not claim any authority to speak on behalf of ICE, nor does he even identify what legally protected interest of ICE's might be impaired by its absence. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015) (finding a declaration insufficient to claim an interest where it "does not indicate whether [the declarant] was authorized to state [the absent party's] position in" the litigation); 4-ER-645 (noting generally that ICE "is responsible for … the detention, health, welfare, transportation, and deportation of detainees in removal proceedings," without specifying how state inspections might undermine them).

As it is inappropriate for GEO to raise ICE's purported interests on ICE's behalf, this Court should affirm the district court's conclusion that ICE has not claimed an interest under Rule 19(a)(1)(B). *See Bowen*, 172 F.3d at 689.

#### c. Even if GEO could speak for ICE, GEO failed to demonstrate a legally protected interest on ICE's behalf that would be impaired

Should the Court consider the four interests GEO identified on ICE's behalf, Opening Br. 34-38, these fail to demonstrate a legally protected interest. "[A] legally protectable interest is an interest that derives from a legal right." *Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1311 (11th Cir.

2005). At the very least, legally protected interests must be supported by affidavits from the non-party, explaining how these interests are impaired. *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). Any interest may not be based on mere speculation by the moving party. *See Northrop Corp.*, 705 F.2d at 1046 (holding the person's interests cannot be based on the moving party's speculation of future events). And unlawful interests, such as turning away public health officials to hide deleterious conditions at private detention facilities in violation of state law, are not legally protected. *See Mt. Hawley Ins. Co.*, 425 F.3d at 1311.

***First,*** GEO claims that the Department's inspections would impair ICE's "sovereign and operational interest in federal immigration detention." Opening Br. 34. But this Court already rejected a version of this argument, finding that nothing in Washinton's private detention inspection regime "frustrates the federal government's ability to detain individuals at the NWIPC." *GEO II*, 151 F.4th at 1123; *see also California*, 921 F.3d at 885 (concluding that California's inspection regime did not frustrate the federal government's interest in detention because it "does not regulate whether or where an immigration detainee may be confined, require that federal detention decisions or removal proceedings conform to state law, or mandate that ICE contractors obtain a state license"). GEO's contrary argument does not cite any evidence or testimony from the federal government. In any event,

the law is clear: a state's exercise of its traditional power to protect the health and safety of those locked in a private detention facility within its borders does not impair any federal interest. *Newsom*, 50 F.4th at 755.

***Second,*** GEO claims that state health inspections might interfere with ICE's interest in a secure facility, insofar as "the ICE-GEO contract expressly reserves to ICE pre-clearance authority over access to ICE facilities and information, routes state-governmental access requests through ICE, and requires GEO to comply with ICE security plans." Opening Br. 34-35. But GEO's contract with ICE does not require ICE pre-clearance of government inspectors, nor otherwise cede control of access to GEO's private facility to ICE. *See supra* at 4, 26.

Moreover, the notion that admitting state health inspectors would undermine facility security makes little sense. Department inspectors are trained public servants whose mission is to protect the health and safety of all people in Washington State. GEO has not identified a single security breach despite admitting other state and local inspectors for over twenty years. If GEO has legitimate concerns, it can accompany Department inspectors. But GEO may not rely on flimsy security justifications to shield its operations from state oversight.

***Third***, GEO and ICE's contractual relationship concerning the provision of detainee services, in and of itself, does not suffice as a "legally protected interest." This Court has explained that absent contracting parties are only necessary in

"action[s] to set aside a contract," "attack[s] on the terms of a negotiated agreement," *Clinton v. Babbit*, 180 F.3d 1081, 1088 (9th Cir. 1999), or "litigation seeking to decimate a contract," *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002). Here, the State is not trying to do any of these things. It asserts only claims for injunctive relief with respect to GEO's obligation to provide the Department with access to its facility. It does not seek to set aside or in any way undo GEO's contract with ICE. *See Ward*, 791 F.3d at 1053 (mere implication of contractual rights does not create legally protected interest) (abrogated on other grounds); *Yeend*, 347 F.R.D. at 414 ("The Court is skeptical that an adverse judgment would result in a breach of the ICE-AGS Contract, but even assuming such breach arises, an adverse judgment here would not foreclose AGS or ICE from litigating a breach of contract issue in a future litigation.").

***Finally***, GEO notes that "[t]he Office of the Immigration Detention Ombudsman is responsible for receiving and investigating complaints concerning individuals in immigration detention" and claims that the Department's "requested access to federal detention areas would require the Court to adjudicate how" that federal process "interacts with ICE's access controls." Opening Br. 36. GEO entirely fails to explain why this is so, or how it implicates the work of the Ombudsman, which has been shuttered in any event. Ximena Bustillo, *DHS blames funding lapse for shutdown of internal detention oversight*, NPR (May 7, 2026),

https://www.npr.org/2026/05/07/g-s1-120834/trump-immigration-detention-ombudsman-shutdown. Regardless, nothing in this litigation requires this Court to adjudicate any overlap between Washington's statute and "ICE's access controls," however defined. Accordingly, the Court should conclude that GEO has failed to identify any "legally protected interest" of ICE that would be impaired, requiring joinder under Rule 19(a)(1)(B)(i).

**d. GEO cannot demonstrate inconsistent obligations**

Because GEO's contract does not conflict with its obligations under Washington law, GEO does not face inconsistent obligations. And nothing in GEO's contract authorizes it to ignore state law, nor could it.[6] As discussed, nothing in GEO's contract requires ICE's pre-approval for state inspectors to access the Tacoma facility. In fact, GEO's contract clearly indicates that GEO is responsible for all points of entry and exit from the facility. At most, GEO asserts that it might get sideways with the ICE agent. Opening Br. 39. But as the district court correctly held, "[a]n ICE officer cannot require GEO to defy a non-preempted state law." *GEO III*, 2026 WL 1983207, at *3. GEO's claim of inconsistent obligations thus

[6] Any contractual provision that enables GEO to defy a non-preempted state law is illegal and must be excised from the contract. *See, e.g.*, *United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986); *Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 700 (Fed. Cl. 2002).

lacks merit. *See Menocal v. The GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1180 (D. Colo. 2022) (drawing the same distinction).

GEO's reliance on *Dawavendewa* is no help. *Contra* Opening Br. 39. In *Dawavendewa*, the plaintiff sought to invalidate a hiring preference that was required as a term of the employer's lease of land owned by the Navajo Nation. 276 F.3d at 1158. As this Court observed, any injunction would be ineffective because if the employer invalidated the hiring preference, the Navajo Nation could move to evict the employer from the reservation. *Id.* Here, GEO owns the Tacoma facility—both the building and the land that it sits on. GEO is not in danger of eviction. Even assuming a single ICE employee (who is not the contracting officer) could authorize GEO to refuse state inspectors' access to GEO's private facility, that would not be enough to show an inconsistent obligation. *See Disabled Rts. Action Comm.*, 375 F.3d at 880 (observing a licensing agreement subjecting a party to liquidated damages in the event of a contract breach did not render the non-party to the contract a necessary party to the litigation).

GEO is not between any rock or hard place. GEO must allow for public health inspections of its private facility as required by state law.

**e. Equity and good conscience cut sharply against dismissal under Rule 19(b)**

ICE is not a required party. However, even if ICE's participation were necessary, "nonjoinder even of a required [party] does not always result in

dismissal." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 862 (2008). When a necessary party cannot be joined the Court considers whether the absent party is indispensable. "A party is indispensable if in 'equity and good conscience,' the court should not allow the action to proceed in its absence." *Dawavendewa*, 276 F.3d at 1161 (citing Fed. R. Civ. P. 19(b)). To make this determination, the Court balances four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Id.* at 1161-62. "The inquiry is a practical one and fact specific[.]" *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). Here, the district court reasonably concluded that even if ICE were a necessary party, "it is not indispensable" because "[n]one of these factors" supported GEO's hopes of dismissal. *GEO III*, 2026 WL 1983207, at *4.

Neither GEO nor ICE would be prejudiced by proceeding without ICE as a joined party. ICE would not be prejudiced because, as discussed above, the State does not seek any relief or judgment against ICE, nor would a judgment against GEO implicate ICE's rights or interests. The State seeks merely to enter the facility and inspect for health and safety concerns—such as water, food, and air quality. Unless GEO is contending that ICE has an interest in concealing health and safety concerns inside the Tacoma facility, an inspection does not harm or implicate any of ICE's

rights or interests. Similarly, since the State seeks relief from GEO alone, ICE's absence does not prejudice GEO. Washington law directs GEO, not ICE, to allow inspectors entry. Wash. Rev. Code § 70.395.050(2)(b). The relief sought would not change even if ICE were a party.

Further, since ICE's approval is not necessary for GEO to allow an inspector entry, an adequate remedy can be granted without the need to shape the order to lessen prejudice. Finally, "[t]here is no alternate forum, meaning that the State would have no legal remedy for a private company's refusal to comply with state law." *GEO III*, 2026 WL 1983207, at *4.

Thus, the district court plainly acted within its discretion in concluding that ICE is not an indispensable party.

**f. Even were ICE indispensable, the public rights exception would apply**

Regardless, even if joinder were otherwise required, the public rights exception to Rule 19 applies. "In a proceeding . . . narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988) (alteration in original; emphasis and citation omitted)); *see also Washington v. The GEO Grp. Inc.*, No. 3:17-cv-05806-RJB, 2018 WL 1963792, at *5 (W.D. Wash. Apr. 26, 2018). The public rights exception to Rule 19 applies where: (1) the litigation transcends

the private interests of the litigants and seeks to vindicate a public right, and (2) although the litigation may adversely affect the absent parties' interests, the litigation does not destroy the legal entitlements of the absent parties. *See Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996). Here, the State seeks to vindicate public rights guaranteed by Wash. Rev. Code ch. 70.395. It seeks no relief that would alter any legal rights of ICE. Thus, the district court did not abuse its discretion in finding that the public rights exception would apply even if ICE were indispensable.

#### 4. GEO has no *Yearsley* defense

GEO is unlikely to succeed on its *Yearsley* defense because Congress has not authorized ICE to immunize private contractors from complying with state law, nor does GEO's contract permit it to block State inspectors.

To succeed on this defense, GEO must show that its failure to permit inspectors was both "'authorized and directed by the Government of the United States' and 'performed pursuant to [an] Act of Congress.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)). Thus, GEO can only ignore state law if the federal government validly authorized it to do so—by, for example, Congress preempting state laws. Even if it could make that showing, GEO would also have to show that it "had no discretion . . . and completely followed government specifications." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (citation

omitted); *see also Hencely*, 146 S. Ct. at 1095 (explaining that a contractor who provided goods to the government is only entitled to a *Yearsley* defense where, *inter alia*, "the United States approved precise specifications" and "the equipment conformed to them").

GEO's argument fails at the threshold: it cannot show any act of Congress that permitted GEO (or authorized ICE to permit GEO) to ignore state law. Instead, it concedes (as it must) that this Court already rejected its preemption defenses. Opening Br. 26 n.3; *see also GEO II*, 151 F.4th at 1123-24; *DOH II*, 2026 WL 1990779 at *2-3. As this Court previously put it, "GEO Group has pointed to no authority suggesting that an ICE employee's verbal directive carries preemptive effect in the absence of any indication of Congressional intent that it should." *DOH II*, 2026 WL 1990779 at *3. If anything, the ICE employee's alleged verbal directive to GEO either exceeded his authority or the authority was not validly conferred. *See Hencely*, 146 S. Ct. at 1099.

GEO's contract with ICE cannot close the gap for two reasons. First, while state law cannot interfere with Congressional prerogatives, GEO cannot simply contract around a non-preempted state health and safety law. *See County of King v. Turner*, No. 25-3664, 2026 WL 2489361, at *13 (9th Cir. Aug. 25, 2026) (holding that an agency "cannot compel" grant recipients "to comply with requirements that Congress never authorized it to impose"). Rather, the contract GEO entered with

ICE in March 2026 incorporated the very laws GEO now resists. *Ocean View Towers Assocs., Ltd. P'ship v. United States*, 88 Fed. Cl. 169, 176 (Fed. Cl. 2009) ("'[L]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.'") (quoting *Norfolk & W. Ry. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991)); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934) ("Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.").

Second, even if GEO could, theoretically, contract around state law to block state health inspectors, its contract here does no such thing. This Court already found that GEO's prior contract did not permit or mandate the denial of entry because that contract mandated compliance with state law. *DOH II*, 2026 WL 1990779 at *2. GEO's new contract does not change this analysis. *See GEO III*, 2026 WL 1983207, at *7.

The contract continues to reflect that GEO, not ICE, owns the facility. 3-ER-468. And it "makes clear that GEO, not ICE, is responsible for 'operat[ing] and control[ling] all designated points of ingress and egress on the site, such as housing units, courtrooms, . . . and hold rooms.'" *GEO III*, 2026 WL 1983207, at *7

(quoting 3-ER-484). By contract, ICE's entry veto is limited to dedicated ICE offices—the "ICE Administrative Space"—that the Department has no interest in inspecting. *See id.* at *7 (citing 3-ER-537).[7] "But nothing in that provision requires GEO to seek ICE pre-clearance for state inspectors seeking access to areas under GEO's control." *Id.* Nor, finally, do contractual pre-clearance provisions for "visits" or "tours" support GEO. *See* 3-ER-537, 562. GEO's prior contract included similar pre-clearance requirements for visits and tours, but this Court already held that these provisions did not restrict state inspectors. *See* 2-SER-504-05, 518, 522, 529, 574 (checking background for visitors, volunteers, and tours). While the new heading states "ICE/ERO Control Over Facility Access," the body of the new contract makes clear that it is no different from the old contract—ICE controls access to its portion of the facility, the ICE Administrative Office, and controls access to GEO's facility only insofar as it requires individuals asking to visit or tour GEO's facility to obtain background clearances beforehand. 3-ER-537 (requiring pre-clearance for this space and visits or tours). As the district court correctly found, this limited language "does not apply to state health officials seeking to inspect conditions pursuant to their statutory authority[.]" *GEO III*, 2026 WL 1983207, at *7. Tours or visits are not compulsory and can be coordinated beforehand without losing their impact; they are

[7] The district court found it was "unclear from the record whether GEO or ICE controls the facility's medical areas." *GEO III*, 2026 WL 1983207, at *7 n. 9. This appeal does not raise that issue.

fundamentally unlike inspections that are unannounced to fulfill their role in ensuring public health and safety. *See* 2-ER-43; 2-ER-46. Indeed, GEO's contract refers to "inspections" and "inspectors" well over a dozen times. *See e.g.*, 3-ER-471, 472, 486, 494, 495, 502, 516, 520, 525, 536, 576, 591, 592, 595. But not in the section relating to pre-clearances. Had GEO or ICE wanted to include inspections within the contractual pre-clearance requirements, they knew what terms to use.[8]

And the contract explicitly incorporates state law through the NDS. The NDS require GEO to comply with a raft of state and local health and safety laws, including fire codes, water standards, garbage and hazardous waste disposal, food service authorities, and public health reporting laws. *See* 2-ER-207-208, 210, 234, 284; 3-ER-304, 307, 309, 318, 323, 328, 343, 344. And, of course, it is state and local authorities who will enforce these. To that end, the NDS specifically contemplates potential "adverse findings" in state citations or licensure actions pertaining to "state and local health, life, safety, and fire codes." 2-ER-206.

---

[8] Even if ambiguous, "tour" or "visit" should not be construed—as GEO argues—to include inspections. In reviewing ambiguous terms, courts find interpretations complying with applicable laws to be the correct interpretation over a reading that violates the law. *See Accura Eng'g and Consulting Servs., Inc. v. United States*, 167 Fed. Cl. 258, 271 (Fed. Cl. 2023). Allowing inspectors into GEO's Tacoma facility only at ICE's say-so puts GEO at odds with the statute providing the Department "free and *unimpeded* access" "at all times." Wash. Rev. Code § 43.70.170 (emphasis added).

In the face of all of this, GEO can only make general statements that ICE "directed the precise conduct for which the State seeks to hold GEO liable." Opening Br. 62. But the record makes clear that the ICE employee never directed GEO to do anything. 4-ER-647-48. Rather, he took it upon himself to deny the Department access to GEO's owned and operated facility. 4-ER-647. Even so, only the "Contracting Officer" has the power to modify GEO's obligations under the contract—not whatever ICE employee happens to be on hand. 3-ER-471, 582. More fundamentally, GEO offers nothing to suggest that a single ICE employee has the authority to nullify state law. And imagine if GEO were correct; if all it took to nullify state law was a verbal directive from a single federal agent, federalism would be a dead letter. Thankfully, it is not. Here, GEO cannot show that any purported authority to bar state inspectors was "validly conferred, that is, . . . done . . . within the constitutional power of Congress[.]" *Yearsley*, 309 U.S. at 20.

GEO's inability to point to a statutory, regulatory, or contractual term that requires (or even permits) it to deny access to state inspectors points to another fatal flaw in its argument: it cannot show that it retains *no* discretion to select the means of implementation. GEO, in fact, exercises that discretion in allowing the Tacoma-Pierce County Health Department to conduct unannounced inspections. 2-ER-41-50. And GEO had no difficulty stipulating to an injunction permitting Washington's Department of Labor and Industries to conduct unannounced inspections. *See*

Stip. Mot. & Order, *Wash. Dep't of Lab. & Indus.*, No. 3:24-cv-05095-BHS, ECF No. 54; 1-SER-105. There is no reason GEO could not similarly exercise its discretion to permit entry to the Department. Under *Hencely* and *Cabalce*, this discretion is fatal to GEO's *Yearsley* defense. *Hencely*, 146 S. Ct. at 1095; *Cabalce*, 797 F.3d at 732 (concluding a *Yearsley* defense "is limited to cases in which a contractor had *no discretion* in the design process and completely followed government specifications.") (citation omitted) (emphasis added).

GEO resists this conclusion by contending that the relevant question is not whether Congress authorized the specific thing giving rise to a lawsuit—here, denying access to state inspectors—"but whether Congress validly authorized the federal project within which the federal officer directed GEO not to admit the inspectors." Opening Br. 63. On this score, GEO cites 8 U.S.C. § 1231(g)(1) and 6 U.S.C. § 112, which generally authorize the federal government to remove and detain immigrants. *Id*. But, as this Court already concluded, the federal government's general authority to detain immigrants does not preempt state health and safety laws or immunize private contractors from state law. *See GEO II*, 151 F.4th at 1123; *Nwauzor v. The GEO Grp., Inc.*, 127 F.4th 750, 768 (9th Cir. 2025). Moreover, the Supreme Court has emphasized, most recently in *Hencely*, that federal contractors are *not* protected from the consequences of their conduct "simply because [they] [are] working for the Federal government and state law is at issue."

146 S. Ct. at 1098. *Yearsley*, *Hencely*, and related cases make clear that the relevant question is whether the thing giving rise to suit was specifically directed by someone with Congressional authority. Or, as the Court put it in *Hencely*, "in a case in which the Government asks a contractor for a certain result, and the contractor is sued for how it achieved that result, the suit is not preempted if the Government was silent about the conduct that allegedly violated state law[.]" *Hencely*, 146 S. Ct. at 1095.

This distinction runs through the cases. In *Yearsley*, where a construction company built a dike "pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, . . . as authorized by an Act of Congress," the Court held that the contractor could not be held liable for injuries flowing from the construction of the dike itself. *Yearsley*, 309 U.S. at 19, 20-21. And in *Boyle*, where "the asserted basis of the contractor's liability," namely, that a helicopter escape hatch should have opened inward, was "precisely contrary to the duty imposed by the Government contract," namely, that the escape hatch open outward, the Court held that the contractor could not be held liable, so long as they precisely followed contractual specifications. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988). By contrast, in *Hencely*, the contractor was undoubtedly acting pursuant to a validly authorized federal contract, but the Court nonetheless rejected a *Yearsley* defense

where the allegedly negligent conduct was not required by contract. *Hencely*, 146 S. Ct. at 1096.

GEO tries to distinguish *Hencely* by pointing out that the government contractor there "violated the government's instructions." Opening Br. 64. True enough, but GEO also violated its contract and the NDS, which both require compliance with state law. Regardless, *Hencely* is beyond clear that the violation of the contract was not dispositive. Instead, the dispositive question is whether the contract specifically dictated "the conduct that allegedly violated state law[.]" *Hencely*, 146 S. Ct. at 1095. As *Hencely* points out, this comes straight from *Boyle*, in which the Court explained that that case would be different if instead of concerning a design component specifically governed by contract, it had concerned "the purchase and installation of an air-conditioning unit," the contract for which "specif[ied] the cooling capacity but not the precise manner of construction[.]" *Id.* (quoting *Boyle*, 487 U.S. at 509). In that case, a state-law "duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary." *Id.* (quoting *Boyle*, 487 U.S. at 509). Because the contractor there "could comply with both its contractual obligations and the state-prescribed duty of care," the state law would not "generally be pre-empted in this context." *Id.* at 1095-96 (quoting *Boyle*, 487 U.S. at 509).

So too here. Because GEO's obligation to permit state health inspectors does not conflict with any lawful, congressionally authorized contractual obligation, GEO is unlikely to succeed on a *Yearsley* defense.

#### 5. Intergovernmental immunity does not permit GEO to disregard Washington law

Intergovernmental immunity "prohibit[s] state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation modified; emphasis in original). The General Inspection and Private Detention Inspection Laws do neither.

##### a. Washington law regulates GEO—not ICE

As GEO acknowledges, this Court already rejected GEO's direct regulation defense with respect to the Private Detention Inspection Law. Opening Br. 48 n.6; *see GEO II*, 151 F.4th at 1118. This ruling is the law of the case and binding. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108 (9th Cir. 2007) (holding that conclusions on pure issues of law are binding, even if that conclusion occurred on appeal at the preliminary injunction phase).

As this Court explained in *GEO II*, "[a] state has greater ability to regulate a contractor of the federal government than to regulate the government itself." *GEO II*, 151 F.4th at 1116; *see also Newsom*, 50 F.4th at 755 ("The scope of a federal

contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality."). The Supreme Court echoed this just last term, explaining that "absent a statute to the contrary, States can regulate . . . federal contractors on the same terms as any private company, even where the party asserts an indirect burden on federal activities." *Hencely*, 146 S. Ct. at 1098. This is particularly so, this Court emphasized, when the state is acting within its "historic police powers" to regulate the "health and safety" of those within its borders. *GEO II*, 151 F.4th at 1117 (quoting *Newsom*, 50 F.4th at 766). In this case, this Court concluded that the Private Detention Inspection Law does not directly regulate the federal government because it does not impose any obligations directly on the federal government, "'overrid[e] federal contracting decisions,'" or even "increase the federal government's costs." *GEO II*, 151 F.4th at 1117 (quoting *Boeing v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014)). "In sum," this Court held, the Private Detention Inspection Law "does not require ICE to entirely transform its approach to detention in the state or else abandon its Washington facilities," "give Washington virtual power of review' over ICE's detention decisions," or "prevent ICE's contractors from continuing to run detention facilities." *Id.* at 1118 (citation modified). It thus "does not directly regulate the federal government." *Id.*

The district court correctly applied this Court's ruling to reject GEO's direct regulation defenses. The Private Detention Inspection Law *still* operates against GEO, and not against the federal government—and the General Inspection Law is no different. Because the laws "mandate[] that GEO, not ICE . . . allow inspections" and "do[] not impermissibly control federal immigration functions," they do not directly regulate the Federal Government. *GEO III*, 2026 WL 1983207, at *10; *see also Nwauzor*, 127 F.4th at 761 (rejecting GEO's direct regulation defense because the federal government "does not 'operate[] the detention facility,'" and Washington's minimum wage law did not interfere with the federal government's authority to use private contractors or otherwise control federal operations); *Hencely*, 146 S. Ct. at 1098-99.

None of GEO's cited cases undermine this Court's binding decisions. *Contra* Opening Br. 49, 53-55. Some are not direct regulation cases at all, but rather preemption cases. *See Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 542-43 (1958) (turning on the "conflict" between federal and state regulations); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188 (1956) (per curiam) (state licensing law "in conflict with" federal law). Others involved state regulations of federal property or federal employees—a circumstance not present here. *See Mayo v. United States*, 319 U.S. 441, 444 (1943) (state attempting to force U.S. Secretary of Agriculture's "compliance with reasonable state regulation [and] payment of

reasonable inspection fees"); *Johnson v. Maryland*, 254 U.S. 51, 55 (1920) (state bringing criminal charges against U.S. Post Office employee for driving mail truck without obtaining state driver's license). And the remaining cases GEO cites were explicitly distinguished by this Court. *See GEO II*, 151 F.4th at 1117 (distinguishing *Boeing v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), because the statute there imposed an obligation directly on the federal government, whereas HB 1470 does not); *see id.* at 1118 (concluding *United States v. King County, Washington*, 122 F.4th 740 (9th Cir. 2024), is "very different" because "HB 1470 does not seek to shut down the [Tacoma facility]; nor does it limit ICE's ability to detain any individual").

Although GEO does not explicitly argue the point, it is worth noting that nothing in GEO's new contract, including the adoption of the NDS, resurrects its direct regulation defense. Under Wash. Rev. Code § 70.395.020(6), GEO, as the operator of a private detention facility, is the responsible party. *Contra Boeing*, 768 F.3d at 839. Moreover, GEO fails to identify any new contract term or NDS provision that restricts state health inspectors from entering its Tacoma facility. The contract continues to presume that state health and safety laws apply, and GEO continues to exercise control over facility access, except for limited ICE administrative offices. *Supra* at 26. Any federal interest in consistent conditions of confinement is in no way disturbed by the Department inspectors accessing GEO's

facility to investigate complaints. In fact, state health inspectors frequently inspect private detention facilities in other states—and the Department of Labor and Industries does so here—without any whimper of federal prerogatives. *See, e.g.*, 1-SER-85 (Colorado Department of Public Health and Environment inspection report).

In sum, this Court already rejected GEO's direct regulation defense, and none of the operative contract provisions GEO identifies represent a substantive change from the old contract. Although the new contract imposes some security requirements, those requirements are no different from those that existed under the old contract. *Compare* 3-SER-692, *with* 3-ER-537 (requiring preclearance for access to ICE operational space); *compare* 2-SER-522, 529, 574, *with* 3-ER-537 (requiring background checks for public visits and tours). Because the General Inspection and Private Detention Inspection Laws (still) operate against GEO, and not the federal government, the district court correctly held that the State is likely to prevail on its claim.

**b. The Private Detention Inspection Law does not discriminate against GEO as a federal contractor**

GEO's arguments under the discrimination prong of intergovernmental immunity fare no better. GEO concedes that the General Inspection Law does not discriminate against it, but it insists that the Private Detention Inspection Law does. *See* Opening Br. 56. But it cannot show that Washington's law treats private,

federally contracted detention facilities differently than any other comparable facility.

A state law violates intergovernmental immunity if it "single[s] out for less favorable treatment" the federal government or federal contractors or "if it regulates them unfavorably on some basis related to their governmental status." *Washington*, 596 U.S. at 839 (quotations omitted). "A state law or regulation that burdens only a federal contractor is not impermissibly discriminatory if it 'duplicate[s] requirements otherwise mandated under' state law that are imposed on similarly situated state contractors.'" *GEO II*, 151 F.4th at 1118 (quoting *California*, 921 F.3d at 873).

GEO's discrimination argument fails twice over. First, as amended by HB 1232, the Private Detention Inspection Law applies to private facilities beyond GEO's, including facilities that do not contract with the federal government. 3-ER-462-63. Accordingly, GEO cannot show the law "singles them out for less favorable treatment.'" *Washington*, 596 U.S. at 839 (citation modified). For this reason alone, their intergovernmental immunity argument fails.

GEO tries to duck the impact of HB 1232's amendment as a "minimal expansion," Opening Br. 60, because it only sweeps in one additional (non-federal) facility. But this merely reflects that there is only one other contract detention facility in Washington (a nonprofit, unlike GEO's for-profit facility).

3-ER-462-63. Prior to the amendment, the law covered 100% of for-profit contract facilities, but only 50% of total contract facilities. Following the amendment, it now covers 100% of contract facilities. A law that treats all facilities the same is the very definition of non-discriminatory.

Yet GEO presses on, speculating that the Department might "promulgate different rules for" Martin Hall. Opening Br. 61. But this is pure speculation. GEO relies on a one-page rulemaking document—called a CR-101—indicating that, "pursuant to [HB] 1232," the Department "is considering establishing new rules . . . to establish operational, health, and safety standards for private detention facilities serving juveniles." 3-ER-465. In Washington, the CR-101 is the document that begins the rulemaking process. When HB 1232 passed, the Department had already been rulemaking under HB 1470 for two years. The filing of a new CR-101 merely reflects the broader scope of the post-amendment law, permitting the Department to expand the scope of its rulemaking without derailing work it had already done. It does not mean that Martin Hall will necessarily be subject to different requirements than GEO's facility. *Cf. Trump v. California*, 609 U.S. ----, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (concluding that plaintiffs likely lacked standing to challenge executive order directing specific rulemaking before rule was finalized).

Moreover, even were GEO correct, the relevant subsection of the Private Detention Inspection Law—Subsection (2)(b)—is not tied to any rulemaking. Thus, even if the Department's implementation of a different subsection of Wash. Rev. Code § 70.395 were discriminatory, that is irrelevant to the subsection at issue here—as GEO admits. *See* Opening Br. 57 ("Other subsections of RCW 70.395 are irrelevant because the State sought a preliminary injunction . . . to enforce . . . RCW 70.395.050(2)(b)[.]"). Because GEO cannot show it is being singled out, its discrimination claim fails at the threshold.

GEO's argument fails for a second reason. Even if the Private Detention Inspection Law applied only to GEO, GEO cannot show it is being singled out for less favorable treatment. To the contrary, Subsection (2)(b)'s inspection requirement is, if anything, less burdensome than those applicable to comparable facilities in Washington. Again, the proper comparators for GEO's Tacoma facility are "residential treatment facilities and civil commitment facilities[.]" *GEO II*, 151 F.4th at 1119. The law's inspection requirements are no more burdensome than those imposed on these other civil detention facilities. The Department may inspect both residential treatment facilities and civil commitment facilities "*at any time*," and each inspection "may include . . . every part of each establishment," as well as "an examination of all records," and "any person confined therein." Wash. Rev. Code §§ 71.12.510-.520 (emphasis added); *see also id.* § 71.12.455(3) (defining scope of

§ .510 and § .520); Wash. Admin. Code § 246-322-025(3) ("The [D]epartment shall. . . [c]onduct on-site inspections [of private psychiatric hospitals] at any time to determine compliance with chapter 71.12 RCW[.]" Beyond this, the General Inspection Law authorizes the Department to inspect "all buildings, yards, warehouses, storage and transportation facilities or any other place" upon receipt of a complaint indicating "a threat to the public health." Wash. Rev. Code § 43.70.170. These laws authorize the Department to conduct broad, sweeping inspections of civil detention facilities, at any time, without any requirement that the Department suspect anything is amiss—they are, if anything, more burdensome than the Department's requirement to "[c]onduct investigations of complaints[.]" Wash. Rev. Code § 70.395.050(2)(b).

Nonetheless, GEO argues that Subsection (2)(b) imposes a greater burden because of the supposed "breadth" of "the State's complaint-intake form." Opening Br. 58. Whatever the complaint form may say, a complaint-based inspection regime is doubtlessly narrower than the "any time" inspection regime applicable to other civil detention facilities. It is no answer that the Department's intake form does not require complaints be limited to health-related matters. *Contra Id.* 59. The Department only investigates complaints related to health and safety. Finally, GEO offers no argument as to how Subsection (2)(b) is any more burdensome than the

General Inspection Law's directive to inspect any place, for any public health threat, broadly defined.

Because the Private Detention Inspection Law does not "single[] out" federal contractors for unfavorable treatment, GEO's discrimination defense fails. *Washington v. United States*, 460 U.S.536, 546 (1983).

### B. The District Court Did Not Err in Concluding That the State Will Suffer Irreparable Harm Without Preliminary Relief

Having concluded the State was likely to succeed on the merits, the district court found that the State would be irreparably harmed absent an injunction because the welfare of detainees in Washington "remains within the State's purview," and "[t] he State has an interest in effectuating its own health and safety laws." *GEO III*, 2026 WL 1983207, at *13. GEO cannot show the district court erred.

GEO is unilaterally blocking the Department's ability to enforce two laws designed to protect the public health. Courts have recognized that a court injunction against a state law is an irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation omitted)). It follows, then, that GEO's cavalier refusal to permit inspections in the face of state law, without *any* court authority, irreparably harms the State's sovereign interest in enforcing its law.

GEO's blockade of state inspectors also risks irreparable harm to the wellbeing of GEO's detainees and the broader community. As detailed above, the Department has received thousands of complaints of inhumane treatment within Washington's borders—ranging from inedible and insufficient food, to filthy rooms, to detainees being forced to wear soiled clothing, to mental health needs going unmet leading to a rash of suicide attempts. If even a fraction of these complaints are true, it means that Washingtonians are suffering and that GEO employees and released detainees are at elevated risk of spreading communicable diseases through their communities. 2-ER-131. Yet GEO is blocking the Department from even investigating. This is intolerable in a free society. And these harms will continue—and get worse—as long as GEO blocks access to basic state oversight.

If the Department finds that conditions within GEO's facility indeed threaten public health, the Department expects to work with GEO to address those issues and ensure that detainees are afforded basic safety and health while detained. Absent even an inspection, detainees are forced to endure inhumane conditions without any hope of reprieve.

GEO responds that "the State has not shown existing processes to be inadequate[.]" Opening Br. 69. But the sheer number and severity of complaints belies any notion that state oversight is superfluous. Moreover, the sovereign harms

to Washington from being denied the ability to enforce its own laws can only be remedied via an injunction.

GEO misses the mark in claiming that *it* will be harmed by an injunction because it will risk violating its contract with ICE. *Id.* at 68. As explained throughout, this is wrong because GEO's contract does not forbid it from following state law. Moreover, as the district court found, this argument is "a red herring" because "[a] Court Order preliminarily enjoining GEO prevails over the consequences of any potential breach of contract." *GEO III*, 2026 WL 1983207, at *13. Any speculative friction between GEO and ICE stemming from GEO being ordered to follow the law "does not rise to the level required to persuade the Court not to enter a preliminary injunction against GEO." *Id.*

### C. The Balance of Equities and Public Interest Clearly Favor Oversight of GEO's Tacoma Facility

The final two *Winter* factors—the balance of equities and the public interest—also tip sharply in the State's favor.

The Department's statutory duty to preserve public health, including detainee health and safety, is plainly in the public interest. Wash. Rev. Code §§ 43.70.005, .130(3). As this Court confirmed, "health and safety" risks to immigrant detainees are a critical part of the preliminary injunction analysis in suits involving conditions at private detention facilities. *Roman v. Wolf*, 977 F.3d 935, 942-44 (9th Cir. 2020). That is because "adverse effects on the health and welfare of the immigrant as well

as general population" are inconsistent with the "equities and public interest[.]" *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020). Indeed, evidence of "egregious conditions in facilities housing civil detainees" should weigh significantly in the analysis. *California*, 921 F.3d at 894 (citation modified); *see also Roman*, 977 F.3d at 944 (concluding "that the equities and public interest tipped in . . . favor" of immigrant detainees challenging facility's failure to implement COVID protocols).

Additionally, Department inspections further the public interest by increasing facility transparency and accountability. *See, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 166 (5th Cir. 2020) ("the public interest favors having politically accountable officials . . . determine how to allocate resources[ ]" in the prison context). GEO's efforts to shield its activities from scrutiny undermine the health and safety of Washingtonians and the public's interest in transparency.

As the public interest and equities tip sharply in favor of the Department's requested injunction, this Court should not impair the State's inherent and broad power to promote public health, safety, and welfare. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991); *Wash. Dep't Lab. & Indus.*, 2024 WL 3250426, at *12.

### D. The District Court's Injunction Complies with Federal Rule 65

Finally, GEO contends the district court violated Federal Rule 65(d) by failing to specify what "ICE-controlled administrative and medical areas" are excluded from its injunction. Opening Br. 70. This is a makeweight argument. The district court's opinion clearly identifies the "ICE-controlled administrative . . . areas" as the "ICE facilities" specifically described in GEO's contract. *GEO III*, 2026 WL 1983207, at *7 (citing 3-ER-537). Similarly, GEO's contract refers to "medical space," "areas where medical . . . services are provided," "medical facilities," "medical clinic," and directs GEO to "review ICE Health Services Design Standards for all administrative and medical space requirements." 3-ER-474, 478, 484, 490. So, if GEO is unsure what the medical space in its own facility is, it knows where to look.

## VII. CONCLUSION

This Court should affirm the district court.

RESPECTFULLY SUBMITTED this 8th day of September 2026.

NICHOLAS W. BROWN
*Attorney General*

/s/Andrew Hughes
ELLEN RANGE, WSBA No. 51334
ANDREW HUGHES, WSBA No. 49515
MINA SHAHIN, WSBA No. 46661
*Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Ellen.Range@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Mina.Shahin@atg.wa.gov

MARSHA CHIEN, WSBA No. 47020
*Worker Rights Unit Chief*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Marsha.Chien@atg.wa.gov

CRISTINA SEPE, WSBA No. 53609
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for State Appellee*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4450, 26-4454

I am the attorney or self-represented party.

**This brief contains** 13,998 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Andrew Hughes **Date** 09/08/2026
*(use "s/[typed name]" to sign electronically-filed documents)*