**Nos. 26-4450, 26-4454**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

WASHINGTON DEPARTMENT OF HEALTH,
*Plaintiff–Appellee,*
v.
THE GEO GROUP, INC.,
*Defendant–Appellant.*

---

THE GEO GROUP, INC.,
*Plaintiff–Counter-Defendant–Appellant,*
v.
ROBERT W. FERGUSON, NICHOLAS W. BROWN,
*Defendants–Counter-Claimants–Appellees.*

---

On Appeal from the U.S. District Court, W. District of Washington
The Honorable Benjamin H. Settle
Case Nos. 3:24-cv-05639-BHS, 3:23-cv-05626-BHS

---

# APPELLANT'S REPLY BRIEF

---

Harry J.F. Korrell
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA 98104
(206) 757-8030
harrykorrell@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Ste. 500-E
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Scott Schipma
THE GEO GROUP, INC.
4955 Technology Way
Boca Raton, FL 33431
(561) 999-7615
scott.schipma@geogroup.com

*Attorneys for The GEO Group, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

GLOSSARY ........ vii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The District Court Failed To Apply The Correct Standard For Mandatory Preliminary Injunctions. ........ 3

II. The State Cannot Show Likelihood Of Success On The Merits. ........ 4

A. The State obfuscates decisive legal and factual issues. ........ 4

1. The ICE Facility is a federal immigration detention facility. ........ 5

2. ICE—not GEO—denied the State access. ........ 6

3. ICE preserved its authority to control access in its contract with GEO. ........ 8

B. Rule 19 requires dismissal because ICE is necessary and indispensable. ........ 10

1. ICE is a “required party” under Rule 19(a)(1) ........ 11

a. Complete relief is impossible without ICE. ........ 11

b. ICE claims an interest in whether the State can access the ICE facility, which would be impaired by proceeding in its absence ........ 13

i. ICE has claimed an interest. ........ 14

ii. ICE’s legally protected interests would be impaired ........ 17

## TABLE OF CONTENTS (continued)

**Page**


c. Proceeding in ICE's absence exposes GEO to inconsistent obligations. .....20

2. Dismissal is required under Rule 19(b). .....22

3. Rule 19's public-rights exception does not apply. .....23

C. The inspection statutes violate the principle of intergovernmental immunity .....24

1. Both disputed inspection statutes directly regulate the federal government. .....25

2. RCW 70.395.050(2)(b) also discriminates against the federal government, via GEO. .....28

D. GEO is likely to prevail on its *Yearsley* defense. .....30

III. The Other *Winter* Factors Favor GEO .....34

IV. The Injunctions Violate Rule 65(d). .....35

CONCLUSION .....36

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS .....38

CERTIFICATE OF SERVICE .....39

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 26

*Boeing v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ........ 28

*Bradley, Gmelich & Wellerstein LLP v. Kay*,
2026 WL 712564 (C.D. Cal. Feb. 3, 2026) ........ 14

*Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*,
17 F.3d 1292 (10th Cir. 1994) ........ 15

*Clinton v. Babbitt*,
180 F.3d 1081 (9th Cir. 1999) ........ 19

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ........ 24

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
276 F.3d 1150 (9th Cir. 2002) ........ 21

*Disabled Rts. Action Comm. v. L.V. Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) ........ 12, 13, 21

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ........ 3

*GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025), reh'g denied,
166 F.4th 1188 (9th Cir. 2026), and pet. for cert. filed,
No. 26-71 (U.S. July 16, 2026) ........ 17, 24, 28, 31

*GEO Grp., Inc. v. Menocal*,
607 U.S. 438 (2026) ........ 12

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 12

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .......... 6, 25, 26

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) .......... 12

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......... 3

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 27, 28

*Kern-Limerick, Inc. v. Scurlock*,
347 U.S. 110 (1954) .......... 26, 27

*Kescoli v. Babbitt*,
101 F.3d 1304 (9th Cir. 1996) .......... 22, 23

*L.T. v. ICE*,
2026 WL 1270746 (C.D. Cal. May 5, 2026) .......... 16

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) .......... 27

*Maverick Gaming LLC v. United States*,
123 F.4th 960 (9th Cir. 2024) .......... 11, 22

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 27, 28

*Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*,
425 F.3d 1308 (11th Cir. 2005) .......... 17

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Northrop Corp. v. McDonnell Douglas Corp.*,
705 F.2d 1030 (9th Cir. 1983) .......... 12

*Nwauzor v. GEO Group, Inc.*,
127 F.4th 750 (9th Cir. 2025) .......... 1

*Public Utilities Commission v. United States*,
355 U.S. 534 (1958) .......... 27

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008) .......... 14, 23

*United States v. Bowen*,
172 F.3d 682 (9th Cir. 1999) .......... 14

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .......... 28

*USPS v. Ester*,
836 F.3d 1189 (9th Cir. 2016) .......... 9

*Ward v. Apple Inc.*,
791 F.3d 1041 (9th Cir. 2015) .......... 14, 19

*Wash. Dep't of Health v. GEO Grp., Inc.*,
2025 WL 2986482 (9th Cir. Oct. 23, 2025) .......... 24, 31, 33

*White v. Univ. of Cal.*,
765 F.3d 1010 (9th Cir. 2014) .......... 11, 22

*Yearsley v. W.A. Ross Constr. Co.*,
309 U.S. 18 (1940) .......... *passim*

*Yeend v. Akima Glob. Servs., LLC*,
347 F.R.D. 405 (N.D.N.Y. 2024) .......... 14, 19

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**Constitutional Provisions**

U.S. Const. Art. I, § 8, Cl. 4 .......... 26

**Federal Statutes**

6 U.S.C. § 205 .......... 20

**State Statutes**

RCW
43.70.170 .......... 25, 30
70.395.050 .......... 24, 25, 28, 29, 30

**Rules**

Fed. R. Civ. P.
19 .......... *passim*
65 .......... 2, 35

**Other Authorities**

DHS OIG, *Unannounced Inspection of ICE's Florida Soft-Sided Facility ("Alligator Alcatraz") in Ochopee, Florida*, OIG 26-22 (Sep. 11, 2026), https://perma.cc/Y8VS-YC7R .......... 20

Wash. DOH, *Chapter 246-385 WAC Draft Rule Language 2 (Word)*, https://perma.cc/QUF4-375A .......... 29

## GLOSSARY

| Item | Definition |
|---|---|
| **Department of Health *or* Department *or* DOH** | Washington State Department of Health |
| **DHS** | United States Department of Homeland Security |
| **GEO** | The GEO Group, Inc. |
| **ICE** | U.S. Immigration and Customs Enforcement |
| **ICE Facility *or* NWIPC** | The Northwest ICE Processing Center in Tacoma, Washington |
| **OIDO** | The Office of the Immigration Detention Ombudsman, part of DHS |

## INTRODUCTION

As the Solicitor General explained to the Supreme Court two weeks ago—in recommending that the Court grant certiorari and reverse this Court's decision in *Nwauzor v. GEO Group, Inc.*, 127 F.4th 750 (9th Cir. 2025)—the State of Washington has launched an inappropriate "crusade against the federal government's use of federal contractors to enforce immigration policy." Amicus Br. of the U.S. in support of cert., *GEO Grp., Inc. v. Nwauzor,* No. 25-828, at 1 (U.S. filed Sep. 15, 2026) (*Nwauzor* Amicus Br.) (quoting *GEO Grp., Inc. v. Inslee*, 166 F.4th 1188, 1191 (9th Cir. 2026) (Bumatay, J., dissenting from denial of rehearing en banc), pet. for cert. pending, No. 26-71 (filed July 10, 2026)). As part of that crusade, the State asks this Court to bless preliminary injunctions that interfere with federal immigration policy and violate fundamental principles of federalism. It should not.

Congress instructed ICE to establish detention centers for immigrants in removal proceedings. ICE houses some detainees at the Northwest ICE Processing Center (ICE Facility), which GEO operates for ICE under its contract with ICE. ICE officers oversee all operations at the facility. Thus, as the Solicitor General explained, GEO operates "a

federal immigration detention facility," executing a uniquely federal function. *Id.* at 2. It is beyond doubt that states may not usurp federal control over federal functions. Because the preliminary injunctions at issue here enforce state laws that purport to do exactly that—by commanding access to a federal facility operated under the direct control of the federal government—they must be vacated.

## ARGUMENT

The State fails to rebut the various grounds raised by GEO on which the Court should vacate the preliminary injunctions. The district court erred in deciding the State's motions for *mandatory* injunctive relief under the less-demanding standard applicable to *prohibitory* relief. And the State cannot make even that lesser showing. It is unlikely to overcome GEO's defenses on the merits: ICE is an indispensable party under Rule 19 that cannot be joined; the State's inspection laws violate principles of intergovernmental immunity; and GEO is protected from liability for adhering to ICE's directives under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). The court erred on the other *Winter* factors. And the district court violated Rule 65(d)'s requirement that injunctions clearly define enjoined conduct.

## I. The District Court Failed To Apply The Correct Standard For Mandatory Preliminary Injunctions.

As GEO explained (Br. 24–26), the district court's injunctions should be vacated in the first instance because that court applied the wrong test—that for prohibitory injunctions, not mandatory injunctions, which are "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 & n.4 (9th Cir. 2015) (en banc).

An injunction is mandatory when it requires the enjoined party to take affirmative action altering the last uncontested status. *Id.* at 740. Here, the injunctions command GEO to "admit" State inspectors and to provide notice to facility employees. 1-ER-29, 32. That requires GEO to take *affirmative steps*, not refrain from acting. And the injunctions would change the status quo by compelling GEO to admit the inspectors over ICE's objections, something GEO has never done.

The State cannot avoid the heightened standard by relabeling this as merely an order to "stop violating the law." State Br. 20–22. What "the law" is won't be determined until final resolution of this litigation (even assuming the district court has jurisdiction to resolve the lawsuit). *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017), State Br. 21, does not help the State because the injunction there merely adjusted how

immigration officials conducted bond determinations they were already required to perform. Finally, the State's reliance on prior state inspections is misplaced. Irrespective of any prior inspection, ordering GEO to admit inspectors over ICE's objection would mandate action, not prohibit inaction. Beyond that, the prior inspections to which the State points were not conducted over ICE's objection. *See* GEO Br. 25.

## II. The State Cannot Show Likelihood Of Success On The Merits.

Even assuming the district court applied the correct test, review of the State's Brief confirms that it is not likely to succeed on the merits.

### A. The State obfuscates decisive legal and factual issues.

Before turning to the merits arguments GEO raised in its opening brief, it is worth flagging some of the misleading presentations of facts and law that infect the State's brief. In particular, the State repeatedly insists that (1) this dispute involves a private facility; (2) GEO employees, not ICE, refused state inspectors access to the facility; and (3) ICE lacks the power, under federal law and the ICE-GEO contract, to control access to the facility. None of these premises is correct. And without them, the State's argument collapses.

### 1. The ICE Facility is a federal immigration detention facility.

The State bases its entire argument on the fiction that it can regulate the ICE Facility as a private facility operated by a private actor—arguing that "GEO owns and operates" the ICE Facility as "a private detention facility," State Br. 3, and that the district court's "injunction merely prohibits GEO from blocking [state] inspectors from accessing its private facility," *id*. at 20–21. GEO does own the building in which ICE houses detainees, and ICE has contracted with GEO to provide detention services there. But in the Solicitor General's words, the ICE Facility is nonetheless a "federal immigration detention facility." *Nwauzor* Amicus Br. 2. "[T]he State does not acquire greater authority to regulate … simply because the government chooses to detain the aliens in contractor-operated facilities." *Id.* at 14; *see also* Amicus Br. of the U.S., *GEO Grp. Inc. v. Inslee*, 2024 WL 6959788, at *10 (9th Cir. July 1, 2024) (*Inslee* Amicus Br.) (noting State's "mistaken belief that principles of intergovernmental immunity do not constrain its ability to regulate DHS detention centers as long as they are operated by private federal contractors").

Congress authorized ICE to detain immigrants in removal proceedings; GEO has no independent authority to detain anyone. *See Nwauzor* Amicus Br. 15 ("Despite the private operation of the Tacoma facility, the federal immigration detainees there remain in the custody of the United States."); *see also* 3-ER-556 (§ 53.0 of GEO's contract, limiting GEO's "authority" as ICE's "Service Provider" "to space or posts that are under the charge and control of ICE"). It is irrelevant who owns the building, or whose employees physically operate locks.

Obvious examples confirm the point. A post office in a commercial strip mall is not a private facility. Nor is the U.S. Attorney's office in Tacoma, even though it occupies rented space in a commercial building. And the presence of contractors executing a federal function does not alter this analysis. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) (state cannot regulate federal facility operated by contractors).

The ICE Facility is a federal facility for federal detainees. That GEO operates it for ICE does not alchemize it into a private one.

**2. ICE—not GEO—denied the State access.**

The State grudgingly acknowledges that ICE's Assistant Field Office Director, Matthew Cantrell—the senior ICE officer at and

responsible for overseeing the ICE Facility—"took it upon himself to deny the [State] access" to the facility. State Br. 43. But the State also repeatedly questions ICE's role in that denial. The Court should recognize these obfuscations.

The State sometimes suggests that ICE and GEO jointly controlled access. State Br. 11 (alleging GEO and ICE employees decided "[t]ogether" to permit limited water testing). Other times, the State suggests it is unclear whether ICE instructed GEO how to respond to State access requests. *E.g.*, *id.* at 19 ("ICE employee's purported directive" to deny access); *id.* at 39 ("ICE employee's alleged verbal directive to GEO"). Elsewhere, the State asserts that "the ICE employee"—whom the State refuses to refer to by name or title—"never directed GEO to do anything." *Id.* at 43. And the State questions Assistant Director Cantrell's authority, making the unconnected point that only the "Contracting Officer" can modify the ICE-GEO contract. *Id.*

This is all nonsense. The State has pointed to nothing to suggest that GEO ever independently denied access. Conversely, Assistant Director Cantrell has declared under oath that *he* denied access on each occasion. 4-ER-646–48 ¶¶ 11–31.

### 3. ICE preserved its authority to control access in its contract with GEO.

The State argues that, under the ICE-GEO contract, GEO controls access to the facility. *E.g.*, State Br. 19. But authority to physically operate doors is not authority to determine who may enter. That authority is ICE's alone.

The State concedes that "ICE controls portions of GEO's Tacoma facility that house ICE staff and information" but suggests "the contract does not indicate any ICE approval or preclearance is necessary to access the remainder of the facility." State Br. 4. Not so. As GEO has explained, the contract confirms that ICE controls access to all the facility, and that ICE pre-clearance or authorization is required for such access. *See* GEO Br. 7–8.

Section 40.0 of the contract is titled "ICE/ERO *Control Over Facility Access*." 3-ER-537 (emphasis added). It provides that ICE "[p]re-clearance approvals are required for access to ICE … facilities." *Id*. It further clarifies that *all* "public contact"—which includes "visits with outsiders" and "tours, visits, or tours with visits," including by "state and local governmental agencies"—"is prohibited unless authorized in advance by" ICE. *Id.*

Section 40.0 does not say—as the State argues—that ICE has control only over ICE administrative spaces, or that ICE pre-clearance is required only for such areas. Rather, ICE reserved undivided control over "Facility Access." *See* 4-ER-646 ¶ 10 (Cantrell declaration confirming ICE held "final authority and control over access to the secure portions of" facility).

The State attempts to avoid this straightforward contractual language by stressing that the words "visits" and "tours" appear in § 40.0, but not "inspections"—despite "inspections" appearing elsewhere in the contract. State Br. 4. To the State, this means "visits" by "state and local agencies"—for which ICE preclearance is required—does not encompass "inspections" by them. *Id.* This argument fails.

*First*, the State ignores the overarching rule of § 40.0—"[p]re-clearance approval[]" is needed for *any* "access to ICE … facilities." 3-ER-537.

*Second*, the contract defines neither "visit" nor "inspection." They must therefore be given their ordinary meanings and understood in context. *USPS v. Ester*, 836 F.3d 1189, 1195 (9th Cir. 2016). As used in the contract, "visit" and "visitor" cover a broad range of people beyond the

narrow meaning the State asserts. *See, e.g.*, 3-ER-486 (using catchall "other visitors" in relation to entry and exit log for anyone but "aliens," ICE staff, GEO staff, and attorneys); 3-ER-536 (requiring GEO to notify ICE of congressional "request[s] to visit the federal facility"). And the word "inspection" appears in the contract only once in relation to non-federal inspectors—to provide that only "*ICE-approved* third-party inspectors" may "have full access to the federal facility." 3-ER-471 (emphasis added).

In sum, the State's refrain that the contract must be amended before ICE can decide who enters the ICE Facility, *e.g.*, State Br. 4–5, 35, 43, is gobbledygook. The contract already says that ICE's permission is required for access.

### B. Rule 19 requires dismissal because ICE is necessary and indispensable.

The preliminary injunctions must be vacated because the underlying claims must be dismissed under Rule 19. ICE denied the State inspectors' requests to access a federal immigration detention facility—and the State never disputes that sovereign immunity prevents joinder of ICE, *see* GEO Br. 40–41. Unable to sue ICE, the State sued GEO. But a "wall of circuit authority" compels dismissal when a

necessary sovereign party cannot be joined. *E.g. White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014); *Maverick Gaming LLC v. United States*, 123 F.4th 960, 981–82 (9th Cir. 2024). The State neither confronts this line of authority nor offers any principled basis for departing from it.

**1. ICE is a "required party" under Rule 19(a)(1).**

ICE is a "required party" under each of the three tests in Rule 19(a)(1). The State's counterarguments are makeweight.

**a. Complete relief is impossible without ICE.**

Under Rule 19(a)(1)(A), the district court could not "accord complete relief among existing parties" without ICE. *See* GEO Br. 28–33. The State insists that because GEO owns the real estate on which the ICE Facility stands and operates the facility for ICE, complete relief must be possible. State Br. 25–26. But ICE controls who enters the building, both legally and factually. The contract reserves to ICE the right to control facility access, *see* § II.A.3, *supra*; and Assistant Director Cantrell denied the State access, *see* § II.A.2, *supra*.[1] In reality, the State's dispute is with

[1] Indeed, the State acknowledges that ICE employees played a significant role in each denial, State Br. 43; *see also* 4-ER-684, and that it cannot enforce its authority in "ICE-controlled administrative and medical

ICE's refusal to allow state inspectors access. But an injunction against GEO would not bind ICE, and thus an order that GEO "admit" inspectors would afford only "partial or hollow relief." *Disabled Rts. Action Comm. v. L.V. Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004) (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir.1983)).

The State next argues that the complete-relief question somehow turns on whether GEO itself is immune from suit. State Br. 27–28 (citing *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1098 (2026); *GEO Grp., Inc. v. Menocal*, 607 U.S. 438 (2026); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022)). But federal-contractor immunity is irrelevant to the Rule 19 question. The relevant question is whether ICE—which unquestionably enjoys such immunity—is necessary for the State to receive complete relief.

The State also points to GEO's stipulation to Labor & Industries inspections as proof that GEO can permit inspections without ICE. State Br. 27. But GEO acquiesced to those inspections with the consent of ICE,

---

areas," State Br. 60. There is no legal distinction between these and other areas. They are all in the same building owned by GEO.

not despite ICE.[2] That says nothing about whether an order directed to GEO here could afford the State complete relief.

*Disabled Rights*, State Br. 25, does not help the State. There, the defendant could independently make an event accessible "with or without" the landlord's participation. *Disabled Rts.*, 375 F.3d at 880. But the ICE-GEO contract requires ICE pre-clearance for state governmental access. *See* § II.A.3, *supra*.

#### b. ICE claims an interest in whether the State can access the ICE facility, which would be impaired by proceeding in its absence.

ICE is separately a "required party" under Rule 19(a)(1)(B)(i) because of its claimed interest in this proceeding, which would be "impair[ed] or impede[d]," Fed. R. Civ. Proc. 19(a)(1)(B)(i), by proceeding in its absence. *See* GEO Br. 33–39.

[2] As the State argued in the L&I case, those inspections were pursuant to Washington's delegated power to enforce the *federal* Occupational Safety and Health Act, which GEO's contract specifically required it to allow. *See* Mot. for Prelim. Inj., *Washington v. GEO Secure Servs.,* No. 3:24-cv-05095-BHS, ECF No. 23 at 6 (W.D. Wash. Feb. 29, 2024); *see also* L&I Amicus Br., Dkt. 34.1, at 2–3 (noting L&I's inspection authority under the Washington Industrial Safety and Health Act, through which Washington executes that delegated federal power).

**i. ICE has claimed an interest.**

The State contends that ICE "has not claimed an interest" because it has not intervened or filed a statement of interest. State Br. 2, 28–30. The State leans on *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999), *Bradley, Gmelich & Wellerstein LLP v. Kay*, 2026 WL 712564, at *5 (C.D. Cal. Feb. 3, 2026), and *Yeend v. Akima Global Services, LLC*, 347 F.R.D. 405, 413 (N.D.N.Y. 2024), for the purported rule that "the absent party themselves must actively and affirmatively assert an interest." State Br. 28. This argument misreads the record; misapplies Rule 19; and ignores *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008).

As the Supreme Court recognized in *Pimentel*, a core feature of sovereign immunity is "protection from the inconvenience of suit." 553 U.S. at 865. A requirement that the sovereign formally appear would turn this protection on its head.

But even where the absent party is *not* a sovereign, this Court has never held that a declaration cannot satisfy the requirement that an absent party affirmatively claim an interest. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015) ("We need not resolve whether [a] declaration satisfies [the] requirement") (abrogated on unrelated

grounds). Indeed, the State essentially admits that, under *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994), "affidavits from the non-party" suffice. State Br. 31.

Here, ICE claimed an interest through the sworn declaration of Assistant Director Cantrell, whose declaration identified ICE's "statutory responsibilities," which "include detention of noncitizens," 4-ER-645; detailed ICE's contractual rights over facility operations, 4-ER-646 ¶¶ 9–10; confirmed that he, not GEO, denied the State's inspectors access "consistent with [ICE's] security protocols," 4-ER-647–48 ¶¶ 18, 21, 26, 30, 31; and confirmed that GEO admitting inspectors over ICE's denial would violate the ICE-GEO contract, *id.* ¶ 32.

The State argues that Cantrell "does not claim any authority to speak on behalf of ICE" and that he fails to "identify what legally protected interest of ICE's might be impaired by its absence." State Br. 30. But Cantrell is ICE's senior on-site official, and he attested to acting "within the scope of [his] responsibilities." 4-ER-645–48 ¶¶ 1, 8–10, 14–30. The State cites no authority that a senior agency official's sworn declarations are insufficient under Rule 19.

The State's reference (Br. 29) to ICE's position in other litigation—where ICE argued that GEO was the proper defendant—only reinforces GEO's point. That ICE views GEO as the proper defendant in cases challenging "day-to-day operational issues" at GEO-managed federal detention facilities, *L.T. v. ICE*, No. 5:26-cv-00322 (C.D. Cal Mar. 30, 2026), ECF No. 54 at 2, says nothing about whether ICE has a legally protected interest in *who accesses a secure federal facility*. Moreover, the court *rejected* that argument, finding that injuries alleged at federal detention facilities were fairly traceable to ICE as the "government agency … responsible for detaining" immigrants. 2026 WL 1270746, at *7 (C.D. Cal. May 5, 2026).

Finally, the State argues that the United States has not claimed an interest in this proceeding because, it suggests, the United States conceded in an amicus brief in the earlier *Inslee* appeal that "binding case law … allows for state inspections of private detention facilities." State Br. 29. (citing *Inslee* Amicus Br. *16). But the cited page of that brief merely *describes* this Court's precedent authorizing "some state inspection requirements"—limited to where those requirements "mirrored those the state applied to state and local detention facilities,

namely jails and prisons." *Inslee* Amicus Br. *16 (internal quotation marks omitted). That in no way suggests that ICE has disclaimed an interest here.

**ii. ICE's legally protected interests would be impaired.**

The State also argues that the four distinct ICE interests GEO identified in its brief (at 34–39)—which derive from ICE's own declaration and contract, *contra* State Br. 31—are not "legally protected." State Br. 30. That is wrong.[3]

***Sovereign interest.*** The State dismisses ICE's sovereign interest in immigration detention by noting this Court's prior holdings that Washington's inspection regime does not "frustrate[] the federal government's ability to detain individuals." State Br. 31 (quoting *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1123 (9th Cir. 2025)). But that was in the context of a preemption analysis. Rule 19(a)(1)(B)(i) asks whether an absent party's interest may "as a practical matter" be impaired—not

[3] The State cites *Mt. Hawley Insurance Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1311 (11th Cir. 2005), for the proposition that "unlawful interests" are not "legally protected." State Br. 31. But the assertion that ICE—or GEO—acted unlawfully assumes the final resolution of this litigation and ignores the Supremacy Clause.

whether a statute is preempted. An order requiring GEO to override ICE's access decisions impairs ICE's ability to control who enters a facility housing federal detainees. *See Nwauzor* Amicus Br. 15 (statute "directly regulates federal governmental activities, notwithstanding the fact that [GEO] (rather than ICE) operates the Tacoma facility on behalf of the federal government").

***Security interest.*** The State asserts that ICE could have no security interest because state inspectors are "trained public servants," and faults GEO for failing to identify past security breaches associated with state inspections. State Br. 32. But that is an argument about whether state inspectors pose a security *threat*, not whether ICE has a security *interest*. The contract explicitly requires pre-approval for state agencies, *see* § II.A.3, *supra*, and "background checks" for anyone approved, 4-ER-646 ¶ 13. And the fact that other inspections may have proceeded without incident, State Br. 32, does not diminish ICE's authority to assess the risk of future incidents.

***Contractual interest.*** The State contends that ICE's contractual interests do not support joinder because the State "does not seek to set aside or in any way undo GEO's contract with ICE." State Br. 33. But in

*Clinton v. Babbitt*, the State's authority, this Court explained that "a district court cannot adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the parties to that agreement." 180 F.3d 1081, 1088–89 (9th Cir. 1999). Here, the State is attacking the terms of the ICE-GEO agreement. ICE and GEO contend their contract gives ICE authority over facility access. The State disagrees. The district court sided with the State, despite lacking jurisdiction over ICE. Just as in *Clinton*, that lack of jurisdiction over a sovereign contracting party warrants dismissal.

The State's other case law fares no better. In *Ward*, this Court recognized that an "absent party may be required in an action seeking equitable relief that would prevent a defendant from fulfilling 'substantial' contractual obligations to the absent party." 791 F.3d at 1053. And the State cites *Yeend* to suggest that even forcing GEO to breach its contract is of no matter because ICE could always sue GEO. State Br. 33 (quoting *Yeend*, 347 F.R.D. at 414). But no damages could compensate *ICE* for loss of sovereign control over the facility.[4]

---

[4] The State's suggestion also implicitly concedes that GEO is indeed between a rock and a hard place, *contra* State Br. 35.

***Federal inspection regime.*** The State dismisses ICE's interest in maintaining a federal inspection process, GEO Br. 36, by claiming—on the basis of an extra-record news article—that the Office of the Immigration Detention Ombudsman "has been shuttered." State Br. 33. But regardless the scope of OIDO's current funding and operations, Congress created it as the mechanism for receiving and investigating detention complaints. 6 U.S.C. § 205(b)(1), (3). A state may not substitute its own regime.[5]

**c. Proceeding in ICE's absence exposes GEO to inconsistent obligations.**

A third—independently sufficient—reason ICE is a "required party" is that proceeding in its absence would expose GEO to "inconsistent obligations" under Rule 19(a)(1)(B)(ii). *See* GEO Br. 39–40.

The State insists GEO faces no inconsistent obligations because "nothing in GEO's contract authorizes it to ignore state law," and because "[a]n ICE officer cannot require GEO to defy a non-preempted state law." State Br. 34–35. But the State focuses on what ICE should be allowed to

---

[5] The DHS OIG also has and uses inspection authority. *See, e.g.,* DHS OIG, *Unannounced Inspection of ICE's Florida Soft-Sided Facility ("Alligator Alcatraz") in Ochopee, Florida*, OIG 26-22 (Sep. 11, 2026), https://perma.cc/Y8VS-YC7R.

do, ignoring what ICE has already done—repeatedly deny the clearance the contract requires GEO to secure before granting state inspectors access to the facility. *See* §§ II.A.2–II.A.3, *supra.* The injunctions order GEO to provide that access over ICE's denial. If GEO complies with the injunctions, it will breach its federal contract and violate ICE's security protocols. *See Dawavendewa v. Salt River Project*, 276 F.3d 1150, 1156 (9th Cir. 2002) (Rule 19(a)(1)(B)(ii) exists to prevent party from being stuck between a "rock and a hard place").

The State attempts to distinguish *Dawavendewa* on the ground that "GEO owns the Tacoma facility" and "is not in danger of eviction." State Br. 35. But *Dawavendewa* rested on "intractable, mutually exclusive alternatives" resulting from an injunction that "would not bind" an absent sovereign, 276 F.3d at 1158, not the precise consequence for breaching its contract.[6]

[6] *Disabled Rights* (State Br. 35) similarly did not consider inconsistent obligations or implicate sovereign interests of the absent party. 375 F.3d at 880–82. And unlike that case, GEO has no route to comply with both its contract and the injunctions.

### 2. Dismissal is required under Rule 19(b).

In its opening brief (at 41–46), GEO explained that dismissal is required under Rule 19(b) because joinder of ICE is infeasible. The State contends that even if ICE were a required party, "equity and good conscience" favor proceeding without ICE. State Br. 35–37. This argument is foreclosed by a "wall of circuit authority," *White*, 765 F.3d at 1028, that the State never addresses.

When the absent required party is an immune sovereign, the multifactor test under Rule 19(b) is short-circuited and compels dismissal regardless of the result of any balancing analysis. *Id.*; *see also, e.g.*, *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) ("If the necessary party is immune from suit," "immunity itself may be viewed as the compelling factor.") (cleaned up); *Maverick Gaming*, 123 F.4th at 981–82 (sovereign immunity "overcomes the lack of an alternative remedy or forum"). The State does not address this binding authority.

And even under traditional balancing, every factor favors dismissal. *See* GEO Br. 42–46. A judgment without ICE prejudices both ICE (by adjudicating its contract and actions in its absence) and GEO (by subjecting it to inconsistent obligations). The State contends that ICE

"would not be prejudiced" unless it "has an interest in concealing health and safety concerns." State Br. 36–37. But ICE's interest is in retaining sovereign authority over who enters a secure federal facility. That interest would be impaired by a court ordering access over ICE's objection, regardless of the purpose. *Pimentel* cautioned courts not to give such "insufficient weight" to the "sovereign status" of absent parties. 553 U.S. at 865.

#### 3. Rule 19's public-rights exception does not apply.

The State argues that dismissal under Rule 19(b) is inappropriate because it "seeks to vindicate public rights guaranteed by" Washington law and "seeks no relief that would alter any legal rights of ICE." State Br. 37–38. But the public-rights exception applies only where (1) the litigation seeks to vindicate a public right and (2) the requested relief does not "destroy the legal entitlements of the absent part[y]," *Kescoli*, 101 F.3d at 1311, and thus does not apply here.

First, the State's claim that it "seeks no relief that would alter any legal rights of ICE," State Br. 38, is difficult to square with what it seeks—a court order overriding ICE's access determinations and directing a federal contractor to disregard ICE's instructions. Such an

order eliminates ICE's authority to control who enters its facility—the destruction of a legal entitlement clearly outlined in ICE's contract with GEO. *See* § II.A.3, *supra*.

Furthermore, the State's foundational public-rights case, *Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988), demonstrates that the exception does not apply here. As *Burford* explained, the exception exists to allow private plaintiffs to vindicate public rights in suits *against the government* without the impracticality of joining any other private party that might be implicated by a remedy of court-ordered policy change. *See id.* at 1459. No part of that logic justifies authorizing one government (the State) to force a policy change on another government (the United States) by suing a private party (GEO).

### C. The inspection statutes violate the principle of intergovernmental immunity.

States can neither directly regulate the federal government, nor discriminate against it or its contractors. The laws at issue here do both. *See* GEO Br. 47–61. The State's counterarguments fail.[7]

---

[7] The *Inslee* panel decided that RCW 70.395.050(b)(2)'s complaint-inspection provision "does not directly regulate the federal government." 151 F.4th at 1118. But the *DOH* panel noted "uncertainties" on that question. *Wash. Dep't of Health v. GEO Grp., Inc.*, 2025 WL 2986482, at

### 1. Both disputed inspection statutes directly regulate the federal government.

The State argues that the two inspection laws—RCW 43.70.170 and 70.395.050(b)(2)—give it the right to enter the ICE Facility whenever it deems necessary. That amounts to direct regulation of the facility. *See* GEO Br. 49–56. The State cites no authority for the proposition that states may dictate who enters federal facilities, and the State is mistaken that GEO's contract or the National Detention Standards suggest otherwise. State Br. 47–56.

The State's argument ignores that the ICE Facility exists solely for the federal function of immigration detention. The Supreme Court has explained that "a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor." *Goodyear*, 486 U.S. at 181. "[T]he State does not acquire greater authority to regulate … simply because the government chooses to detain … aliens in contractor-operated facilities." *Nwauzor* Amicus Br. 14.

---

*2 (9th Cir. Oct. 23, 2025). No panel has previously addressed RCW 43.70.170. Resolving these divergent conclusions would aid the Court in arriving at a reasoned opinion.

Here, ICE uses a "contractor-operated facilit[y]," *id.*, in fulfilling its congressional mandate to detain immigrants during removal proceedings. That is a uniquely federal function. *Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (citing U.S. Const. art. I, § 8, cl. 4). The ICE Facility is, if anything, more a federal facility than the federally owned plant in *Goodyear*. It is not clear that any federal employees worked at that plant. 486 U.S. at 176–77. In contrast, many ICE employees work at the ICE Facility, directly supervising it—including the "building access control system." 3-ER-484 (§ 12.1).

But even if state law could dictate standards applicable to the ICE Facility, the inspection laws do not do that. Rather, they purport to authorize the State's physical incursion into the facility. That imposes obligations on the federal government by requiring ICE to admit State inspectors, overriding the power ICE specifically reserved to itself to decide who may enter. *See* § II.A.3, *supra*.

To be sure, the State can regulate GEO in ways it cannot regulate ICE. *See* State Br. 47. But the State applies this principle overbroadly. GEO's role regarding facility access is analogous to a contractor procuring goods for a federal agency. In *Kern-Limerick, Inc. v. Scurlock*,

the Supreme Court held that a state could not apply sales tax to a federal contractor's purchases because the United States was directly liable for the purchases, each purchase required specific federal approval, and relevant statutes envisioned use of purchasing agents. 347 U.S. 110, 120–22 (1954). Likewise here, Congress envisioned using contractors, and ICE's authorization is required to admit state inspectors, making GEO an arm of ICE performing a federal function when it operates the facility's doors.

The State also misconstrues the cases GEO cited (at 49, 53–55) that support the conclusion that the inspection laws directly regulate ICE. *See* State Br. 49–50:

- *Public Utilities Commission v. United States,* 355 U.S. 534 (1958), and *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), are not strictly preemption cases, *contra* State Br. 49. *See* 355 U.S. at 542–44 (holding that state law impermissibly restrained federal policy to negotiate shipping rates did not depend on a conflict); 352 U.S. at 188 (principal question whether state law "interfere[d] with the Federal Government's power to select contractors"). Indeed, both cases rely on *Johnson v. Maryland*, 254 U.S. 51 (1920), which the State accepts is a direct-regulation case. *See* 352 U.S. at 190; 355 U.S. at 544; State Br. 49–50.

- *Johnson* and *Mayo v. United States*, 319 U.S. 441 (1943), are not distinguishable on the ground they involved state regulation of federal property or employees, not federal contractors, *contra* State Br. 49–50. The *Mayo* Court deemed non-federal "county committees" distributing fertilizer to be federal

"instrumentalities," 319 U.S. at 443, 447–48, mirroring GEO's federal-program support. And there is no indication that *Johnson*'s holding would have differed had the mail carrier been a contractor.

- Although this Court previously distinguished *Boeing v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), and *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), *see* State Br. 50; *Inslee*, 151 F.4th at 1117–18, neither the inspection provisions at issue here nor the dispositive question who controls facility access was squarely before the panel. GEO Br. 54 n.8. Moreover, subsequent amendments to the contract and the incorporated National Detention Standards have negated any argument that the "contract explicitly orders GEO to comply with obligations imposed under state law." *Inslee*, 151 F.4th at 1117.[8]

Thus, both inspection statutes directly regulate the federal government and violate the principle of intergovernmental immunity.

#### 2. RCW 70.395.050(2)(b) also discriminates against the federal government, via GEO.

RCW 70.395.050(2)(b) also discriminates against the federal government. *See Nwauzor* Amicus Br. 12–13 (discrimination where "application of [law] reflects a novel reinterpretation of state law to target federal immigration operations").

[8] The State suggests (at 50–51) that these amendments change nothing. But the new contract plainly reserves control over facility access to ICE. *See* § II.A.3, *supra*. And the State identifies no provision of the contract that "presumes" state health laws apply to the facility—none does.

The State argues (at 52–53) that the extension of the law to one small juvenile detention facility defeats GEO's discrimination argument. But the State does not suggest it has ever inspected the juvenile facility under this provision. And the State acknowledges (at 53) that it is actively considering subjecting that facility to different rules. Its efforts to minimize that rulemaking (at 54–55) are absurd—the CR-101 specifies that the State is considering establishing an entirely "new chapter of rule" for the juvenile facility. 3-ER-465.[9]

Nor is this law saved by other inspection provisions in Washington law, *contra* State Br. 54–55. The State argues that provisions aimed at residential-treatment and civil-commitment facilities—the comparator facilities this Court designated[10]—are more intrusive than RCW 70.395.050(2)(b) because they authorize inspection of "every part" of those facilities "at any time." State Br. 54–56. But those inspections are limited to confirming compliance with two specific statutes. Similarly,

[9] The State's assertion that RCW 70.395.050(2)(b) "is not tied to any rulemaking," State Br. 54, is baseless. The State's draft rules address "investigations in accordance with RCW 70.395.050," without excluding (2)(b). *See* Wash. DOH, *Chapter 246-385 WAC Draft Rule Language 2 (Word)*, https://perma.cc/QUF4-375A.

[10] GEO maintains the proper comparators are prisons and similar facilities. *See Inslee* Amicus Br. *15–16.

RCW 43.70.170 (State Br. 55) authorizes inspections only in relation to public-health threats. RCW 70.395.050(2)(b), by contrast, authorizes inspections in response to complaints on *any* topic. The State's assurance that its health department "only investigates complaints related to health and safety," State Br. 55, is belied by the statute's text, which does not limit permissible investigation topics,[11] and by the complaint-intake form, which invites complaints about any "concerns" detainees have "about their detention." 3-ER-434.

Thus, RCW 70.395.050(2)(b) discriminates against the federal government, violating the principle of intergovernmental immunity.

### D. GEO is likely to prevail on its *Yearsley* defense.

Under *Yearsley*, GEO cannot be held liable because it is undisputed GEO followed ICE's express instructions not to admit the state inspectors. *See* GEO Br. 61–67. The State's response (at 39, 44–47) rests on the false premise that this Court's rejection of GEO's *preemption* defenses forecloses GEO's *Yearsley* defense. Not so. This Court previously held that Washington's inspection laws are not categorically displaced

---

[11] Indeed, RCW 70.395.050(1) purports to authorize inspections to determine compliance with any "other applicable state or federal statutes or rules."

merely because they apply to a federal contractor or concern an immigration detention facility. *Inslee*, 151 F.4th at 1123–24; *DOH*, 2025 WL 2986482, at *2–3. But that does not answer the distinct, fact-specific question whether GEO may be held liable for adhering to the access decisions ICE had the sole authority to make. *See DOH* at *1–2 (remanding for factual development concerning derivative sovereign immunity, including questions about who denied entry and Assistant Director Cantrell's authority over facility access).

The record developed on remand establishes GEO's defense. Assistant Director Cantrell testified that ICE retained final authority over access to secure portions of the facility; that he personally denied the state inspection requests and documented the denials; and that he acted within the scope of his ICE responsibilities. He further testified that GEO would violate its federal contract by admitting the inspectors over ICE's decision. 4-ER-645–48. Thus, this is not a case in which GEO independently decided how to accomplish a general contractual objective. The evidence is that ICE made the precise decision challenged here; GEO merely followed orders. That evidence places this case squarely within *Yearsley*.

The State attempts to avoid that evidence by characterizing the denial as the act of a single ICE employee who lacked authority to modify GEO's contract. State Br. 43. But GEO does not contend that Cantrell amended the contract. He exercised the access-control authority ICE already possessed. *See* §§ II.A.2–II.A.3, *supra*. The relevant question is not whether he was the Contracting Officer, but whether his assigned responsibilities included deciding who could enter secure portions of the facility. The contract and his sworn testimony show they do. 4-ER-645–48.

The State likewise focuses on the wrong discretion. It argues that GEO controls ingress and egress and has permitted other inspections, State Br. 40–44, but ignores the part of the contract that requires ICE "[p]re-clearance approvals … for access to ICE … facilities." 3-ER-537 (§ 40.0).

Indeed, although GEO operates the doors, it does so pursuant to ICE's direction—and ICE expressly reserves the sole authority to grant or deny access to particular entrants. In other words, GEO may open the doors, but only to whom ICE allows. Operating the doors pursuant to

ICE's orders is squarely within the type of conduct *Yearsley* protects—a federal contractor executing government directives.[12]

The contract's references to state health and safety standards, State Br. 40–42, are irrelevant. These requirements address *substantive* operating standards; they do not provide for state enforcement, let alone determine who has the authority to admit particular individuals—including state inspectors—into the facility. ICE is free to authorize state inspections. But *Yearsley* means that, if ICE does not, the State cannot target GEO with its ire.

Finally, it is circular for the State to argue (at 44–45) that, because this Court held Washington's laws are not preempted, any ICE directive inconsistent with those laws necessarily exceeds federal authority. That approach would collapse *Yearsley* into preemption even though this Court treated the defenses separately in *DOH*. GEO's position is not that ICE may generally nullify Washington law by oral directive. It is that, on the developed record, GEO did not independently choose the challenged

[12] That GEO cooperated with certain prior inspections, State Br. 43, is entirely irrelevant—the State presents no evidence that GEO did so over ICE's objection (it did not).

conduct and cannot be held liable for refusing to disobey the federal official who exercised ICE's access authority.

## III. The Other *Winter* Factors Favor GEO.

The State does not credibly articulate a likely irreparable harm that the injunctions would alleviate, the second *Winter* factor. GEO is not blocking State access, State Br. 56; ICE is. *See* § II.A.2, *supra*. An injunction against GEO thus resolves little. But other remedies are available to the State and detainees. The State may, for example, address concerns about released detainees, State Br. 57, outside the ICE Facility. It may also pursue its concerns with the federal government. And detainees can file complaints with federal authorities and courts.

Moreover, the State's sovereignty is not irreparably harmed by not enforcing its laws while this case is resolved. State Br. 56–58. Doing otherwise risks imposing laws that violate well-settled principles of federalism and squeezing GEO into an untenable choice between contempt proceedings or irreparable loss of goodwill. *See* GEO Br. 68.

The third and fourth *Winter* factors likewise favor preserving the status quo. None of the detention-conditions cases the State cites (at 58–59) addresses an injunction compelling a contractor to override a

nonparty federal custodian's access decision. Nor does the extra-record evidence offered by amici in this case—personal stories by detained immigrants—justify the injunctions. *See generally* NWIRP Amicus Br., Dkt. 31.1; La Resistencia Amicus Br., Dkt. 28.1. As NWIRP acknowledges (at 12–13), individual immigrants facing detention conditions to which they object have remedial options, including habeas corpus. Maintaining existing conditions while the Court resolves GEO's federal defenses does not disserve the public.

## IV. The Injunctions Violate Rule 65(d).

As GEO explained (at 70–72), the injunctions—even if otherwise valid—violate Rule 65(d) by leaving unclear which parts of the facility are exempt as "ICE-controlled administrative and medical areas." 1-ER-29. The State's brief proves the point.

The State points to the ICE-GEO contract to define these terms. But that belies the State's assertion that the injunctions "clearly identif[y]" the exempt areas. State Br. 60. And the contract itself further undermines the argument. The State suggests that "ICE-controlled administrative … areas" are the "ICE facilities" referenced in § 40.0 of the contract, 3-ER-537; *see* State Br. 60. But as explained above (§ II.A.3),

that contract provision governs *all secure portions* of the facility—the very portions the State seeks to inspect. And the contract does not define "medical areas." Rather—as the State notes—it refers to medical "space," "facilities," and "clinic"; "areas where medical … services are provided," State Br. 60, as well as "areas where … dental, mental and behavioral health, and intake medical screening services are provided" and "medical housing and medical isolation units." 3-ER-478. The parties must guess which of these spaces are exempt, inviting further litigation.

## CONCLUSION

This Court should vacate the preliminary injunctions.

Respectfully submitted,

/s/ David M. Gossett
David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Ste. 500-East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Harry J.F. Korrell
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA 98104
(206) 757-8030
harrykorrell@dwt.com

Scott Schipma
THE GEO GROUP, INC.
4955 Technology Way
Boca Raton, FL 33431
(561) 999-7615
scott.schipma@geogroup.com

*Attorneys for The Geo Group, Inc.*

Dated: September 29, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: https://www.ca9.uscourts.gov/filing/forms/form-8-certificate-of-compliance-briefs/*

**9th Cir. Case Number(s): 26-4450, 26-4454**

I am the attorney or self-represented party.

**This brief contains 6,998 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[●] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** /s/ *David M. Gossett* **Date:** September 29, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's Appellate Case Management System (ACMS) on September 29, 2026.

I further certify that all participants in this case are registered ACMS users and that service will be accomplished via ACMS.

Dated: September 29, 2026

*/s/ David M. Gossett*